**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**NATIONAL SOURCING, INC., PEDRO**
**L. VALDEZ,**

        Plaintiffs,

vs.                                Case No.:

**STEPHEN R. BRACCIALE, ANGELUS**
**TAM, TEK SOURCE USA, INC., and**
**SAINT ANTON CAPITAL, LLC,**

        Defendants.
_____/

## COMPLAINT

COME NOW, Plaintiffs, NATIONAL SOURCING, INC., and PEDRO L. VALDEZ, and

sue Defendants, STEPHEN R. BRACCIALE, ANGELUS TAM, TEK SOURCE USA, INC.,

SAINT ANTON CAPITAL, LLC, and allege:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff, NATIONAL SOURCING, INC. ("NATIONAL SOURCING"), is a

Florida corporation with its principal place of business in Hillsborough County, Florida.

NATIONAL SOURCING is a certified Service-Disabled Veteran Owned Small Business

("SDVOSB").   NATIONAL SOURCING provides personnel, employment, placement, and

administrative support services under contracts with entities such as the United States Department

of the Navy and the United States Army.

2.      Plaintiff, PEDRO L. VALDEZ ("VALDEZ") is an individual residing in

Hillsborough County, Florida.   VALDEZ is a partially disabled veteran of the United States

Marine Corps.  VALDEZ is currently NATIONAL SOURCING's Chief Executive Officer and holder of at least 51% of the shares of NATIONAL SOURCING.

3.     Defendant, STEPHEN R. BRACCIALE ("BRACCIALE"), is an individual residing in Hillsborough County, Florida.  At certain relevant times, BRACCIALE was an owner of 49% of NATIONAL SOURCING.

4.     Defendant, ANGELUS TAM ("TAM"), is an individual residing, upon information and belief, in Pinellas County, Florida.

5.     Defendant, TEK SOURCE USA, INC. ("TEK SOURCE"), is a Florida corporation with its principal place of business in Hillsborough County, Florida.  TAM is understood to the chief principal officer of TEK SOURCE.

6.     Defendant, SAINT ANTON CAPITAL, LLC ("SAINT ANTON"), is a Florida limited liability company with its principal place of business in Hillsborough County, Florida.

7.     This Honorable Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under, and raises questions of, federal law. This Honorable Court has subject matter jurisdiction over the related claims arising under Florida state law pursuant to 28 U.S.C. § 1367.

8.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because the events, transactions, and omissions giving rise to this civil action occurred in this Middle District of Florida, and the parties reside within the geographic bounds of this Middle District of Florida.

## GENERAL ALLEGATIONS

**I.**     **SDVOSB Certification and Controlling Law**.

9.      The Small Business Administration ("SBA") is a federal agency created in 1953 to aid, counsel, assist, and protect the interests of small business concerns, to preserve free competitive enterprise, and to maintain and strengthen the overall United States economy.

10.     The U.S. Department of Veterans Affairs ("VA"), the U.S. General Services Administration ("GSA"), the U.S. Army ("Army"), and the U.S. Navy ("Navy") award contracts worth billions of dollars to government contracting entities each year.

11.     Since 1999, the Small Business Act (Title 15, United States Code, Section 644(g)) has mandated a government-wide goal for participation by SDVOSB's in government contracting of not less than 3 percent of the total value of all prime and subcontract awards for each fiscal year.

12.     Contractors seeking to do business with the VA, the GSA, the Army, or the Navy as an SDVOSB must register electronically utilizing the Online Representations and Certification Application ("ORCA"), certifying that they are an SDVOSB.

13.     The eligibility requirements for the SBA SDVOSB contracting program utilized by the GSA, the Army, and the Navy in awarding contracts are set out in the Code of Federal Regulations (Title 13, Part 125) ("the SBA SDVOSB regulations"). The SBA SDVOSB regulations were in effect as of March 23, 2005.

14.     The eligibility requirements for the VA SDVOSB contracting program are also set out in the Code of Federal Regulations (Title 38, Part 74) ("the VA SDVOSB regulations"). The VA SDVOSB regulations were in effect as of May 19, 2008, and were amended effective February 8, 2010.

15.    Both the SBA and VA SDVOSB regulations mandate that for a corporation to qualify as an SDVOSB at least fifty-one percent of the aggregate of all stock outstanding and at least fifty-one percent of each class of voting stock outstanding be unconditionally owned by one or more service-disabled veterans.   A service-disabled veteran is a veteran with a service-connected disability.

