```
 1  IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
         IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
 2                       CIVIL DIVISION

 3

 4  PEDRO VALDEZ,
                                      CASE NO: 17-CA-6700
 5     Plaintiff,

 6  Vs.

 7  STEPHEN BRACCIALE; SAINT ANTON          EXHIBIT A
    CAPITAL, LLC; ANGELUS TAM;
 8  TEK SOURCE USA, INC; and
    NATIONAL SOURCING, INC.,
 9
       Defendants.
10  _____/

11

12
       PROCEEDINGS:         DEFENDANTS' EMERGENCY MOTION
13                          FOR APPOINTMENT OF RECEIVER

14     BEFORE:              Honorable Gregory P. Holder

15     DATE:                August 4, 2017

16     TIME:                10:00 a.m. to 1:20 p.m.

17     REPORTED BY:         Chere J. Barton
                            Notary Public
18                          State of Florida at Large

19     PLACE:               Hillsborough Courthouse
                            800 East Twiggs Street
20                          Tampa, Florida  33602

21

22          _____
             REGENCY REPORTING SERVICE, INC.
23            500 East Kennedy Boulevard
                     Suite 100-B
24              Tampa, Florida  33602
                   (813) 224-0224
25
```

1    A.   S.S. Realty is a company that I -- another
2    company that I own.
3    Q.   And it gets paid by Tek Source for what?
4    A.   It goes back to what we just spoke about, it gets
5    paid by -- any business that I bring to Tek Source USA,
6    me personally, I ask them to pay it to S.S. Realty to
7    keep it active.  It's now a consulting company.
8    Q.   So it's not paid to you, it's done through this
9    entity, S.S. Realty?
10   A.   Yes, and taxes are fully paid on it.  Yes.
11   Q.   What does S.S. Realty do for its business?
12   A.   Consulting.
13   Q.   Just consulting?
14   A.   Yes.
15   Q.   Does it do -- what's the reason for it having
16   realty in its name?
17   A.   Back when it was first activated, if you will, it
18   owned a piece of property in Columbus, Ohio, a hospital,
19   myself and someone else.
20   Q.   You're familiar with the promissory note and the
21   security agreement that was entered into back in April
22   of 2013 with Saint Anton Capital, Mr. Valdez and NSI.
23   Correct?
24   A.   Yes.  I mean, I don't have it in front of me, but
25   yes.

```
1     Q.   Who prepared the loan documents?
2     A.   A lawyer.
3     Q.   Which lawyer?
4     A.   Bill Dunker.
5     Q.   I'm sorry, Bill --
6     A.   Dunker, D-u-n-k-e-r.
7     Q.   And who did he represent?
8     A.   He represented -- well, I asked him to be a
9  neutral party.  I paid him.
10    Q.   You paid him individually?
11    A.   I think I -- I don't know.  I can't give you an
12 honest answer to that.
13    Q.   And you asked him to not represent any particular
14 party?
15    A.   I asked him to prepare loan documents that we
16 neutrally discussed with him.
17    Q.   When you structured the operating agreement for
18 NSI to afford Mr. Valdez control so that that could then
19 be shown to the United States government there was a
20 lawyer involved.  Yes?
21    A.   Mr. Valdez was involved as was the lawyer.
22    Q.   And who was the lawyer there?
23    A.   Mr. Valdez submitted those documents.
24    Q.   Who was the lawyer there?
25    A.   It was Bill Dunker.
```

```
 1      Q.   Mr. Dunker did that as well?
 2      A.   Yes.
 3      Q.   And who did he represent in connection with those
 4   documents?
 5      A.   NSI and Mr. Valdez in connection with those
 6   documents.
 7      Q.   Has Mr. Dunker ever represented you in connection
 8   with any matter?
 9      A.   Yes, in structuring the promissory note.
10      Q.   And isn't it true that the operating agreement,
11   promissory note relationships were all about the same
12   approximate time?
13      A.   I can't give you -- you know, there were a myriad
14   of three or four different promissory notes, so I can't
15   give you a specific answer.
16      Q.   There were provisions of the operating agreement
17   that you were trying to get greater control, and you
18   were told by the counsel that you couldn't get it.  Do
19   you remember that?
20      A.   Yes, on that.  That's why the counsel represented
21   Mr. Valdez at the time.
22      Q.   Okay.  And you're saying that Mr. Dunker's
23   communications with you would not be attorney/client
24   privilege because he didn't represent you in that
25   transaction?
```

```
 1       A.   He represented me as a shareholder.
 2       Q.   So is he your counsel or not?
 3       A.   I think he was a mutual counsel.  I don't know
 4  that he was defined as being my counsel, Valdez's
 5  counsel, the --
 6       Q.   Was Mr. Dunker involved in making the submission
 7  to the government as to the control and ownership of Mr.
 8  Valdez?
 9       A.   With Mr. Valdez.  The two of them consulted it --
10  consulted on it.  I did review some of it because I had
11  to agree to some of it as a shareholder and as a note
12  holder.
13       Q.   You made no notices of default prior to being
14  sued under any loans.  Isn't that true?
15       A.   On which note?
16       Q.   On any of the notes.  Have you given a written
17  notice of default on any of the notes --
18       A.   I have not given a written notice of -- oh, yes,
19  yes, I have.
20       Q.   When?
21       A.   It's in one of your documents.  It's for $895,000
22  on the very -- there were multiple notices of default as
23  a matter of fact, not directly on this one but on the
24  original note that I had with Valdez and Marc Wolfson I
25  submitted two to three to four notices of default prior
```