16.    Both the SBA and VA SDVOSB regulations mandate that for a corporation to qualify as an SDVOSB, the management and daily business operations of the corporation must be controlled by one or more service-disabled veterans.  Both the SBA and VA SDVOSB regulations state that control means that both the long-term decision making and day-to-day management of the corporation are conducted by one or more service-disabled veterans.

17.    The VA SDVOSB regulations state that a non-veteran may be involved in the management and may be a stockholder of an SDVOSB, but cannot receive compensation from the corporation "in any form" that exceeds the compensation of highest ranking officer position held by the service-disabled veteran.

18.    The VA SDVOSB regulations further state that a nonveteran or entity may be considered to control, or have the power to control, an SDVOSB if a non-veteran has an equity interest in the corporation, or provides critical financial or bonding support for the corporation which directly or indirectly allows the nonveteran significantly to influence business decisions of the SDVOSB.  The VA SDVOSB regulations also state that a non-veteran may be found to control an SDVOSB through loan arrangements with the service-disabled veteran owner/operator.

## II.      Historical Ownership and Governance Structure of NATIONAL SOURCING.

19.     On or about September 18, 2002, pursuant to a written plea agreement, BRACCIALE pled guilty to wire fraud, in violation of 18 U.S.C. § 1343, et. seq., and thereafter served a sentence in federal prison.

20.     In May of 2005, subsequent to BRACCIALE's release, NATIONAL SOURCING was formed in Florida by BRACCIALE and non-party individual, JOHN D. STANTON, III ("STANTON").  Upon its formation, NATIONAL SOURCING was expressly intended to be "'Disabled Veteran' owned small business for Employment/Placement Staff Augmentation" as set forth within NATIONAL SOURCING's Articles of Incorporation.  A true and correct copy of the articles of incorporation for NATIONAL SOURCING is attached hereto as *Exhibit A*. STANTON, upon information and belief, qualified as a service-disabled veteran.  STANTON is currently serving a multi-year prison sentence for Federal income tax evasion.

21.     In a writing dated October 28, 2005, BRACCIALE represented and acknowledged to STANTON that STANTON owned 100% of NATIONAL SOURCING.  BRACCIALE further represented that BRACCIALE had loaned STANTON $58,200.00 under a non-descript loan arrangement, and that BRACCIALE had an option to take ownership of 49% of NATIONAL SOURCING, should BRACCIALE decide to forgive the loan to STANTON.  A true and correct copy of a letter signed by BRACCIALE and dated October 28, 2005, is attached hereto as *Exhibit B*.

22.     In "meeting minutes" dated December 22, 2005, and kept by the apparent shareholders of NATIONAL SOURCING at that time, BRACCIALE, TAM, and STANTON, appear to have agreed to the following:

    a.   BRACCIALE, TAM, and STANTON each owned NATIONAL SOURCING in equal shares of one-third (1/3);

    b.   STANTON would accept sole personal responsibility for all of NATIONAL SOURCING's tax liability, and report 100% ownership of NATIONAL SOURCING to the Internal Revenue Service, notwithstanding his alleged one-third (1/3) ownership share;

    c.   STANTON would not participate in the management of NATIONAL SOURCING, notwithstanding his alleged one-third (1/3) ownership share;

    d.   STANTON would be compensated only $2,500 per month, notwithstanding his alleged one-third (1/3) ownership share;

    e.   All of NATIONAL SOURCING's operating capital was loaned to NATIONAL SOURCING though BRACCIALE's non-party entity, SS REALTY, LLC.

A true and correct copy of purported meeting minutes dated December 22, 2005, is attached hereto as ***Exhibit C***.  As a result of these previously undisclosed agreements between NATIONAL SOURCING's then shareholders, STANTON, as the nominal service-disabled veteran would neither control NATIONAL SOURCING, nor be compensated commensurately with his ostensible and published status as the majority shareholder.

    23.   For fiscal year 2005, a Schedule K-1 (I.R.S. Form 1120S) attached to NATIONAL SOURCING's corporate tax return reflects that STANTON reported that he owned 100.00% of the stock in NATIONAL SOURCING, notwithstanding his undisclosed (1/3) one-third ownership share in NATIONAL SOURCING.  STANTON's inaccurate reporting of 100% ownership of NATIONAL SOURCING, at the behest of BRACCIALE and TAM, would apparently continue for a term of years thereafter.