Case 8:17-cv-01950-CEH-JSS   Document 25-1   Filed 10/18/17   Page 6 of 7 PageID 307

112

```
 1  to calling the notes.
 2           That's when I restructured the loan to the
 3  benefit of Mr. Valdez and took out the principal and
 4  interest on a semi-annual basis and said this is going
 5  to be the 5.1 million dollars, and it was five percent I
 6  think is all I charged in interest, by the way, and
 7  interest was seven, eight percent at the time, nine
 8  percent and said that all you have to pay is interest
 9  for the first five years and it balloons on year five
10  because I had issued several notices of default to Mr.
11  Valdez and to Mr. Wolfson on previous loans that I had
12  given them.
13      Q.   So to be clear about that, that --
14               MR. KEHOE:   Excuse me, Judge.  He said 20
15      minutes.  I need some time for recross here if we're
16      leaving at 1:00 at counsel's request.
17               THE COURT:   How much more do you have?
18               MR. LILLY:   Two more questions.
19               THE COURT:   Two more.
20      Q.   (By Mr. Lilly)  To be clear, that notice of
21  default that you're referring to had to do with an old
22  loan --
23      A.   Right.
24      Q.   -- to Mr. Wolfson?
25      A.   Right.  No.  He and Mr. Valdez.
```

```
 1      Q.  But it had been refinanced as part of this
 2   transaction in which Mr. Valdez purchased 51 percent.
 3   Correct?
 4      A.  Yes.
 5      Q.  So you've not given any notes or any written
 6   notices of default --
 7              THE COURT:  Whoa.  Whoa.  Whoa.  Again, one
 8       at a time.  It's still Mr. Lilly's turn.
 9      Q.  (By Mr. Lilly)  You've not given any written
10   notices of default on any of the three active loans that
11   you've made the subject of your affidavit.  Correct?
12      A.  Yes, I did last week.
13      Q.  Prior to being sued?  No?  Correct?
14      A.  We just had verbal discussions.
15              THE COURT:  Cross.
16              MR. KEHOE:  Thank you, Your Honor.
17                        CROSS EXAMINATION
18   BY MR. KEHOE:
19      Q.  Now, Mr. Bracciale, the ongoing business, you put
20   -- let's just look at the amount of money that you put
21   in since 2013.  You gave Valdez a note for 5.1 million
22   dollars?
23      A.  Right.
24      Q.  And then in 2016 you gave another note to NSI for
25   a million dollars?
```