24.    In "meeting minutes" dated December 8, 2006, and kept by the apparent shareholders of NATIONAL SOURCING at that time, BRACCIALE, TAM, and STANTON, appear to have agreed to the following:

a.    STANTON then owned 51% of the voting stock in NATIONAL SOURCING;

b.    STANTON effectively relinquished his unilateral majority and *de facto* control to the Board of Directors, two-thirds (2/3) majority of which consisted of BRACCIALE and TAM.  BRACCIALE and TAM could then control all "key decisions" related to NATIONAL SOURCING, including profit distributions, as defined therein.

A true and correct copy of purported meeting minutes dates December 8, 2006, is attached hereto as ***Exhibit D***.  Again, as a result of these previously undisclosed agreements between NATIONAL SOURCING's then shareholders, STANTON, as the nominal service-disabled veteran would not lawfully control NATIONAL SOURCING, or its distribution.

25.    In a writing dated November 5, 2007, STANTON, BRACCIALE, and TAM, apparently signed a purported "Amended Corporate Partnership Agreement" providing, *inter alia*, that:

a.    Net profits would be split in equal thirds between STANTON, BRACCIALE, and TAM;

b.    STANTON would own 51% of NATIONAL SOURCING, and BRACCIALE and TAM would each respectively own 24.5% of NATIONAL SOURCING; and

      c.   STANTON would accept sole personal responsibility for all of NATIONAL SOURCING's tax liability, and report 100% ownership to the Internal Revenue Service, notwithstanding his alleged one-third (1/3) ownership share.

A true and correct copy of the purported "Amended Corporate Partnership Agreement" is attached hereto as ***Exhibit E***.   Again, a result of these previously undisclosed agreements between NATIONAL SOURCING's then shareholders, STANTON, as the nominal service-disabled veteran would neither control NATIONAL SOURCING, nor be compensated commensurately with his status as the nominal majority shareholder.

26.    On November 23, 2009, STANTON testified in unrelated proceedings under oath that he had never received any distributions, dividends, or profits from NATIONAL SOURCING, in spite of his ownership interest.

27.    On or about October 18, 2010, corporate records reflect that BRACCIALE exchanged his ownership interest in TEK SOURCE for TAM's ownership interest in NATIONAL SOURCING.  As a result of the transaction, BRACCIALE would thereafter purport to own 49% of NATIONAL SOURCING, and STANTON would own the remaining 51% of NATIONAL SOURCING.

28.    On or about March 24, 2011, non-party individual, MARC J. WOLFSON ("WOLFSON"), a disabled veteran, entered a share purchase agreement under which WOLFSON agreed to purchase STANTON's 51% of the shares in NATIONAL SOURCING for an inflated and arbitrary price of $5,100,000.00.  WOLFSON apparently later agreed to pay STANTON the same purchase price for the shares through a promissory note given to STANTON.  Subsequently, STANTON assigned the said promissory note in STANTON's favor to SAINT ANTON, of which BRACCIALE was then president, and owns as of this date.    The purchase price paid by

WOLFSON at $5,100,000.00 was arbitrary, unsupported, and unsupportable based on NATIONAL SOURCING's financial data contemporaneous to that time.

29.     Additionally, there is no evidence that SAINT ANTON ever extended any credit, or actually tendered funds, or other consideration to STANTON or another party in exchange for his shares.  Therefore, WOLFSON's purchase of STANTON's shares would appear to be a sham transaction with no economic substance or underlying consideration.  Such a "loan" arrangement would also appear to be a facial violation of the SBA regulation 13 C.F.R. § 124.106, which states, in relevant part, that a person may be found to exercise control over a company if he or she "provides critical financing" to the company or exercises control "through loan arrangements."  It was through such specious loan arrangements that BRACCIALE, under the guise of SAINT ANTON, could extract a disproportionate share of profits from NATIONAL SOURCING, and exercise *de facto* control and leverage over NATIONAL SOURCING's majority shareholders.

30.     Also on or about March 24, 2011, non-party, RICHARD STANTON, a relative of STANTON, entered a share purchase agreement under which RICHARD STANTON agreed to purchase BRACCIALE's 49% of the shares in NATIONAL SOURCING for $4,900,000.00.  RICHARD STANTON also apparently later agreed to pay BRACCIALE the purchase price for the shares under a promissory note to BRACCIALE.

31.     On December 6, 2011, purported minutes of the special meeting of NATIONAL SOURCING's shareholders reflect that WOLFSON raised concerns regarding communications from the VA reflecting that NATIONAL SOURCING was in danger of losing its listing with the VA as a "VetBiz" vendor.  As part of addressing this issue, the shareholders authorized WOLFSON to terminate the existing "Administrative Services Agreement" between NATIONAL

SOURCING and TEK SOURCE.  A true and correct copy of purported meeting minutes dated December 6, 2011, is attached hereto as **Exhibit F**.

32.     On or about January 15, 2012, BRACCIALE signed a member status report for SAINT ANTON, under which BRACCIALE reported to SAINT ANTON's membership that BRACCIALE valued the entirety of NATIONAL SOURCING was worth $4,000,000.00, in spite of an "independent valuation" of NATIONAL SOURCING on December 31, 2010, establishing a value of "$1.75 - $2.00" million dollars.

33.     On April 9, 2012, RICHARD STANTON transferred and assigned his 49% of the shares in NATIONAL SOURCING to VALDEZ.

34.     In and around April of 2013, BRACCIALE and VALDEZ discussed VALDEZ taking majority ownership in NATIONAL SOURCING, as a qualified disabled veteran. BRACCIALE represented to VALDEZ that a valuation of NATIONAL SOURCING at $10 million was fair and reasonable based on projections.   BRACCIALE further represented that NATIONAL SOURCING was then, and at all times had been, a duly qualified and compliant SDVOSB.  VALDEZ, by virtue of the trust and confidence he reposed in BRACCIALE, and due to BRACCIALE's extensive historical involvement with NATIONAL SOURCING, relied upon BRACCIALE's representations.

35.     On or about April 25, 2013, WOLFSON transferred and assigned his 51% of the shares in NATIONAL SOURCING to VALDEZ.  As of the consummation of the same transaction with WOLFSON, VALDEZ owned 100% of the shares in NATIONAL SOURCING.

36.     On or about April 25, 2013, BRACCIALE directed VALDEZ to enter a promissory note (hereinafter the "VALDEZ NOTE") in the principal amount of $5,100,000.00, payable to SAINT ANTON over the course of five (5) years, and secured by VALDEZ's ownership interest

in NATIONAL SOURCING.   A true a correct copy of the VALDEZ NOTE is attached hereto as **Exhibit G**.  As above, there is no evidence that SAINT ANTON actually extended any credit or tendered moneys to any party, such that there is no identifiable economic substance or consideration underlying the VALDEZ NOTE, and the VALDEZ NOTE transaction is understood to largely or wholly be a sham.  The apparent actual purpose of the VALDEZ NOTE was to allow BRACCIALE to extract disproportionate profits from NATIONAL SOURCING through interest payments, thereby avoiding and skirting the restrictions of the SBA and VA SDVOSB regulations, and further obscuring regulatory non-compliance.  The VALDEZ NOTE calls for VALDEZ to make interest only payments thereunder until April 1, 2018, when the entire principal and accrued interest will come due or "balloon."

    37.    Also on April 25, 2013, VALDEZ was induced to enter a purported security agreement (hereinafter the "SECURITY AGREEMENT") under which SAINT ANTON retained a security interest substantially all of NATIONAL SOURCING's assets to secure VALDEZ's performance under the VALDEZ NOTE. A true and correct copy of the SECURITY AGREEMENT is attached hereto as **Exhibit H**.

    38.    Also on April 25, 2013, VALDEZ was induced to enter a stock pledge agreement (hereinafter the "STOCK PLEDGE") under which VALDEZ pledged all of his shares in NATIONAL SOURCING to SAINT ANTON as further security for performance under the VALDEZ NOTE.   A true and correct copy of the STOCK PLEDGE is attached hereto as **Exhibit I.**

    39.    On or about July 10, 2013, NATIONAL SOURCING and TEK SOURCE entered an "Administrative Services Agreement" (the "ADMINISTRATIVE SERVICES AGREEMENT") under which TEK SOURCE would provide administrative services relative to

accounting, accounts receivable collections, and contract administration to NATIONAL SOURCING.  A true and correct copy of the ADMINISTRATIVE SERVICES AGREEMENT is attached hereto as **Exhibit J**.   Through the ADMINISTRATIVE SERVICES AGREEMENT, TEK SOURCE used its service role to the specific benefit of BRACCIALE and to the exclusion of NATIONAL SOURCING and VALDEZ and partitioned certain critical financial information from VALDEZ.   Under this arrangement, TEK SOURCE obscured key financial data from VALDEZ and in effect limited VALDEZ's access to such data.

### III.      Termination of BRACCIALE and TEK SOURCE.

40.      Also on or about July 10, 2013, NATIONAL SOURCING entered a "consulting agreement" (the "CONSULTING AGREEMENT") with BRACCIALE under which BRACCIALE was to be paid 40% of the profits from NATIONAL SOURCING's business agreed to have been generated through BRACCIALE.   Again, through such an arrangement, BRACCIALE could and did receive a disproportionate share of NATIONAL SOURCING' profits in order to avoid the restrictions of regulations controlling SDVOSB entities, such as 38 CFR 74.4(g)(3), which provides in relevant part that, "no . . .  non-veteran or immediate family member may . . .  Receive compensation from the applicant or participant in any form  . . . including dividends, that exceeds the compensation to be received by the highest officer (usually chief executive officer or president)."

41.      Notwithstanding the existence of the CONSULTING AGREEMENT in BRACCIALE's own favor, NATIONAL SOURCING is not currently able to identify the manner under which any payments to BRACCIALE as "commissions," were properly accounted for, or quantified. BRACCIALE, for his part, has claimed that the entirety of NATIONAL SOURCING's ongoing business relationships and contracts are attributable solely to BRACCIALE, such that he

entitled to 40% of every dollar of profit generated by NATIONAL SOURCING, in addition to his salary, distributions, and other compensation both direct and indirect.

42.     On or about December 31, 2013, BRACCIALE entered a share purchase agreement with VALDEZ under which BRACCIALE nominally repurchased 49% of the shares in NATIONAL SOURCING in exchange for "forgiveness" of certain obligations of loan arrangements previously made with WOLFSON which are currently understood to have been a potential sham.

43.     During times subsequent to BRACCIALE's purported re-acquisition of 49% of NATIONAL SOURCING, BRACCIALE was an employee of NATIONAL SOURCING, such that he received attendant compensation and was properly issued I.R.S. Forms W-2.

44.     Since his purchase of majority ownership in NATIONAL SOURCING, VALDEZ received periodic salary, and what "distributions" or profits VALDEZ received have been, in vast majority, immediately committed to servicing the purported debt to SAINT ANTON under the VALDEZ NOTE.

45.     At least through the VALDEZ NOTE, the ADMINISTRATIVE SERVICES AGREEMENT, the CONSULTING AGREEMENT, and/or other undisclosed arrangements, the vast majority of NATIONAL SOURCING's would-be profits were being, and have been, siphoned off to BRACCIALE in violation of controlling law.

46.     In the times leading up to, and into 2017, VALDEZ access to NATIONAL SOURCING's records was restricted, which were then held and maintained by TEK SOURCE. VALDEZ began to note tax irregularities under which disproportionate, irreconcilable, or phantom income was then being attributed to him for purposes of Federal income tax.  VALDEZ had received tax refunds apparently attributable to NATIONAL SOURCING's profits, and upon

VALDEZ inquiring as to the refunds, TAM and BRACCIALE demanded that such tax refunds to VALDEZ be immediately returned to NATIONAL SOURCING. VALDEZ further took issue with what appeared to be disproportionate distributions to BRACCIALE, and received no substantive explanation.

47.     In or around April of 2017, BRACCIALE threatened VALDEZ and represented that if VALDEZ should raise any further issues, or contest any demands or decisions by BRACCIALE or TAM, VALDEZ would be made to "leave" NATIONAL SOURCING on BRACCIALE's implied authority.

48.     On or about July 18, 2017, NATIONAL SOURCING, through VALDEZ, terminated BRACCIALE's employment with NATIONAL SOURCING, terminated NATIONAL SOURCING's ADMINISTRATIVE SERVICES AGREEMENT with TEK SOURCE, and terminated the BRACCIALE's CONSULTING AGREEMENT with NATIONAL SOURCING.

49.     After July 18, 2017, SAINT ANTON promptly claimed that the VALDEZ NOTE was in default, and threatened to execute on the collateral consisting of the majority of NATIONAL SOURCING's assets. Likewise, TEK SOURCE immediately demanded payment from NATIONAL SOURCING of alleged and purported outstanding invoices roughly claimed to be upwards of $800,000 to $1,000,000.

50.     Symptomatic of VALDEZ having limited access to NATIONAL SOURCING's financial data, in July of 2017, VALDEZ requested copies of NATIONAL SOURCING's tax records as kept by BRACCIALE's personal accountant, but has not received any such documentation.

51.     On August 4, 2017, NATIONAL SOURCING first learned that BRACCIALE receives and has received commissions from TEK SOURCE for business which BRACCIALE

generated for TEK SOURCE with other contracting parties like NATIONAL SOURCING. Such a commission structure in favor of BRACCIALE is currently understood and believed to operate to further divert NATIONAL SOURCING's corporate profits to solely BRACCIALE and/or his interests.

52.    On August 16, 2017, NATIONAL SOURCING redeemed BRACCIALE's shares in NATIONAL SOURCING, premised in substantial part upon BRACCIALE's termination as an employee of NATIONAL SOURCING, and in conformance with operative shareholder agreement for NATIONAL SOURCING.

53.    NATIONAL SOURCING and VALDEZ have each retained undersigned counsel to represent each of them in this action, and are obliged to pay their undersigned counsel attorneys' fees and costs in connection with services rendered in this action.

54.    Any conditions precedent to the bringing of this cause have occurred, have been satisfied, or have otherwise been waived.

## COUNT I – BREACH OF FIDUCIARY DUTY
### *(National Sourcing, Inc. v. Stephen R. Bracciale)*

55.    This count sets forth a claim for breach of fiduciary duty.

56.    NATIONAL SOURCING repeats, as if fully set forth here, each and every allegation in paragraphs 1-54 above.

57.    BRACCIALE had a fiduciary duty to NATIONAL SOURCING as a long-time officer, director, employee, and consulting agent of NATIONAL SOURCING, under Fla. Stat. Ch. 607, under common law, and by virtue of the trust and confidence reposed in BRACCIALE by NATIONAL SOURCING. BRACCIALE's fiduciary duties to NATIONAL SOURCING include, without limitation, good faith, acting in the best interest of the corporation, refraining from criminal acts, and refraining from obtaining an improper personal benefit.

58.     BRACCIALE breached his fiduciary duties to NATIONAL SOURCING, at least by:

    a.  Engaging in corporate transactions intended and operating to unlawfully or criminally defraud the United States government, and undertaken to the detriment of NATIONAL SOURCING; and

    b.  Engaging in corporate transactions intended and operating to divert NATIONAL SOURCING's profits solely to BRACCIALE and his interests.

59.     NATIONAL SOURCING has been damaged as a direct result of BRACCIALE's breaches of his fiduciary duties, including but not limited to loss of wrongfully diverted corporate profits and revenues, and the expenses incurred to rectify and reform the offending transactions.

60.     BRACCIALE's breach of his fiduciary duties are understood to have been willful and malicious, such that NATIONAL RESOURCING reserves the right to seek punitive damages upon obtaining leave of this Honorable Court.

WHEREFORE, Plaintiff, NATIONAL SOURCING, INC., prays for entry of judgment against Defendant, STEPHEN R. BRACCIALE, awarding damages, disgorging any profits unlawfully obtained by Defendant, STEPHEN R. BRACCIALE, and awarding interest, costs, and such other and further relief as the Court deems just and proper.

### COUNT II – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
*(National Sourcing, Inc. v. Angelus Tam, Tek Source USA, Inc.)*

61.     This count sets forth a claim for aiding and abetting breach of fiduciary duty.

62.     NATIONAL SOURCING repeats, as if fully set forth here, each and every allegation in paragraphs 1-54 above.

63.     BRACCIALE had a fiduciary duty to NATIONAL SOURCING as a long-time officer, director, employee, and consulting agent of NATIONAL SOURCING, under Fla. Stat. Ch.

607, under common law, and by virtue of the trust and confidence reposed in BRACCIALE by NATIONAL SOURCING. BRACCIALE's fiduciary duties to NATIONAL SOURCING include, without limitation, good faith, acting in the best interest of the corporation, refraining from criminal acts, and refraining from obtaining an improper personal benefit.

64.    TAM and TEK SOURCE were aware at all relevant times of BRACCIALE's fiduciary duties to NATIONAL SOURCING, some of which TAM and TEK SOURCE shared at various relevant times.

65.    TAM and TEK SOURCE materially assisted BRACCIALE in breaching his fiduciary duties to NATIONAL SOURCING, at least by:

    a.    Engaging in corporate transactions intended and operating to unlawfully or criminally defraud the United States government, and undertaken to the detriment of NATIONAL SOURCING; and

    b.    Engaging in corporate transactions intended and operating to divert NATIONAL SOURCING's profits solely to TEK SOURCE, BRACCIALE, and BRACCIALE's interests.

66.    NATIONAL SOURCING has been damaged as a direct result of TAM and TEK SOURCE materially aiding and assisting BRACCIALE in breaching of his fiduciary duties, including but not limited to loss of wrongfully diverted corporate profits, and the expenses incurred to rectify and reform the offending transactions.

67.    TAM and TEK SOURCE are understood to have acted willfully and maliciously in materially aiding and abetting BRACCIALE's breaches of his fiduciary duties, such that NATIONAL SOURCING reserves the right to seek punitive damages upon obtaining leave of this Honorable Court.

WHEREFORE, Plaintiff, NATIONAL SOURCING, INC., prays for entry of judgment against Defendants, ANGELUS TAM, and TEK SOURCE USA, INC., awarding damages, interest, and costs, disgorging any profits unlawfully obtained by Defendants, ANGELUS TAM, and TEK SOURCE USA, INC., and such other and further relief as the Court deems just and proper.

## COUNT III – DECLARATORY JUDGMENT
### *(National Sourcing, Inc. v. Stephen R. Bracciale, Tek Source USA, Inc., Angelus Tam, Saint Anton Capital, LLC)*

68.    This count sets forth a claim for declaratory judgment.

69.    This court has jurisdiction of this claim for relief pursuant to the provisions of the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202.

70.    Plaintiff repeats as if fully set forth here each and every allegation in paragraphs 1-54 above.

71.    There is an actual and present controversy between NATIONAL SOURCING and the Defendants in that:

    a.    NATIONAL SOURCING contends that by reason of the facts alleged above, the SECURITY AGREEMENT in favor of SAINT ANTON, impairing NATIONAL SOURCING's substantial assets, is void as illegal or criminal, and violative of at least 13 C.F.R. § 124.106, and 38 C.F.R. § 74.4, by virtue of its effective vesting control of NATIONAL SOURCING in BRACCIALE as a non-veteran;

    b.    NATIONAL SOURCING contends that ADMINISTRATIVE SERVICES AGREEMENT, to the extent that it has, previously unknown to NATIONAL SOURCING, operated to disproportionately divert NATIONAL SOURCING's profits and revenues to BRACCIALE and/or his interests, is void as illegal and

violative of at least 13 C.F.R. § 124.106, and 38 C.F.R. § 74.4, by virtue of its overcompensation of BRACCIALE as a non-veteran;

c.  NATIONAL SOURCING contends that to the extent that the VALDEZ NOTE illegally or criminally diverts disproportionate profits to BRACCIALE through SAINT ANTON, and vests BRACCIALE with disproportionate control over NATIONAL SOURCING, in violation of at least 13 C.F.R. § 124.106, and 38 C.F.R. § 74.4, BRACCIALE is due to restore any unlawful portion of such diverted profits to NATIONAL SOURCING.

d.  Defendants, BRACCIALE, TAM, TEK SOURCE, and SAINT ANTON contend that SECURITY AGREEMENT, ADMINISTRATIVE SERVICES AGREEMENT, and VALDEZ NOTE are enforceable, lawful, valid, and effective.

WHEREFORE Plaintiff, NATIONAL SOURCING, INC. requests entry of declaratory judgment:

i.  Declaring the SECURITY AGREEMENT, and ADMINISTRATIVE SERVICES AGREEMENT to be void and unenforceable as illegal, criminal, and/or contrary to public policy;

ii.  Awarding supplemental or other relief restoring any unlawful or disproportionate profits unlawfully obtained by Defendant, STEPHEN R. BRACCIALE, and/or SAINT ANTON CAPITAL, LLC;

iii.  Awarding Plaintiff, NATIONAL SOURCING, INC., reasonable attorney's fees and costs under the express terms of the SECURITY AGREEMENT and ADMINISTRATIVE SERVICES AGREEMENT;

iv.   Awarding such other and further relief as this Honorable Court deems just and proper.

## COUNT IV – FRAUDULENT INDUCEMENT
### *(Pedro L. Valdez v. Stephen R. Bracciale)*

72.   This count sets forth a claim for fraudulent inducement.

73.   VALDEZ repeats, as if fully set forth here, each and every allegation in paragraphs 1-54 above.

74.   On or around April 25, 2013 BRACCIALE falsely represented to VALDEZ that:

a.   NATIONAL SOURCING was then fairly and reasonably valued at $10,000,000.00, such that VALDEZ could expect to service the debt under the VALDEZ NOTE from his anticipated profits through NATIONAL SOURCING; and

b.   NATIONAL SOURCING was then, had been, and intended to be, compliant with SBA and VA SDVOSB regulations.

75.   BRACCIALE's representations were false as BRACCIALE knew and intended that VALDEZ would necessarily default under the VALDEZ note and thereby allow BRACCIALE to install another nominal disabled veteran at the head of NATIONAL SOURCING. BRACCIALE further knew that his representations were false as he had designed NATIONAL SOURCING's corporate financing and compensation structure to allow for regulatory non-compliance and to systematically deprive VALDEZ of his proportionate share of profits by diverting the same to BRACCIALE.

76.   BRACCIALE's false representations were material to VALDEZ's decision to enter the VALDEZ NOTE.

77.     BRACCIALE intended for VALDEZ to rely on his false representations to induce VALDEZ to enter the VALDEZ NOTE, SECURITY AGREEMENT, and STOCK PLEDGE, and thereby allow BRACCIALE to extract disproportionate profits from NATIONAL SOURCING.

78.     VALDEZ reasonably relied on BRACCIALE's false representations at least because of BRACCIALE's superior knowledge of the true circumstances, and the trust and confidence reposed in BRACCIALE by VALDEZ.

79.     VALDEZ has been damaged as a direct result of his reliance on BRACCIALE's false representations, at least by incurring inflated interest payments and inflated debts that he could never be expected to satisfy from the illegally diminished profits of NATIONAL SOURCING.

80.     BRACCIALE's false representations were made intentionally and with malice, such that VALDEZ reserves the right to seek an award of punitive damages upon leave of this Honorable Court.

81.     VALDEZ is entitled to an award of attorney's fees and costs under the VALDEZ NOTE in the event that VALDEZ prevails in this action.

WHEREFORE, Plaintiff, PEDRO L. VALDEZ, prays for entry of judgment against Defendant, STEPHEN R. BRACCIALE, awarding damages, attorney's fees, interest, costs, and such other and further relief as the Court deems just and proper.

Respectfully submitted on this 16th day of August, 2017.

_____

**Kevin L. Dees, Esquire**
Florida Bar No. 0015959
**Harry P. Teichman, Esquire**
Florida Bar No. 0157211
OLDER LUNDY & ALVAREZ
3014 West Palmira Avenue, Suite 202
Tampa, Florida 33629
Telephone No. (813) 254-8998
Facsimile No. (813) 839-4411
triallawyers@olalaw.com
*Counsel to Plaintiff, NATIONAL SOURCING, INC.*


*s/ Brent Britton*_____
**BRENT C.J. BRITTON, ESQ.**
Florida Bar No. 0012940
**LAUREN OREBAUGH, ESQ.**
Florida Bar No.0105451
**de la Peña & Holiday LLP**
400 North Tampa Street
Suite 2840
Tampa, FL 33602
PH: (813) 452-2006
FAX: (415) 268-8180
Primary email: *bcjb@dlphlaw.com*
Primary email: *lorebaugh@dlphlaw.com*
*Secondary email: lperez@dlphlaw.com*
*Counsel to Plaintiff, PEDRO L. VALDEZ*

and

*/s/ Scott R. Lilly*_____
**SCOTT R. LILLY, ESQ.**
Florida Bar No.0119245
*Lilly Law, PLLC, of counsel to*
**de la Peña & Holiday LLP**
400 North Tampa Street
Suite 2840
Tampa, FL 33602
*Primary email: srlilly@lilly-law.com*

*Secondary email:* ezra@lilly-law.com
*Counsel to Plaintiff, PEDRO L. VALDEZ*

and

*/s/ Brent Gordon*
**BRENT A. GORDON, ESQ.**
Florida Bar No.11902
*The Gordon Law Firm, P.A. of counsel to*
**de la Peña & Holiday LLP**
400 North Tampa Street
Suite 2840
Tampa, FL 33602
*Primary email:* bg@thegordonfirm.com
*Counsel to Plaintiff, PEDRO L. VALDEZ*