| | |
|---|---|
| **From:** | DunkerB@gtlaw.com |
| **Sent:** | Thursday, April 25, 2013 12:00 PM |
| **To:** | sbracciale@nationalsourcing.com |
| **Cc:** | backielk@gtlaw.com |
| **Subject:** | NSI Ownership Transfer Documents |
| **Attachments:** | Wolfson Satisfaction Release and Termination Agreement April 2013.doc; NSI Minutes of Special  Shareholders and Directors Meeting April 2013.DOC; Pedro Valdez Promissory Note April 2013.doc; Pedro Valdez Security AgreementApril 2013.doc; Pedro Valdez Stock Pledge Agreement April 2013.doc; Revised and Restated NSI Shareholder Agreement April 2013.doc; Wolfson - Valdez Stock Purchase and Sale Agreement April 2013.doc; Wolfson Resignation April 2013.doc |

**EXHIBIT E**

Steve, Per your direction, I have prepared the attached documents to effect the transfer of Wolfson's 51 shares of NSI to Pedro Valdez.  Please review first the first document above  entitled "Wolfson Satisfaction, Release and Termination Agreement".  I have included in that agreement an additional confidentiality provision which you requested.

Per your directions last night, the notes, etc are payable to you personally.

It is my understanding that at the present time, the Board of NSI is made up of Wolfson and Valdez and that, after the stock sale, the Board will be composed of only Valdez. That is the way the documents are drafted. Let me know if you would like any changes.

I have separated the resignation letter from the Board Minutes.  Note that both Pedro (as final board member and sole shareholder) and Marc (as former Board Member and former shareholder) are to sign the Minutes.  This reduces the possibility that Marc might contest the action in the future.

Don't forget to fill in the blanks (i.e., the signatures, the dates and the amount of the severance payment).

Do you want an employment agreement for Pedro?  Let me know.

Call with any questions.

**Bill Dunker**
Of Counsel
Greenberg Traurig, P.A. | 625 East Twiggs Street, Suite 100 | Tampa, FL 33602
Tel 813.318.5700 | Fax 813.318.5905 | Cell 813 494-0795
DunkerB@gtlaw.com | http://www.gtlaw.com

**GT GreenbergTraurig**

**Albany · Amsterdam · Atlanta · Austin · Boston · Chicago · Dallas · Delaware · Denver · Fort Lauderdale · Houston · Las Vegas · London\* · Los Angeles · Mexico City + · Miami · New Jersey · New York · Orange County · Orlando · Palm Beach County · Philadelphia · Phoenix · Sacramento · San Francisco · Shanghai · Silicon Valley · Tallahassee · Tampa · Tel Aviv^ · Tysons Corner · Warsaw ~ · Washington, D.C. · White Plains**
\* Operates as Greenberg Traurig Maher LLP   + Operates as Greenberg Traurig, S.C.   ^A Branch of Greenberg Traurig, P.A., Florida, USA   ~ Operates as Greenberg Traurig Grzesiak sp.k.
  Strategic Alliance with an Independent Law Firm
  **Milan · Rome**
PLEASE CONSIDER THE ENVIRONMENT BEFORE PRINTING THIS EMAIL.

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information. Pursuant to IRS Circular 230,

any tax advice in this email may not be used to avoid tax penalties or to promote, market or recommend any matter herein.

## SATISFACTION, RELEASE, AND TERMINATION AGREEMENT

1.      Stephen Bracciale ("Bracciale"), by execution of this Satisfaction, Release, and Termination Agreement ("Release"), represents, acknowledges and agrees that Marc J. Wolfson ("Wolfson") has, by Wolfson's execution of and compliance with the Pedro Valdez Share Purchase Agreement of even date herewith, fully satisfied all of Wolfson's obligations under the Wolfson Share Purchase Agreement, Promissory Note, Security Agreement, Stock Pledge Agreement and the NSI Shareholders Agreement, all dated on or about March 24, 2011 (collectively, the "Stock Agreements") and Wolfson's Employment and Confidentiality Agreements with National Sourcing, Inc. ("NSI"). Bracciale hereby releases Wolfson from his obligations under the Stock Agreements; provided, however, that nothing in this Release shall be deemed to forgive or release Wolfson from any of his indemnity, confidentiality, or non-solicitation obligations under any of the foregoing agreements.

2.      NSI, by execution of this Release, represents, acknowledges and agrees that, in consideration for Wolfson's execution of and compliance with the Pedro Valdez Share Purchase Agreement of even date herewith, Wolfson is released from his obligations under his Employment Agreement with NSI; provided, however, that nothing in this Release shall be deemed to forgive or release Wolfson for any of his indemnity, confidentiality or non-solicitation obligations under his Employment Agreement or any other agreement with NSI executed by Wolfson.

3.      Wolfson, by execution of this Release, acknowledges and agrees to the satisfaction and releases provided above, agrees to comply with the continuing confidentiality, indemnity, and non-solicitation obligations under the Stock Agreements and the Employment and Confidentiality Agreement referenced above, agrees that except as set forth in paragraph 4 immediately below, neither Bracciale, NSI nor any officer, director, shareholder, employee, consultant or agent of NSI owes Wolfson any amount of money or any other duty or obligation with respect to, or as a result of,(i) any of the agreements referenced in Paragraphs 1 and 2 above, (ii) Wolfson's employment with NSI, and/or (iii) the termination of Wolfson's employment with NSI, and further agrees to waive and release any claim or cause of action, known or unknown which he has, had or might have against Bracciale, NSI and/or any officer, director, shareholder, employee, consultant or agent of NSI related to any of the above referenced agreements, his employment and/or the termination of his employment with NSI.

4.      NSI agrees to pay Wolfson a severance payment in the amount of _____ (the "Severance Payment"); provided, however, that if Wolfson shall breach any of his obligations under this Release including, without limitation, the Termination Confidentiality Obligations set forth in paragraph 5 below, Wolfson agrees to pay NSI the amount of the Severance Payment within ten (10) days of NSI's written demand therefor and, further, agrees to defend and indemnify NSI, Bracciale and the officers, directors and shareholders of NSI from any loss, cost, damage, liability, claim or expense (including, without limitation, attorneys' fees) caused by or resulting from such breach.

5.      <u>Termination Confidentiality Obligations</u>.  Wolfson recognizes and acknowledges that he has had access to certain Confidential Information (as defined below) and that such information

constitutes valuable, special and unique property of NSI and/or its affiliates. Wolfson acknowledges that the Confidential Information is and shall remain the exclusive property of NSI and/or its affiliates. Wolfson agrees that he will not at any time disclose any Confidential Information to anyone outside NSI, or utilize any Confidential Information for his own benefit or the benefit of any third party without the prior written consent of NSI. Wolfson further agrees that all memoranda, disks, files, notes, records or other documents which contain Confidential Information, whether in electronic form or hard copy, and whether created by Wolfson or others, which may have come into his possession, shall be and remain the exclusive property of NSI or its affiliates. Wolfson agrees that the foregoing restrictions shall apply whether or not such information is marked "Confidential," "Proprietary" or otherwise. For purposes hereof, "Confidential Information" shall mean and include all information, whether written or oral, tangible or intangible, of a private, secret, proprietary or confidential nature, of or concerning NSI or any of its affiliates or their respective business, operations, licenses, permits, employees, employee agreements, customers and customer agreements including, without limitation, any trade-secrets or know-how, any technique, process or methodology, any sales, promotional or marketing plans, programs, techniques, practices or strategies, any expansion plans (including existing and entry into new markets), any operational or management guidelines, any cost, pricing or other financial data or projections, the identity, background, duties, responsibilities, salary or other information of any employee, customer, prospect, supplier or investor, and any other information that is to be treated as confidential because of any duty of confidentiality owed by NSI or its affiliates to a third party or any other information that NSI or its affiliates shall, in the ordinary course of business, possess or use and not release externally without restriction on use or disclosure. Notwithstanding the foregoing, the term "Confidential Information" shall not include information which (a) was known by Wolfson prior to his affiliation with NSI, (b) becomes available to Wolfson from a source other than NSI, its affiliates or parties with whom NSI or its affiliates does business that is not bound by a duty of confidentiality to NSI, its affiliates or such other parties, or (c) becomes generally available or known to the public other than as a result of its disclosure by Wolfson. In the event that Wolfson becomes, on the advice of counsel, legally obligated to disclose any Confidential Information other than to NSI or its officers or agents, Wolfson will provide NSI with prompt written notice thereof so that NSI may seek a protective order or other appropriate remedy, and Wolfson agrees to fully cooperate with and assist NSI in securing such protective order or other remedy. In the event that such protective order is not obtained, or that NSI waives compliance with the provisions of this Section to permit a particular disclosure, Wolfson will furnish only that portion of the Confidential Information which Wolfson is, on the advice of counsel, legally required to disclose.

6.   <u>Injunctive Relief</u>.  It is further understood and agreed that money damages would be an insufficient remedy for any breach of this Release by any party or its representatives and that without prejudice to the rights and remedies otherwise available to it, a party shall be entitled to equitable relief by way of injunction (without having to post any bond), specific performance or otherwise if the other party or any of its representatives breaches or threatens to breach any of the provisions of this Release.

7.     This Release shall be construed, enforced, and interpreted in accordance with the laws of the State of Florida.  Any litigation brought to interpret or enforce this Release shall be brought only in a court of competent jurisdiction located in Hillsborough County, Florida.

8.     This Release and the documents referred to herein constitute the entire agreement between Wolfson, Bracciale and NSI concerning the matters set forth herein and therein and supersede all prior agreements, representations, warranties, statements, promises, and understandings, whether written or oral, with respect to the matters covered by this Release and such other documents, except as set forth herein.   No modification, waiver, amendment, discharge, or change of this Release shall be valid unless the same is in writing and signed by the party against whom the enforcement of such modification, waiver, amendment, discharge, or change is sought.   Neither this Release, nor any of its terms, shall be interpreted against the drafting party.  The alleged invalidity of any term shall not affect the validity of any other terms. Wolfson further acknowledges that he has fully read this Release and understands its terms. Facsimile or other electronically transmitted copies of this Release and any signatures thereon shall be considered for all purposes as originals.

It is agreed this ___ day of April, 2013.


_____         _____
Name (Print):_____         STEPHEN BRACCIALE


_____
Name (Print):_____


_____         _____
Name (Print):_____         MARC J. WOLFSON


_____
Name (Print):_____


                                          NATIONAL SOURCING, INC.


                                          By: _____
                                          Pedro Valdez, Authorized Representative

**MINUTES OF SPECIAL MEETING OF
THE SHAREHOLDERS AND DIRECTORS OF
NATIONAL SOURCING, INC.**

**April __, 2013**

Marc J. Wolfson ("Wolfson"), a shareholder and director of National Sourcing Inc. (the "Corporation") and Pedro Valdez ("Valdez"), a shareholder and director of the Corporation were present at the meeting, in person, representing all shares of the common stock and all of the directors of the Corporation.

At the request of Wolfson, Valdez served as Chairman, called the meeting to order, and announced that a quorum was present and that the meeting was held pursuant to a waiver of notice of meeting by Wolfson and Valdez, whose consents to the waiver are evidenced by their execution of these minutes.

The minutes of the previous meetings of the shareholders and directors were then read and approved.

On motions duly made and seconded, the following business came before the shareholders and directors, which business was approved by unanimous consent of the shareholders and directors:

1. Wolfson advised the shareholders and board that, effective immediately, he was resigning as a director, Chief Executive Officer and employee of the Corporation and from all other positions, if any, with the Corporation and its affiliates .  Valdez thanked Wolfson for his service and thereafter moved the board and shareholders to accept such resignations of Wolfson.  After a unanimous vote of approval by the remaining board member and shareholders, Wolfson's resignation as a board member and Chief Executive Officer was accepted effective immediately and Wolfson was removed as a director and Chief Executive Officer of the Corporation and from all other positions, if any, with the Corporation and its affiliates.

2. Wolfson, as a shareholder of the Corporation, advised the Board and the shareholders that, concurrently with his resignation as a director, Chief Executive Officer and employee of the Corporation, he has sold all of his shareholdings in the Corporation to Pedro Valdez pursuant to that certain Pedro Valdez Share Purchase Agreement ("Purchase Agreement") and Wolfson requested that the Board and the shareholders approve the Purchase Agreement and his sale of his shareholdings in the Corporation to Pedro Valdez. After due consideration of the Purchase Agreement and a unanimous vote of approval, the remaining board member and shareholder approved the Purchase Agreement and the immediate transfer of  Wolfson's shareholding in the Corporation to Pedro Valdez whereupon the Purchase Agreement was consummated and Wolfson's shares in the Corporation were transferred to Pedro Valdez.

3. The Chairman moved the Board and the Shareholder to elect Pedro Valdez as Chairman of the Board of Directors and Chief Executive Officer of the Corporation. After a

unanimous vote of approval the Board and the Shareholder elected Pedro Valdez as the Chairman of the Board and Chief Executive Officer of the Corporation.

4. The Chairman moved the Board and the Shareholder to approve the Revised and Restated Shareholder Agreement to reflect the management and additional changes effected by the Board and the Shareholders. After review and due consideration of the Revised and Restated Shareholder Agreement and a unanimous vote of approval the Board and the Shareholder approved the Revised an Restated Shareholder Agreement and directed that it be inserted into the official records of the Corporation.

## ADJOURNMENT

There being no further business to come before this meeting, on motion duly made, seconded, and carried, the meeting was adjourned.

By their signatures below, each of the signatories confirm their agreement to the representations, statements, and actions set forth above as of the date set forth above.

WITNESSES                                SIGNATORIES

_____          _____

                                         Pedro Valdez, Director and Sole Shareholder

_____          _____

                                         Marc J. Wolfson, Former Director and Shareholder

# PROMISSORY NOTE

Date of Note:          April __ 2013
Principal Amount:     $5,100,000.00
Maturity Date:        April 1, 2018

| Borrower: Pedro Valdez | Lender:  Stephen Bracciale |
|---|---|
| Address:  19128 Fern Meadow Loop<br>Lutz, FL 33558 | Address: 8402 Laurel Fair Circle,<br>Suite 207<br>Tampa, FL 33610 |

FOR VALUE RECEIVED, the undersigned, Pedro Valdez, an individual (hereinafter  referred to as "Borrower") unconditionally promises to pay to the order of Stephen Bracciale, his successors and assigns, without setoff, at the Lender address indicated above, the amount of FIVE MILLION ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($5,100, 000.00), together with interest at the rate and in accordance with the payment schedule specified below, together with such other charges as may be provided for in this Promissory Note ("Note").

      1.    **Rate**.  Borrower shall pay interest at the rate of six percent (6%) per annum on the unpaid balance of the Principal Amount during the term of the Note.  In no event shall the interest charged hereunder be in excess of the legal maximum rate of interest (if any) allowed by applicable law as the law now exists or as the law may be changed in the future.  In the event that interest is charged at a rate in excess of the maximum rate allowed, any excess sums collected by Lender shall be applied as a reduction to principal, it being the intent of the Borrower and Lender that the Borrower pay no more and Lender collect no more than a lawful rate of interest.

      2.    **Payment Schedule**.  This is a five (5) year installment loan with payments as follows:

(i)     during months one through fifty-nine (1-59) there will be interest only payments in the amount of $153,000 per six month period;

(ii)     The first payment shall be due six months after the date of this Note, and payments shall continue on the same day of the month every sixth month thereafter, until April 1,  2018 when the entire outstanding principal balance of this Note, together with all accrued interest and any other charges provided for herein shall be due and payable.  If a due date falls on a bank holiday, the payment shall be due on the next consecutive business day.  All payments received hereunder shall be applied first to the payment of any expense or charges payable hereunder, then to interest due and payable, with the balance applied to principal.

      3.    **Grant Of Security Interests**.  Borrower grants to Lender a security interest in the following identified collateral to secure the payment of all of the indebtedness hereunder (the "Secured Obligations"): All of the shares held by Borrower in, and all rights held currently or in the future by Borrower to obtain any interest in the shares or assets of, National Sourcing, Inc. (the "Collateral"), as such Collateral may be further identified by the provisions of the Security Agreement executed by Borrower of even date herewith ("Security Agreement").

4.    **Representations And Warranties Regarding Collateral**.  On and as of the date of this Note, Borrower represents and warrants to Lender, that as of such date, Borrower is the true and lawful owner of the Collateral identified immediately above, having good and marketable title thereto, free and clear of any and all liens other than the lien and security interest granted to Lender hereunder, and any lien agreed to in writing by Lender (collectively, the "Permitted Liens"); provided; however that such Collateral is subject to the restrictions contained in the Pedro Valdez Share Purchase Agreement and the Revised and Restated NSI Shareholders Agreement, both of which are of even date herewith (the "Stock Agreements").  Except as set forth in the Stock Agreements and except as created or permitted by this Note, the Security Agreement and Permitted Liens, Borrower shall not create or assume or permit to exist any such lien on or against any of the Collateral and Borrower shall promptly notify Lender of any such other lien against the Collateral and shall defend the Collateral against, and take all such action as may be necessary to remove or discharge, any such lien.

5.    **Perfection Of Security Interest.**    Borrower agrees to take all actions requested by Lender and reasonably necessary to perfect, to continue the perfection of, and to otherwise give notice of, the lien granted hereunder, including, but not limited to, execution of a stock pledge agreement.

6.    **Loan Purpose**.  Borrower is using the proceeds of this loan exclusively for business purposes for payment of amounts due Lender for the sale of 51 shares of stock in National Sourcing Inc. to Borrower.  This is a business loan and is not made for household or family purposes.

7.    **Waivers; Covenants.**    Borrower, any endorser or guarantor hereof, or any other party hereto and each of them jointly and severally: (a) waive presentment, demand, protest, notice of demand, notice of intent to accelerate, notice of acceleration of maturity, notice of protest, notice of nonpayment, notice of dishonor, and any other notice required to be given under the law to Borrower in connection with the delivery, acceptance, performance, default or enforcement of this Note, any endorsement or guaranty of this Note, or any other documents executed in connection with this Note or any other note or other loan documents, including that certain Security Agreement between Borrower and Lender of even date herewith, and any other documents now or hereafter executed in connection with any obligation of Borrower to Lender including, without limitation the Stock Agreements (collectively, the "loan documents"); and (b) agree to pay, on demand, all costs and expenses of collection or defense of this Note or of any endorsement or guaranty hereof and/or the enforcement or defense of Lender's rights with respect to, or the administration, supervision, preservation, or protection of, or realization upon, any property securing payment hereof, including, without limitation, reasonable attorneys' and paralegals' fees, including fees related to any demand and/or related negotiations, suit, mediation or arbitration proceeding, out of court payment agreement, trial, appeal, bankruptcy proceedings or other proceeding, in such amount as may be determined reasonable by any arbitrator or court, whichever is applicable. NOTWITHSTANDING THE FOREGOING, THE LENDER AGREES TO GIVE TO THE BORROWER WRITTEN NOTICE OF DEFAULT, WITH THE OPPORTUNITY TO CURE, AS FOLLOWS:  TEN (10) DAYS FOR A MONETARY DEFAULT AND THIRTY (30) DAYS FOR A NON-MONETARY DEFAULT SUBJECT TO CURE; PROVIDED, HOWEVER, THAT BORROWER HAS NOT BEEN GIVEN NOTICE OF THE BREACH OF THE SAME PROVISION OF THIS NOTE WITHIN THE PRECEDING ONE HUNDRED EIGHTY (180) DAYS.  FURTHERMORE, THE ABOVE ATTORNEYS' FEE PROVISION SHALL APPLY SO THAT ANY ATTORNEYS' FEES, PARALEGALS' FEES OR COSTS INCURRED BY EITHER THE BORROWER OR THE LENDER SHALL BE REIMBURSED TO THE PREVAILING PARTY BY THE NON-PREVAILING PARTY.

8.    **Indemnification for Taxes, Bank Fees**.  Borrower agrees to promptly pay, indemnify and hold Lender harmless from all state and federal taxes, fees or charges of any kind and other liabilities with respect to or resulting from the execution, filing, and/or delivery of this Note and/or any security agreement related to this Note. Borrower shall also be responsible for payment of any wire transfer fees in

conjunction with payments on the Note.

9.    **Prepayments**.   Prepayments may be made in whole or in part at any time.   All prepayments of principal shall be applied in the inverse order of maturity, or in such other order as Lender shall determine in its sole discretion.

10.    **Delinquency Charge**.   To the extent permitted by law, a delinquency charge will be imposed in an amount not to exceed five percent (5%) of any payment that is more than ten (10) days late.

11.    **Events of Default**.   The following are events of default hereunder:  (a) the failure to pay or perform any obligation, liability or indebtedness of Borrower to Lender under this Note or the Security Agreement of even date herewith between Borrower and Lender, as and when due (whether upon demand, at maturity or by acceleration); (b) the death or disability of any shareholder of National Sourcing, Inc. ("NSI), as determined by Lender in its sole discretion; (c) the commencement of a proceeding against NSI for dissolution or liquidation, the voluntary or involuntary termination or dissolution of NSI, or the merger or consolidation of NSI with or into another entity without Lender's written consent; (e) the determination by Lender that any material representation or warranty made to Lender by Borrower in this Note or the Security Agreement or otherwise is or was, when it was made, untrue or materially misleading; (f) the failure of Borrower to timely deliver such financial statements, including tax returns, other statements of condition or other information, as Lender shall request from time to time pursuant to the provisions of the Security Agreement or otherwise; (g) the seizure or forfeiture of, or the issuance of any writ of possession, garnishment or attachment, or any turnover order for any property of Borrower or NSI ; (h) the failure to promptly pay, when due, any taxes assessed against the real and personal property that secures the payment of this Note, except as permitted in the Security Agreement; (i) the failure to keep any real and personal property that secures the payment of this Note insured against all perils, to promptly pay all premiums when due, and to name the Lender as an additional insured under said insurance policy(ies); or (j) a material adverse change occurs in Borrower's financial condition.  For the purposes of this paragraph, the term "Borrower" shall be deemed to include all corporations or other businesses in which Borrower owns and/or holds a legal or beneficial interest of fifty percent (50%) or more of its ownership interests.

12.    **Remedies upon Default**.   Subject to any applicable notice and cure provisions in this Note, whenever there is a default under this Note (a) the entire principal balance outstanding hereunder and all other obligations of Borrower to Lender (however acquired or evidenced) shall, at the option of Lender, become immediately due, and (b) to the extent permitted by law, the rate of interest on the unpaid principal balance shall be increased, at Lender's sole discretion, up to the maximum rate permitted by law (the "Default Rate").  The provisions herein for a Default Rate shall not be deemed to extend the time for any payment hereunder or to constitute a "grace period" giving Borrower a right to cure any default. Additionally, Lender shall have all rights and remedies available under the Security Agreement, as well as all rights and remedies available at law or in equity.

**Notwithstanding anything in this Note to the contrary, in the event of a Default under the Note, Borrower's liability under this Note shall be limited to the Collateral, provided that the Collateral is not encumbered in violation of the this Note or the Security Agreement, plus any legal fees or other costs of collection suffered by Borrower as a result of any Breach by Borrower of the Note, Security Agreement and/or any of the loan documents.**

13.    **Non-Waiver.**   The failure at any time of Lender to exercise any of its options or any other rights hereunder shall not constitute a waiver thereof, nor shall it be a bar to the exercise of any of its options or rights at a later date.  All rights and remedies of Lender shall be cumulative and may be pursued singly, successively or together, at the option of Lender.  The acceptance by Lender of any partial payment shall not constitute a waiver of any default or of any of Lender's rights under this Note.  No

3

waiver of any of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Lender unless the same shall be in writing, duly signed on behalf of Lender; each such waiver shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Lender or the obligations of Borrower to Lender in any other respect at any other time.

14.     **Applicable Law, Venue and Jurisdiction**.  This Note and the rights and obligations of Borrower and Lender shall be governed by and interpreted in accordance with the laws of the State of Florida.  In any litigation in connection with or to enforce this Note or any endorsement or guaranty of this Note or any loan documents, Borrower irrevocably consents to and confers personal jurisdiction on the courts of the State of Florida or the United States located within or having jurisdiction over Hillsborough County, Florida and expressly waives any objections as to venue in any such courts. Nothing contained herein shall, however, prevent Lender from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available under applicable law.

15.     **Partial Invalidity**.  The unenforceability or invalidity of any provision of this Note shall not affect the enforceability or validity of any other provision herein and the invalidity or unenforceability of any provision of this Note or of the loan documents to any person or circumstance shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

16.     **Binding Effect**.  This Note shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors, assigns, heirs and personal representatives; provided, however, that no obligations of Borrower hereunder can be assigned without prior written consent of Lender.

17.     **Controlling Document**.  To the extent that this Note conflicts with or is in any way incompatible with any other document related specifically to the loan evidenced by this Note, this Note shall control over any other such document, and if this Note does not address an issue, then each other such document shall control to the extent that it deals most specifically with an issue.

18.     **WAIVER OF TRIAL BY JURY**.   BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE, AND ANY DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER EXTENDING CREDIT TO BORROWER.

**BORROWER**:


_____

Pedro Valdez

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is entered into as of April __, 2013, by and between National Sourcing, Inc., a Florida corporation (the "Company"), Stephen Bracciale, an individual resident of the State of Florida ("Bracciale"), and Pedro Valdez, an individual resident of the State of Florida ("Valdez").

### Background

A.     Valdez and Marc J. Wolfson ("Wolfson") are parties to the Valdez Share Purchase Agreement dated of even date herewith (the "Valdez Stock Purchase Agreement"), pursuant to which Valdez agreed to purchase Wolfson's fifty-one (51) shares of stock (the "Shares") in the Company for a purchase price of Five Million One Hundred Thousand Dollars ($5,100,000.00) (the "Purchase Price").

B.     In accordance with the Valdez Stock Purchase Agreement, Valdez is paying the purchase price by executing, delivering and complying with a Promissory Note, made payable to the order of Bracciale, in the principal amount of the Purchase Price (the "Promissory Note").

C.     Company acknowledges and agrees that it will receive substantial benefit as a result of Valdez's purchase of the indicated interest in the Company due to Valdez's knowledge of and experience with the Company and due to Valdez being a duly certified Service Disabled Veteran and the holder of a Secret Security Clearance under the laws of the United States.

D.     As a material inducement for Wolfson to enter into the Valdez Stock Purchase Agreement, and for Bracciale to release Wolfson from Wolfson's obligations to Bracciale under the Stock Purchase Agreement dated March 24, 2011 ("Wolfson Stock Purchase Agreement") pursuant to which Wolfson purchased the Shares from Bracciale, the Promissory Note from Wolfson to Bracciale, the Stock Pledge Agreement and Security Agreement associated with the Wolfson Stock Purchase Agreement  and to accept the Promissory Note in consideration for Bracciale's release of Wolfson under the foregoing agreements, Valdez has agreed to: (i) execute, deliver, and comply with the Stock Pledge Agreement (defined below); and (ii) cause Company to provide, and Company has agreed to provide, the collateral security described below for the performance by Valdez of all of his obligations and liabilities under the Valdez Stock Purchase Agreement and the Promissory Note, pursuant to the terms and conditions of this Agreement.

### Terms and Conditions

For the reasons described above, in consideration of the mutual promises and covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by the parties, the Company, Valdez, and Bracciale hereby agree as follows:

1.     <u>Definitions</u>.  The following capitalized terms used in this Agreement shall have the meanings assigned to them in this Section 1, and shall include the plural as well as the singular number:

1.1    "Collateral" means all assets of the Company, whether now owned or hereafter acquired by the Company, and all products thereof, and all replacements, replenishments, additions, accessions, and substitutions thereof and the proceeds (including, without limitation, insurance proceeds, cash, bank accounts, deposits and accounts receivable), including, without limitation:

1.1.1    all instruments, documents, chattel paper, and general intangibles (including, without limitation, all software, patents, trademarks and customer lists), as such terms from time to time are defined in the Florida Uniform Commercial Code, and the sales of such items;

1.1.2    all inventory from any source or supplier;

1.1.3    all contract rights (including all client contracts and all property, casualty, and life insurance contracts owned by the Company) and other rights and privileges of the Company under any and all leases and other contracts between the Company and any third party;

1.1.4    all equipment, including, but not limited to, motor vehicles, furniture and furnishings, fixtures and office equipment; and

1.1.5    without limiting the generality of the foregoing, to the extent related to all or any part of the other Collateral, all books, correspondence, credit files, records, invoices, tapes, cards, computer runs and other papers and documents in the possession or under the control of the Company or any computer bureau or service company from time to time acting for the Company.

1.2.    "Event of Default" means the occurrence of any one or more of the following events:

1.2.1    any event of default by Valdez under the Stock Purchase Agreement;

1.2.2    any event of default under the Promissory Note;

1.2.3    the inability of the Company or the admission by the Company of its inability to pay its debts as they mature, or the insolvency of the Company;

1.2.4    the making of any levy, seizure or attachment of or on the Collateral by any third party; or

1.2.5    the appointment of a receiver or trustee for the Company or for any substantial part of its assets, if such receiver or trustee is not discharged within thirty (30) days of his appointment.

1.3    "Liability" or "Liabilities" means all monetary obligations and liabilities of Valdez to Bracciale under the Stock Purchase Agreement or the Promissory Note, whether now existing or hereafter incurred, matured or unmatured, direct or indirect,

absolute or contingent, now due or hereafter to become due, as well as all costs and reasonable expenses of collection, including reasonable attorneys' fees, paralegals' fees and expenses for any primary and appellate proceedings, incurred by Bracciale or his assignee in connection with the enforcement of the Stock Purchase Agreement, the Promissory Note or this Agreement.

1.4    "Stock Pledge Agreement" means that certain stock pledge agreement attached hereto and incorporated herein as Exhibit A pursuant to which Valdez pledges his Stock in National Sourcing, Inc. to secure his full and complete payment of the Promissory Note.

2.    Grant of Security Interest.  To further secure the full and punctual payment of all Liabilities, the Company hereby grants to Bracciale a continuing security interest in the Collateral, free and clear of any and all prior liens, encumbrances or charges whatsoever except Permitted Liens.

3.    Perfection of Security Interest.  To perfect the security interest granted above, the Company and Valdez authorize Bracciale to file financing statements in forms that are satisfactory to Bracciale, including amendments thereto and continuation statements thereof, describing the Collateral.  The Company shall, from time to time, at the request of Bracciale, execute such other documents and perform such other acts reasonably necessary or appropriate to establish and maintain a valid and perfected security interest in the Collateral, free of all other liens and claims whatsoever.  The Company hereby appoints Bracciale as its attorney-in-fact (without requiring him to act as such) to perform all acts that Bracciale deems necessary or appropriate to perfect and continue his security interest in the Collateral.  The Company hereby acknowledges that this power of attorney is coupled with an interest and is irrevocable until all Liabilities have been fully paid.

4.    Representations and Warranties.  Until such time as the Liabilities have been fully satisfied, the Company, with the full and continuing consent and approval of Valdez,   represents and warrants to Bracciale as follows:

4.1    The Company is the owner of the Collateral free from any security interest, encumbrance, or lien, except Permitted Liens, as defined below, and will defend the Collateral against all claims and demands of all persons at any time claiming the same.

4.2    No financing statement covering any Collateral or any proceeds thereof is on file in any public office, except for that which may be on file to perfect the security interest of Bracciale.

4.3    The Company is not in default with respect to any of its existing indebtedness, and the making and performance of this Agreement will not violate any laws or result in a default under or imposition of any security interest in, or lien or encumbrance upon, any of the assets of Company under any contract, agreement, or instrument to which Company is a party or by which its property is bound

4.4     The Company has the power and authority to enter into and perform this Agreement and to incur the obligations herein provided for, and has taken all actions necessary to authorize the execution, delivery, and performance of this Agreement.

4.5     This Agreement, when delivered, will be valid, binding and enforceable against the Company in accordance with its terms.

5.     <u>Affirmative Covenants</u>.  The Company, with the full and continuing consent and approval of Valdez, covenants that, until such time as all of the Liabilities have been fully satisfied and paid:

5.1     it shall pay or cause to be paid when due, all taxes, assessments, and charges or levies imposed upon the Collateral;

5.2     it shall notify Bracciale thirty (30) days in advance of any change in the location of its business, or of the establishment of any new, or the discontinuance of any existing, place of business;

5.3     it shall continuously maintain, preserve, and keep in full force and effect, its corporate existence, good standing, and its right and privilege to conduct business in Florida;

5.4     it shall permit Bracciale or his representatives at any time to inspect as frequently as reasonably requested, the Collateral, wherever located, and it shall fully and timely assist Bracciale in regard to such inspections to the extent requested by Bracciale, and

5.5     it shall maintain insurance, at full replacement cost, on the Collateral.

6.     <u>Negative Covenants</u>.  The Company covenants that, until such time as all of the Liabilities have fully paid satisfied, it will not:

6.1     increase the compensation of any employee or independent contractor of the Company, or pay any dividends to its shareholders, without the prior consent of Bracciale, which consent shall not be unreasonably withheld;

6.2     sell, transfer or otherwise dispose of all or any part of the Collateral, except for collection of accounts receivable and sales of inventory in the ordinary course of business, or

6.3     mortgage, pledge, grant, or permit to exist a security interest in or lien upon any of the Collateral.

7.     <u>Remedies Upon Default</u>.  Upon the occurrence of an Event of Default, Bracciale may declare all Liabilities to be immediately due and payable and may, at his option and without notice or demand on the Company and in addition to all the rights and remedies that accrue to a secured party under the Uniform Commercial Code as in effect in under applicable law or that are otherwise available to Bracciale under applicable law, do any one or more of the following:

(a) foreclose or otherwise endorse Bracciale's interest in any manner permitted by law, or provided for in this Agreement; or (b) sell, lease or otherwise dispose of any Collateral at one or more public or private sales, whether or not such Collateral is present at the place of sale, for cash or credit or future delivery, on such terms and in such manner as Bracciale may determine. The Company expressly waives any constitutional or other right to a judicial hearing prior to the time Bracciale takes possession or disposes of the Collateral upon default as provided in this Section 7.

8.    <u>General Provisions</u>.

8.1    <u>Choice of Law</u>.  The laws of the State of Florida (without giving effect to its conflict of law principles) shall govern all matters arising out of or relating to this Agreement and all of the transactions contemplated hereby, including, without limitation, the validity, interpretation, construction, performance and enforcement of this Agreement.   In the event of arbitration or litigation (including trial, bankruptcy, or appellate proceedings) or other legal action arising from a breach or threatened breach of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' and paralegals' fees and costs incurred.

8.2    <u>Designation of Forum</u>.  Any legal action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be brought in either the United States District Court for the Middle District of Florida or in any court of the State of Florida sitting in Hillsborough County, Florida (the "Designated Courts"). The parties consent to the exclusive personal jurisdiction of the Designated Courts for the purpose of all legal actions and proceedings arising out of or relating to this Agreement or the transactions contemplated hereby.   The parties agree that the exclusive choice of forum set forth in this Section 8.2 does not prohibit the enforcement of any judgment obtained in the Designated Courts or any other appropriate forum.

8.3    <u>Waiver of Right to Contest Venue</u>.  The parties consent to the Designated Courts as the sole and exclusive venue for any legal action or other proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.  Each party waives, to the fullest extent permitted by law, (i) any objection which he may now or later have to a Designated Court as the proper venue for any legal action or proceeding arising out of or relating to this Agreement, and (ii) any claim that any action or proceeding brought in a Designated Court has been brought in an inconvenient forum.

8.4    <u>Notice</u>.  Any notice, demand or other communication to a party that is permitted or required hereunder shall be given in writing, and shall be deemed to have been duly delivered (i) when delivered by personal delivery, (ii) three (3) days after being deposited with the United States Postal Service for mailing by first class mail, postage prepaid, certified mail, with return receipt requested (regardless of whether the return receipt is subsequently received), or (iii) one business day after being deposited with a nationally recognized courier service for overnight delivery; and in each case addressed by the sender to the recipient at the address listed below, or to such other address as party may notify the other party in writing in conformity with the provisions of this Section 8.4.

To the Company:
National Sourcing, Inc.
8402 Laurel Fair Circle, Suite 207
Tampa, FL 33610

To Bracciale:
Stephen Bracciale
8402 Laurel Fair Circle, Suite 207
Tampa, FL 33610

To Valdez
Pedro Valdez
19128 Fern Meadow Loop
Lutz, FL 33558

8.5   <u>Further Action</u>.   Each party agrees to take all further action, and to execute, acknowledge, and deliver any other documents, which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

8.6   <u>Amendment</u>.   The Agreement may be amended only by a written instrument signed by all parties hereto.

8.7   <u>No Waiver</u>.   No waiver of any provision of this Agreement, and no consent to any departure by a party from the terms and conditions of this Agreement, shall be effective unless such waiver or consent is given in writing by the party against whom the waiver is being sought (in which the case the waiver or consent shall be effective only in the specific instance, and only for the specific purpose, for which it was given).   No failure or delay by a party in exercising any right or remedy, or requiring the satisfaction of any condition under this Agreement, and no course of dealing between the parties, shall operate as a waiver or estoppel of any right or remedy of such party hereunder, or limit or prevent the subsequent enforcement of any provision of this Agreement by such party.   Further, the parties agree that the execution of this Agreement, the Stock Purchase Agreement and the other loan documents associated with this transaction do not constitute and shall not be interpreted to constitute a waiver, forgiveness or forbearance with respect to any breach of any obligation of Valdez, if any should exist, under any other agreements between Valdez and Bracciale and/or any other parties.

8.8   <u>Integration</u>.   This Agreement is the complete and exclusive expression of the agreement between the parties on the matters contained in this Agreement.   All prior and contemporaneous negotiations and agreements between the parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement.   The provisions of this Agreement may not be explained, supplemented, or qualified through evidence of trade usage or a prior course of dealings.   In entering into this Agreement, no party has relied upon any statement, representation, warranty or agreement of the other party except for those expressly contained in this Agreement or the documents attached as exhibits to this Agreement.   There are no conditions precedent

to the effectiveness of this Agreement other than those expressly stated in this Agreement.

8.9    <u>Severability</u>.  If any provision of this Agreement is determined to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force, if the essential terms and conditions and conditions of this Agreement for each party remain valid, binding and enforceable.

8.10    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties and their respective successors and permitted assignees.

8.11.    <u>Number and Gender</u>.  Except where the context requires otherwise, any reference in this Agreement to the singular includes the plural, and any reference in this Agreement to the masculine gender includes the feminine and neuter gender.

8.12    <u>Descriptive Headings</u>.  The titles and captions preceding the text of the sections of this Agreement are inserted solely for convenient reference and neither constitutes a part of this Agreement nor affect its meaning, interpretation, or effect.

8.13    <u>Computation of Time</u>.  Whenever the last day for the exercise of any privilege or the discharge of any duty under this Agreement shall fall upon Saturday, Sunday or any public or legal holiday, whether federal or of the State of Florida, the party having such privilege or duty shall have until 5:00 p.m. on the next succeeding regular business day to exercise such privilege or to discharge such duty.

8.14    <u>Counterparts, Electronic Mail and Facsimiles</u>**.**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all such counterparts together shall constitute one and the same instrument.  Facsimile or electronic mail copies of this Agreement and any signatures thereon shall be considered for all purposes as originals.

IN WITNESS WHEREOF, the parties have executed this Security Agreement on the dates indicated below, to be effective for all purposes as of April __, 2013.

PEDRO VALDEZ

_____

Pedro Valdez, An Individual

STEPHEN BRACCIALE

_____

Stephen Bracciale, An Individual

NATIONAL SOURCING, INC.

By: _____

      Pedro Valdez
      Duly Authorized Representative

**STOCK PLEDGE**

THIS AGREEMENT made this __ day of April, 2013, by and between Pedro Valdez, having an address at 10128 Fern Meadow Loop, Lutz,  FL 33558, hereinafter referred to as the "Pledgor," and Stephen Bracciale, whose address is 8402 Laurel Fair Circle, Suite 207, Tampa, Fl 33610, hereinafter referred to as the "Pledgee."

WHEREAS, the Pledgor is duly indebted to the Pledgee in the aggregate principal amount of Five Million One Hundred Thousand and 00/100 Dollars ($5,100,000.00) evidenced by a promissory note of the Pledgor of even date herewith (the "Note"); and

WHEREAS, to induce the Pledgee to loan to the Pledgor the principal amount of the Note and to induce Pledgee to release Marc J. Wolfson ("Wolfson") from his obligations to Pledgee under a promissory note, stock purchase agreement, security agreement and stock pledge agreement dated March 24, 2011, the Pledgor has agreed to pledge all of the shares he purchased from Wolfson, consisting of 51 shares (the "Shares") of National Sourcing, Inc. ("Company"), as security for the prompt payment of the Note in accordance with its terms.

NOW, THEREFORE, intending to be legally bound hereby, the parties agree as follows:

1. In consideration of the foregoing, the Pledgor pledges, delivers and assigns to the Pledgee all of the Shares, duly endorsed in blank, and does hereby appoint the Pledgee's nominee, Angelus Tam ("Nominee") the Pledgor's true and lawful attorney and in Pledgor's name, place and stead to cause the Shares to be transferred on the books of the Company to the name of the Pledgee upon the occurrence of an event of default by Pledgor under the Purchase Agreement (as defined below).

2. The Pledgor does hereby represent and warrant:

(a) That, except as pledged herein, and/or as set forth in the Pedro Valdez Share Purchase Agreement of even date herewith ("Purchase Agreement") pursuant to which Pledgor acquired the shares from Wolfson and or certain other agreements between Pledgor and Pledgee (the "Other Agreements"), the Pledgor has not sold, assigned, transferred, pledged, or granted any security interest in or otherwise hypothecated the Shares in any manner whatsoever and that, except as set forth in this Pledge, the Other Agreements, and the Purchase Agreement, the Shares are pledged herewith free and clear of any and all liens, encumbrances, pledges, restrictions, security interests and agreements;

(b) That the Pledgor has full power and authority to execute and deliver this pledge agreement and to pledge the Shares, that this Agreement constitutes the valid and binding obligation of the Pledgor enforceable in accordance with its terms, and that this pledge of the Shares is not in violation of any agreement, undertaking or obligation of the Pledgor;

(c) Pledgee's nominee, Angelus Tam, shall hold the Shares as security for the payment of the Note and will not at any time dispose of or encumber the same except as herein provided and/or in the Purchase Agreement. While the Nominee is the holder of the Shares, neither Nominee nor Pledgee shall collect dividends thereon and the Pledgor shall have the right, subject to the provisions of the Purchase Agreement and/or any applicable Shareholder Agreement, to cast any vote of the same at meetings of stockholders of the corporation, at which said stock may be entitled to vote so long as an Event of Default as defined below, has not occurred. Upon the full payment of the Note, the Pledgee shall retransfer or redeliver the Shares to the Pledgor.

3. Upon the occurrence of an Event of Default as defined below, the Nominee shall transfer possession of the Shares to Pledgee and Pledgee shall hereby and thereby be granted all of the rights and remedies accorded a secured party under the Uniform Commercial Code and may, upon ten (10) days prior written notice to the Pledgor, sell, lease or otherwise dispose of the Shares pledged hereunder, at any time or from time to time, in whole or in part, at public or private sale, without advertisement or notice of sale, all of which are hereby waived, and apply the proceeds of any such sale (a) first to the expenses of holding, preparing the collateral for sale, in arranging for the sale, selling and the like, including without limitation reasonable attorney fees and legal expenses incurred by the Pledgee (including fees and expenses of any litigation incident to any of the foregoing); (b) second to the payment of the Note and all interest accrued thereon; and (c) shall pay any excess to the Pledgor.

In the event that the proceeds of any such sale are not sufficient to pay the items listed in (a) and (b) above, then the Pledgor shall remain liable and shall pay the Pledgee any such deficiency, subject to the provisions of the Promissory Note. Any purchaser at any such sale (which term shall include the Pledgee in the case of a public sale) shall receive the Shares and all rights of redemption or other rights or claims of the Pledgor, all of which are hereby waived.

An Event of Default hereunder is defined as:

(a) The nonpayment of any installment due and owing on the Note when it has become due pursuant to the terms of the Note;

(b) The adjudication of the Pledgor as a bankrupt or insolvent, or entry of any order, remaining unstayed by appeal or otherwise for twenty (20) days, appointing a receiver or trustee for the Pledgor or for all or any of the Pledgor's properties, or the filing by or against the Pledgor of a petition seeking any of the foregoing or consenting thereto, or the filing of a petition to take advantage of any debtors' act, or making a general assignment for the benefit of creditors or admitting in writing inability to pay debts as they may mature; and

(c) Any event of default under the Note and/or the Purchase Agreement.

5. This is the entire agreement between the parties hereto and may be changed only by a written instrument signed by the party against whom any change is sought to be enforced.

6. This agreement is made in and shall be governed by and construed in accordance with the laws of the State of Florida.  Venue for any action related to this pledge shall lie exclusively in Hillsborough County, Florida. In the event of arbitration or litigation (including trial, bankruptcy, or appellate proceedings) or other legal action arising from a breach or threatened breach of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' and paralegals' fees and costs incurred.

7. This agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, personal representatives, successors and assigns.

IN WITNESS WHEREOF, the Pledgor, intending to be legally bound hereby, has executed this agreement the day and year first above written.


PLEDGOR:


_____     April _____, 2013 _____
Signature: Pedro Valdez             Date


Agreed to and accepted: _____ April ___, 2013
                        Stephen Bracciale, Pledgee            Date

### REVISED AND RESTATED
### SHAREHOLDERS AGREEMENT
### FOR
### NATIONAL SOURCING,  INC.
### A Florida Corporation

THIS REVISED AND RESTATED SHAREHOLDERS AGREEMENT (the "Agreement") is made effective this ___ day of April, 2013, by and between Pedro Valdez ("Valdez") and Marc J. Wolfson ("Wolfson") (each hereinafter individually referred to as a "Shareholder" or collectively as the "Shareholders"), and National Sourcing, Inc., a Florida corporation (hereinafter referred to as the "Corporation") and is intended to  replace in its entirety the NSI Shareholders Agreement dated March 16th, 2012.

### BACKGROUND

A.      As of the execution of this Agreement, the Corporation has 100 shares of authorized common stock outstanding as follows: Wolfson - 51 Shares and Wolfson - 49 Shares.  After execution and closing of the stock purchase agreement identified in Background Paragraphs B and C below, Wolfson will no longer be a Shareholder.

B.      Wolfson and Valdez have negotiated a stock purchase agreement pursuant to which Valdez is to purchase 51 shares of the issued and outstanding stock of the Corporation from Wolfson.

C.      The Shareholders wish to enter into this Agreement in order to set forth their relative rights and interests as they relate to the Corporation in the event that they enter into a stock purchase agreement in the general form of Exhibit A to this Agreement (the "Valdez Stock Purchase Agreement"), with the Shareholders agreeing that this Agreement shall take effect, and shall only take effect  if and when the Wolfson and Valdez execute and close on the Valdez Stock Purchase agreement in the form of Exhibit A.

E.      The Shareholders believe that this Agreement is essential for the proper and harmonious operation of the Corporation.

F.      The purpose of this Agreement is to provide for the orderly continuation of the affairs of the Corporation in the event of the death, incapacity, termination of employment of a Shareholder, or the occurrence of other events specified in this Agreement, if any.

G.      All parties intend for this Agreement to comply with applicable Florida law, including the Florida Business Corporation Act.

H.      The Shareholders are entering into this Agreement intending to be legally bound.

NOW THEREFORE, in consideration of the covenants, terms and conditions set forth below, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties agree as follows:

National Sourcing, Inc.
Revised and Restated
Shareholders Agreement
Page 2 of 16

<u>**TERMS AND CONDITIONS**</u>

1. <u>**BACKGROUND AND DEFINITIONS.**</u>  The Background set forth above is true, and, to the extent necessary to interpret this Agreement, the Background is incorporated into these Terms and Conditions by reference.  For the purposes of this Agreement, the phrase "a majority of the Shareholders" or "a majority in interest of the Shareholders" shall mean an affirmative vote, or written approval in lieu of a formal vote, of Shareholders holding at least fifty-one percent (51%) of the issued and outstanding shares of the Corporation. Notwithstanding any provision in this Agreement to the contrary, any provision of this Agreement restricting the ability of a shareholder to sell or otherwise transfer his or her shares in the Corporation in his or her sole discretion shall not apply to any shareholder who owns at least fifty one percent (51%) of the shares of the Corporation and is qualified as a service disabled veteran under the laws of the United States.

2. <u>**MANAGEMENT AND EMPLOYMENT**</u>.  As long as a Shareholder owns shares in the Corporation, and until the Promissory Note executed by the Shareholder in conjunction with his purchase of his share in the Corporation is paid in full or otherwise satisfied, the Board of Directors shall consist of Pedro Valdez.  After such notes are paid in full each Shareholder shall be entitled to one seat on the board of directors of the Corporation or, alternatively, shall be entitled to appoint one (1) person to sit on the Board.  If any of the Shareholders shall become employees of the Corporation then, if agreed upon by a majority of the Directors, any such Shareholder shall execute an employment agreement with the Corporation which shall govern their employment relationship with the Corporation.

3. <u>**LIFETIME STOCK RESTRICTIONS; RIGHT OF FIRST REFUSAL**</u>.  No Shareholder shall, during his or her lifetime, transfer, encumber, or dispose of all or any portion of his or her shares in the Corporation, except as specifically set forth in this Agreement.  Any transfers, encumbrances, or dispositions of shares which are not made in accordance with the terms of this Agreement shall be void unless approved by a vote of a majority of the Shareholders. Furthermore, any Shareholder transferring, or attempting to transfer, shares in the Corporation in violation of this Agreement, agrees to indemnify, hold harmless, and defend the Corporation and the other Shareholders from any claims or damages (including attorney and paralegal fees and court and expert witness costs) arising out of or as a result of the improper transfer, or attempted transfer, of shares of the Corporation by such Shareholder.

Until the Promissory Note identified in Exhibit A (the "Promissory Note") is paid in full, the stock restriction provisions of the respective Stock Purchase Agreements referenced above shall be effective and prevail over the terms of this Agreement.  Thereafter, the provisions of this Section 3 and the remaining provisions of this Agreement shall be in effect and prevail.

In the event that a Shareholder desires to dispose of any or all of his or her shares in the

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 3 of 16**

Corporation during his or her lifetime (the "Selling Shareholder"), the Selling Shareholder shall first offer, in writing, to sell such shares to the Corporation at the same price and on the same terms as the Selling Shareholder proposes to sell them to a third party. In his or her written offer, the Selling Shareholder shall represent and warrant to the Corporation and the remaining Shareholders that a bona fide offer was received from a third party and shall provide the remaining Shareholders with a true and complete copy of such offer or agreement, signed by such third party and the Selling Shareholder. The Corporation shall have thirty (30) days from its receipt of such offer from the Selling Shareholder (and signed copy of the third party offer) within which to purchase the shares, or a desired portion thereof, at the same price and under the same terms and conditions as those which the Selling Shareholder were to receive if the shares were sold to the third party.

Any shares not purchased by the Corporation within thirty (30) days after receipt of such signed offer, shall be available for purchase by the remaining Shareholders at the same price, each of whom shall have the right to purchase his or her proportionate share of the shares; provided, however, that if any Shareholder does not purchase his full proportionate share of the shares, the balance of the shares may be purchased by the other Shareholders proportionately, excluding the Shareholder who opted not to purchase the shares and also excluding the Selling Shareholder. As used in this section, a Shareholder's proportionate share of the shares shall equal the number of shares owned by the Shareholder at the time the shares are sought to be transferred, divided by the total number of shares owned by all of the other Shareholders, excluding the Selling Shareholder and any Shareholder who opts not to purchase pursuant to this section.

If the shares are not purchased by the remaining Shareholders within thirty (30) days of the receipt of the offer to them, the Selling Shareholder may, subject to Section 9 below, sell them to any other person qualified to own such shares under the laws of the State of Florida and not in violation of this Agreement. Any purchaser of shares of the Corporation shall become a party to, and be bound by, this Agreement.

If the Selling Shareholder has no third party offer as contemplated by this section, the Selling Shareholder may offer, in writing, to sell his or her shares to the Corporation and/or the remaining Shareholders as if the Selling Shareholder had a third party offer. In the event of an offer pursuant to the preceding sentence, the timelines and other terms of this section shall apply except that the payment shall be calculated according to the Purchase Price and Terms of Payment section, below, and there shall be no obligation on the Corporation or the remaining Shareholders to purchase the shares offered.

4. **PURCHASE ON DEATH, DISABILITY, APPROVED RETIREMENT, OR TERMINATION WITHOUT CAUSE.** This section shall apply to the sale and purchase of the shares of any Shareholder upon his or her death, disability, approved retirement, or termination of his or her employment, without cause (such death, disability, approved retirement, or termination of employment, without cause, shall be referred to individually and/or collectively as the "occurrence"

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 4 of 16**

and the Shareholder affected by the occurrence shall be referred to as the "affected Shareholder").

As used in this agreement, "disability" shall mean that the Shareholder is no longer able to work on a full-time basis for the Corporation or one of its affiliated companies because of mental or physical incapacity lasting for a period which shall end at the later to occur of one hundred twenty (120) days and/or the completion of any "elimination period" (or period of similar import) that may be established by any disability policy that may have been purchased by the Corporation or its affiliate to insure Shareholders. Successive periods of disability separated by less than thirty (30) days of substantial full-time active work are considered as one period of disability, unless the latter disability is due to an injury or sickness entirely unrelated to the causes of the earlier disability. Any Shareholder becoming disabled before reaching age 65 shall provide the Corporation with such medical records as the Corporation may reasonably require to ascertain the extent of the Shareholder's disability.

As used in this Agreement, "approved retirement" shall mean a decision by a Shareholder to retire from full-time employment, without seeking other full-time paid employment:

      a.      without the approval of the Board of Directors if the retiring Shareholder is 65 years of age or over; or

      b.      with the approval of the Board of Directors if the retiring Shareholder is under 65 years of age, which approval shall not be unreasonably withheld?

As used in this Agreement, "termination, without cause," shall mean the termination of a Shareholder by the Corporation where no "Cause," as defined below, exists for such termination. "Termination, without cause," shall also mean a Shareholder's voluntary termination of his or her employment with the Corporation, as long as at the time of the voluntary termination there were not grounds pursuant to which the Shareholder could have been terminated by the Corporation, for cause, as defined below and as long as the Shareholder does not breach the Nondisclosure Covenant and/or Nonsolicitation Agreement sections below. Notwithstanding any other provision of this Agreement, if the occurrence is the termination of the Shareholder's employment by the Corporation, without cause, then the Shareholder shall sell his or her shares to the Corporation pursuant to this section, unless otherwise agreed by a majority in interest of the unaffected Shareholders.

Upon an occurrence, the Corporation shall purchase all of the affected Shareholder's shares in the Corporation at the price and terms determined in accordance with the provisions of the Purchase Price and Terms of Payment section, below. The Corporation shall give notice of its intent to purchase the shares within thirty (30) days from its receipt of written notice of the occurrence. If the occurrence is retirement and approval is necessary, then the time shall begin from the date on which the Board of Directors approved the retirement. If the Corporation is unable to or,

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 5 of 16**

for any reason (proper or improper), elects not to purchase the affected Shareholder's shares, then each of the remaining Shareholders shall have the option to purchase a proportionate share of the affected Shareholder's shares at the same price; provided, however, that if any Shareholder does not purchase his or her full proportionate share of the shares, the balance of the shares may be purchased by the other Shareholders proportionately, excluding the Shareholder who is not purchasing shares pursuant to this section.  As used in this section, a Shareholder's proportionate share of the shares shall equal the number of shares owned by the Shareholder at the time of the occurrence divided by the total number of shares owned by all of the other Shareholders, excluding the affected Shareholder and any Shareholder(s) who do not opt to purchase their proportionate share pursuant to this section.  The Shareholders shall have this option for thirty (30) days from the date on which they receive written notice of the Corporation's election not to purchase the shares under this section.  Such notice may be provided by the affected Shareholder, or his or her representative, if not given by the Corporation.  The affected Shareholder, or his or her representative, shall not transfer any shares to a third party until the expiration of the Shareholders' thirty (30) day option period.  If all of the affected Shareholder's shares have not been purchased by the end of this period, and the occurrence is death or disability, then the Corporation shall use its best efforts to purchase the remaining shares, including by seeking financing.

If either the Corporation or the Shareholders exercise their rights under this section, the affected Shareholder, the estate of the affected Shareholder, his or her guardian, or any other person or entity legally charged with the affairs of the affected Shareholder shall sell all of the affected Shareholder's shares, or such portion as the Corporation and/or the Shareholders shall elect.  If neither the Corporation nor the Shareholders exercise their rights under this section, subject to Section 9 below, the shares may be sold to any other person qualified to own such shares under this Agreement and the laws of the State of Florida, but the shares shall not be sold for a period of an additional ten (10) days without giving the Corporation and the remaining Shareholders written notice of the sale and the right to purchase such remaining shares at the price and on the terms offered to such other person.

**5.     PURCHASE ON TERMINATION OF SHAREHOLDER FOR CAUSE OR UPON BREACH OF CERTAIN COVENANTS.**  If either:

(a)     the Shareholder is terminated as an employee of the Corporation, for cause, as defined below, or

(b)     the Shareholder breaches either the Nondisclosure Covenant or the Covenant Not to Compete sections below, then in any such event the Shareholder must immediately transfer his or her shares to the Corporation pursuant to this Agreement.  These events are also included in the term "occurrence."

National Sourcing, Inc.
Revised and Restated
Shareholders Agreement
Page 6 of 16

For purposes of this Agreement, "Cause" means (i) an act or acts of dishonesty on Employee's part which are intended to result in his or her substantial personal enrichment at the expense of the Corporation; (ii) repeated violations by Employee of his or her obligations under this Agreement, which violations are demonstrably willful and deliberate on Employee's part and which resulted in material injury to the Corporation; (iii) conduct of a serious criminal nature which has or which is more likely than not to have a serious adverse effect on the reputation of the Corporation or its principals, its standing in the applicable business community, or its continuing relationships with its clients; or (iv) fraudulent conduct in connection with the business or affairs of the Corporation, designed to defraud the Corporation or others of material amounts; provided that, in each of the above situations, Employee has received written notice of the proscribed activity, has been afforded a reasonable opportunity to cure or correct the activity described in the notice, and has failed to substantially cure, correct or cease the activity, as appropriate.

      6.    **PURCHASE PRICE AND TERMS OF PAYMENT.**  At least once per year, the Shareholders shall set the value of the Corporation's shares.  This value shall be termed the "Stipulated Value."  The Stipulated Value shall be presumed to be the book value of the Corporation unless the Shareholders agree otherwise in writing.  Further, in the event of any failure of the Shareholders to establish or agree upon a Stipulated Value or if no Stipulated Value has been set within twelve months prior to the occurrence, the value of the shares shall be their book value as determined by an independent accountant.  If the parties cannot agree on an accounting firm to value the shares, each party at odds shall select one accounting firm and then the firms so picked shall select the accounting firm to ultimately value the shares.  The share valuation by the accounting firm will be final and no challenge shall be possible unless it can be demonstrated that the accounting firm committed a gross error or intentional fraud.  In connection with valuing the shares of the Corporation, the accountant may retain such experts as are reasonably necessary to complete the appraisal, including qualified appraisers.  All such costs shall be paid by the Corporation; however, in the event of a termination pursuant to Section 6, such costs shall be deducted from any payment due to the Selling Shareholder and reimbursed to the Corporation.

      In the event that the occurrence causing a transfer is pursuant to Section 5 above, entitled Purchase on Termination of Shareholder for Cause or Upon Breach of Certain Covenants, the Purchase Price determined pursuant to this section and which is to be paid to the transferring Shareholders shall be reduced by fifty percent (50%).

      In any purchase pursuant to this Agreement, including pursuant to the Right of First Refusal section above, the purchaser may, at his option, pay cash or execute a note payable to the Selling Shareholder or estate in the amount of the full Purchase Price.  The note shall be payable in no more than sixty (60) equal consecutive monthly installments, including interest at the rate equal to prime plus two percent (2%) per annum as established by the Wall Street Journal on that date which is ten days prior to the issuance of the above referenced note (but in no event higher than the maximum

National Sourcing, Inc.
Revised and Restated
Shareholders Agreement
Page 7 of 16

legal interest rate), with the first installment due on the date of the closing.  All or any portion of the note shall be prepayable by the purchaser without penalty.  The purchaser shall pledge the shares to be purchased as security for the unpaid balance of the Purchase Price, plus interest, by a pledge agreement which allows the purchaser to vote the shares and receive dividends, if any, as long as the indebtedness is not in default.  If the payments required under the note(s) to be given pursuant to this section places an unreasonable financial burden on the Corporation, in the judgment of the Board of Directors, then the Board of Directors may authorize a longer payout term for the note, as if such extended term were included in this section.

7.    **TRANSFER TO IMMEDIATE FAMILY**.  Notwithstanding any other provision in this Agreement, a Shareholder may, subject to the approval of a majority in interest of the Shareholders (which approval shall not be unreasonably withheld), transfer some or all of his or her shares to a trust for the benefit of a member of his or her immediate family.  This section shall apply to inter vivos transfers to trusts whose beneficiaries are members of the Shareholder's immediate family, and to transfers upon death.  As used in this section, "immediate family" shall mean the Shareholder's spouse, parents, siblings, and lineal descendants.

8.    **BOARD PROHIBITION OF A TRANSFER**.  A majority in interest of the Shareholders may prohibit a proposed transfer of shares, even if otherwise in compliance with this Agreement, if such Shareholders believe, in their reasonable discretion, that the proposed transfer would be detrimental to the Corporation.  The interest of the Shareholder proposing to transfer his shares shall not be entitled to vote on such matter.

9.    **OPTIONS**.  Any Shareholder transferring shares pursuant to this Agreement, other than to a member of the Shareholder's immediate family, shall exercise his or her options, if any, prior to the transfer or the options shall be deemed abandoned and forfeited to the Corporation.  In the event of death, disability, or termination, without cause (other than voluntary termination), the options may be exercised at any time during the thirty (30) days immediately following the death or determination of disability of the Shareholder by the Corporation, or notice by the Corporation to the Shareholder of his or her termination, without cause.  If not timely exercised, they shall be deemed abandoned and forfeited to the Corporation.  The options, as well as any shares received from the exercise of an option, shall be subject to the terms and conditions of this Agreement.

10.    **LOAN REPAYMENTS**.  If a Shareholder transfers all of his or her Shares, any loans due from the Shareholder to the Corporation will be due and payable, and will be repaid, within thirty (30) days from the date of transfer.  The Shareholders acknowledge and agree that this section will override any and all payment provisions in any promissory note, whether entered into before or after the effective date of this Agreement.  The Corporation is authorized to offset any payment otherwise due to a Shareholder by any loan due to the Corporation from the selling Shareholder.  If the purchaser is another Shareholder(s), the purchasing Shareholder(s) may pay to the Corporation some or all of the loan due under this section and offset this amount from the

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 8 of 16**

payment or note to be given to the selling Shareholder in connection with the share purchase.  If the Corporation owes any monies to the selling Shareholder pursuant to a note, the Corporation shall pay the note pursuant to its terms.

11.     **SPOUSAL JOINDER**.  If shares in the Corporation are held jointly by a husband and wife, whether as tenants by the entireties, or otherwise, it shall be so indicated on the share certificate and the spouses must agree to, and execute, this Agreement.  Each Shareholder who signs below represents, covenants, and warrants to the Corporation that his or her ownership of the Shares is as set forth herein.  Further, each Shareholder indemnifies, holds harmless, and agrees to defend the Corporation and the other Shareholders from any claim made by a spouse who has not signed this Agreement and claims an interest in the shares of the Corporation.  Any spouse who does not sign this Agreement shall nonetheless be subject to the terms and conditions of this Agreement if the spouse claims an interest in shares of the Corporation.

12.     **JOINDER BY TRANSFEREE**.  If any shares are transferred pursuant to this Agreement to any person who is not already a party to this Agreement, such person shall, as a condition precedent to the validity of the proposed transfer, execute an unconditional joinder which obligates that person to all of the terms and conditions of this Agreement, without exception. Failure to comply with this section shall make the transfer void unless approved by a vote of a majority in interest of the Shareholders.

13.     **SUBORDINATION.**     Each promissory note issued and delivered by the Corporation pursuant to this Agreement, at a time when there is an outstanding debt of the Corporation that requires subordination, shall contain a subordination clause in the form required by the terms of any agreement with the Corporation's creditors.

14.     **CLOSING.**  The purchaser shall set a reasonable time (not to exceed 30 days unless approved by the unanimous vote of all of the non-selling Shareholders) after its agreement to purchase shares, for closing the purchase required under this Agreement.  In no event, however, shall the closing date be more than sixty (60) days after the written notice to the purchaser by the Shareholder, or his or her legal representative, requesting closing.

15.     **DELIVERY OF STOCK.**  Upon payment in full of the purchase price or promissory note (including accrued interest and any other charges), the Shareholder or his or her legal representative shall assign and deliver the shares purchased under this Agreement to the purchaser, free and clear of all liens, charges or encumbrances of any nature.

16.     **STOCK LEGEND.**  The Shareholders agree that all share certificates now or hereafter held by them will contain the following legend prominently on the front of that certificate, reading as follows:

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 9 of 16**

"This share certificate is subject to restrictions on transfer.  See Back."

The reverse of the share certificate shall carry the following endorsement:

The shares evidenced by this certificate are subject to restrictions in regard to voting, purchase and transfer by the provisions of a Shareholders Agreement dated effective August ___, 2012, among the Shareholders and the Corporation, a copy of which is on file in the office of the Secretary of the Corporation.  Said Agreement supersedes the restrictions on transfer contained in the ByLaws of the Corporation.

17.    **INSUFFICIENT SURPLUS.**  If the surplus of the Corporation proves to be insufficient under then existing laws to authorize it to purchase shares as contemplated under this Agreement, the Corporation agrees to take such action as may be necessary to permit it to make such purchases, and the Shareholders agree that they will also take such action as may be necessary for the Corporation to make such purchases.

18.    **INSURANCE.**  The Corporation may, in its discretion, from time to time maintain life insurance policies on the lives of the Shareholders.  Each Shareholder shall cooperate with the Corporation in obtaining any insurance policy.  In the event that the Shareholder is deceased, the insurance proceeds will be applied to pay any amounts owing by the Corporation for the deceased Shareholder's shares.  Any excess of the insurance proceeds over the amounts to be paid for the shares of the decedent Shareholder's shares shall belong to the Corporation.  The Corporation may structure the purchase of insurance in any way that the Board of Directors, in its discretion, believes is most appropriate, including through the use of a trust.

19.    **INVOLUNTARY TRANSFERS.**  If all or any part of a Shareholder's Shares are subjected to any transfer not voluntarily made by the Shareholder (including transfers under operation of law, judicial process, dissolution of marriage, and/or proceedings in bankruptcy or receivership, whether voluntary or involuntary), the Corporation will have an option to acquire all of the Shares involved.  The option will commence on the date when the Corporation receives notice of the involuntary transfer, and the option must be exercised within ninety (90) days from that date.  The Corporation will have the power to assign its purchase option proportionately to all non-affected Shareholders.

20.    **VOTING TRUST PROHIBITION.**  No Shareholder shall enter into a voting trust agreement or any other type of agreement vesting another person with the authority to exercise the voting power of any or all of that Shareholder's shares.  This section shall not prohibit the use of a proxy.

21.    **SALE UPON VIOLATION OF THIS AGREEMENT.**  If a Shareholder commits a material breach of any term of this Agreement, the Corporation may, in its discretion, require that

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 10 of 16**

the Shareholder sell all of his or her shares to the Corporation as if the Shareholder had been a Shareholder terminated by the Corporation for cause.

      **22.**    <u>**TERM AND TERMINATION.**</u>  This Agreement shall be effective as of the date first set forth above and shall last perpetually until terminated or amended pursuant to the terms of this Agreement.  This Agreement will terminate upon the occurrence of any of the following events:

        a.    the cessation of the Corporation's business;
        b.    any initial public offering of the Corporation's shares;
        c.    bankruptcy, receivership or dissolution of the Corporation; or
        d.    the mutual agreement of all the shareholders then bound by the terms of this Agreement.

      **23.**    <u>**NONDISCLOSURE COVENANT**</u>.  Each Shareholder recognizes and acknowledges that by virtue of his or her ownership and employment by the Corporation, the Shareholder will have access to the Corporation's list of customers and will learn confidential information regarding the Corporation and its business, which lists and confidential information constitute trade secrets, which are valuable, special and unique assets of the Corporation. Accordingly, a Shareholder will not, during the period of ownership and/or employment or at any time after the termination of the ownership and/or employment, disclose or divulge to any person, firm, corporation, association, or other entity, or use directly or indirectly for the Shareholder's benefit or for the benefit of any other person, firm, corporation, association, or other entity, any confidential information of the Corporation.  The term "confidential information" for purposes of this section shall include, but is not limited to, the Corporation's list of customers and customers in development, business plans and proposals, marketing and sales programs or procedures, billing procedures, and the products, services, methods of conducting the Corporation's business developed or used by the Corporation, including without limitation, pricing, discounts, identities of subcontractors and/or suppliers and non-public confidential information pertaining to the business or affairs of the Corporations clients.

      This covenant of nondisclosure (the "Nondisclosure Covenant") shall be construed as an agreement independent of any other provision of this Agreement and the existence of any claim or cause of action of a Shareholder against the Corporation or other Shareholders, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Corporation of the Nondisclosure Covenant.  Each Shareholder recognizes and agrees that irreparable injury will result to the Corporation in the event of a breach or threatened breach of this Nondisclosure Covenant by a Shareholder for which the Corporation shall not have an adequate remedy at law and, in such event, the Corporation shall be entitled, without further proof of monetary or immediate damage, and without the necessity of posting any bond therefore, to such equitable and injunctive relief as may be available, to restrain the Shareholder and all persons acting for or with the Shareholder from the violation of this Nondisclosure Covenant.  Nothing herein shall be construed

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 11 of 16**

as prohibiting the Corporation from pursuing any other remedy or remedies available to the Corporation in law or in equity for such breach or threatened breach, including the recovery of damages from the Shareholder.

24. **NONSOLICITATION AGREEMENT**. Except as provided herein, each Shareholder agrees that during the term of the Shareholder's ownership of shares and for a period of two (2) years after the later of the termination of this Agreement or a Shareholder's employment, if any, with the Corporation, the Shareholder shall not, directly or indirectly, solicit, accept business or monies from, or engage in any business with (collectively, "soliciting conduct"), any client or customer of the Corporation (who was a client or customer of the Corporation at any time within the twelve (12) months immediately preceding the termination contemplated in this section) when such soliciting conduct is in competition with the Corporation or would otherwise cause any economic detriment to the Corporation.

This Nonsolicitation Agreement shall be construed as an agreement independent of any other provision of this Agreement and the existence of any claim or cause of action by the Shareholder against the Corporation, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Corporation of this Nonsolicitation Agreement. Each Shareholder recognizes and agrees that irreparable injury will result to the Corporation in the event of a breach or threat of breach of this Nonsolicitation Agreement by a Shareholder for which the Corporation will have no adequate remedy a law and that, in such event, the Corporation shall be entitled to such equitable and injunctive relief as may be available to restrain the Shareholder from violation of this Nonsolicitation Agreement. Nothing herein shall be construed as prohibiting the Corporation from pursuing any other remedy or remedies available for such breach or threaten to breach, including the recovery of damages from Shareholder. In the event any Court shall determine that the length of time or any other part of this Nonsolicitation Agreement is unreasonable, the Nonsolicitation Agreement shall not be rendered invalid thereby and the Court shall modify the length of time or any geographic area of applicability to the least extent necessary to make the Nonsolicitation Agreement valid and binding.

25. **ATTORNEY FEES.** In the event of arbitration or litigation (including trial, bankruptcy, or appellate proceedings) or other legal action arising from a breach or threatened breach of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' and paralegals' fees and costs incurred.

26. **CONTRIBUTION AND INDEMNIFICATION AGREEMENT.** The Shareholders expect that they may be required from time to time to guarantee the obligations of the Corporation, including supplier agreements, loans, and the like (collectively, an "obligation"). To the extent that any Shareholder guarantees an obligation of the Corporation, which obligation was reasonably required for the business of the Corporation, any of the Shareholders who have not signed the guaranty or otherwise obligated themselves, agree to contribute to the obligation in

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 12 of 16**

proportion to their share ownership in the Corporation and further agree to indemnify the obligated Shareholder to the same extent.  It is the intent of the Shareholders that they should share in any obligation of the Corporation (which obligation was reasonably required for the business of the Corporation) proportionately with their share ownership in the Corporation regardless of whether they executed a guaranty of the obligation at issue.  For purposes of this section, but not exclusively, an obligation shall be deemed to be reasonably required for the business of the Corporation if approved by the Board of Directors of the Corporation at any time prior to incurring the obligation.

      27.    **ENTIRE AGREEMENT**.  This instrument contains the entire agreement of the parties and may only be amended by a writing signed by all parties.

      28.    **PRIOR AGREEMENTS**.   This Agreement supersedes any and all prior Shareholder or Stock Purchase Agreements, whether written or oral, between the parties which relate to their ownership of shares of the Corporation.

      29.    **BINDING EFFECT**.  This Agreement will inure to the benefit of and be binding upon the Corporation, its successors and assigns, including, but not limited to, any corporation or entity that may acquire all or substantially all of the Corporation's assets or business, or into which the Corporation may be consolidated or merged.

      30.    **HEADINGS**.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

      31.    **SEVERABILITY**.  If any part of this Agreement is determined to be illegal or unenforceable, all other parts shall be given effect separately and shall not be affected.

      32.    **REMEDIES**.  The parties acknowledge that any violation of this Agreement will cause irreparable harm to the parties.  As a consequence, the parties agree that if any party fails to abide by the terms of this Agreement, any other party will be entitled to specific performance, including the immediate issuance of any temporary restraining order or for damages caused by such breach, and to any other remedies provided by applicable law.

      33.    **GOVERNING LAW**.  This Agreement shall be construed in accordance with Florida law without regard to its conflict of laws provisions.

      34.    **NONWAIVER**.  No assent or waiver, express or implied, of any breach of any one or more of the covenants, conditions or provisions of this Agreement shall be deemed a waiver of any subsequent breach, or a waiver of any other covenant, condition or provision of this Agreement.

      35.    **COUNTERPARTS AND FACSIMILES**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all such

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 13 of 16**

counterparts together shall constitute one and the same instrument. A facsimile copy of this Agreement and any signatures thereon shall be considered for all purposes as originals.

**36.** __INTERPRETATION.__ Whenever the context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and neuter and vice versa. This Agreement and any related instruments shall not be construed more strictly against any party regardless of who was more responsible for its preparation, it being recognized that this Agreement and any related instruments are the product of extensive negotiations between the parties hereto and that all parties have contributed substantially and materially to the final preparation of this Agreement and all related instruments.

**37.** __SURVIVAL OF REPRESENTATIONS, WARRANTIES, ETC.__ The parties to this Agreement covenant and agree that the representations, warranties, covenants, statements and agreements contained in this Agreement shall survive the sale and/or purchase of the Corporation's shares pursuant to this Agreement.

**38.** __NOTICES.__ All notices under this Agreement shall be sent by registered mail, return receipt requested, or hand delivered if to the Corporation, at its principal place of business, and if to the Shareholders to their addresses as set forth below. Any party may change its mailing address by serving written notice of such new address upon all of the other parties.

Corporation:
8402 Laurel Fair Circle, Suite 207, Tampa, FL 33610

Pedro Valdez
8402 Laurel Fair Circle, Suite 207, Tampa, FL 33610

Marc J. Wolfson
8402 Laurel Fair Circle, Suite 207, Tampa, FL 33610

**39.** __ARBITRATION.__ The parties agree that any dispute regarding or in any way arising out of this Agreement shall be submitted to arbitration in Hillsborough County, Florida, before one (1) arbitrator in accordance with the rules of the American Arbitration Association. The arbitrator shall be an attorney experienced with corporate and shareholder matters. If the parties are unable to agree on the arbitrator, each party shall select one arbitrator and the arbitrators so selected shall select the single arbitrator who will arbitrate the dispute. The parties agree that the arbitrator shall have the jurisdiction to award fees and costs to the prevailing party at the conclusion of the arbitration. During the pendency of the arbitration, however, each party shall bear his own fees and costs and shall share equally in the costs of the arbitration. Once the arbitration has been concluded, the arbitrator shall award fees and costs to the prevailing party. The arbitrator shall have the power to award specific performance. Nothing in this section, however, shall bar any party from seeking

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 14 of 16**

injunctive relief from a court of competent jurisdiction, including a temporary injunction to stop violations of this Agreement; provided that it is agreed that the sole venue for any such action shall be in the state courts in Hillsborough County, Florida.

     **40.**   **REPRESENTATION.**  The undersigned acknowledge and agree that Greenberg Traurig, P.A. and William L. Dunker, Esq. (collectively, the "Attorney") have represented the Corporation in the preparation of this Agreement.  While the Attorney has attempted to be fair and reasonable to all of the interests of the Shareholders and the Corporation, the Attorney has not acted as counsel for any of the Shareholders.  The Shareholders have been advised to consult with their own legal counsel and either have done so or have chosen not to do so after being so advised.

     **41.**   **DEADLOCK PROVISION.**  In the event of a dispute between the Shareholders with regard to a matter requiring a unanimous vote of the Shareholders hereunder, or in the event that the Shareholders cannot obtain approval of a majority or, where required, the designated super majority of the Shareholders required for an action necessary for the Corporation to remain in business, the Shareholders agree that all such disputes shall, be resolved through impartial binding arbitration in Hillsborough County, State of Florida.  The Shareholders further agree that the proceeding shall be the exclusive, final and binding forum for the ultimate resolution of said dispute, subject to any specific right of appeal that a Shareholder may have under applicable state law dealing with the review of arbitration decisions.  Upon consideration of the facts and circumstances of a particular dispute, the arbitrator shall issue to each Shareholder a written opinion containing findings of facts, conclusions of law, if any, and the overall basis for his or her final decision.  Unless the Shareholders otherwise agree in writing, the Corporation shall pay all fees, costs and expenses of the Arbitrator, including any required travel.

Until further action of the Shareholders as provided herein, _____ is designated and appointed as the initial Arbitrator of the Corporation.  The Arbitrator shall serve until replaced by a vote of the Shareholders holding 80% of the shares of the Corporation and shall be compensated strictly on a "per dispute" basis.  Subject to such matters as are expressly reserved hereunder to the Shareholders for decision under this Agreement, nothing contained in this arbitration provision shall adversely affect or diminish the rights, power and authority of the Directors to manage the day to day operations of the Corporation.  The Shareholders further acknowledge and understand that this arbitration provision shall not prevent any Shareholder from pursuing equitable or injunctive relief in a judicial forum for certain other disputes arising from this Agreement that do not involve the issue of unanimous or consent of the Shareholders or approval by a super majority or majority of the Shareholders.

     **42.**   **EFFECT ON BYLAWS.**   The Shareholders agree that the provisions of this Agreement, as it may be amended, shall supercede any inconsistent provisions in the Bylaws of the Corporation as they may be in effect from time to time.

**National Sourcing, Inc.**
**Revised and Restated**
**Shareholders Agreement**
**Page 15 of 16**

**THE UNDERSIGNED BEING DULY AUTHORIZED TO EXECUTE THIS INSTRUMENT, HAVE CAREFULLY READ THE FOREGOING AGREEMENT, FULLY UNDERSTAND IT, AND HAVE KNOWINGLY AND VOLUNTARILY ENTERED INTO THIS AGREEMENT INTENDING TO BE LEGALLY BOUND.**

IN WITNESS WHEREOF, the parties have set their hands and seals the day and year first above written.

**NATIONAL SOURCING, INC.**
By: _____
Pedro Valdez, Vice President

Dated: _____

_____
Pedro Valdez, Shareholder

Dated: _____

_____
Marc J Wolfson, Shareholder

Each of the undersigned, who either owns shares with their spouse, jointly as tenants by the entireties, or otherwise, or does not own any shares, jointly or otherwise, agrees to be bound by the terms and conditions of this Agreement as though they were a Shareholder.

_____
Signature

_____
Printed Name

_____
Spouse

_____
Signature

_____
Printed Name

_____
Spouse

## PEDRO VALDEZ SHARE PURCHASE AGREEMENT

This **PEDRO VALDEZ SHARE PURCHASE AGREEMENT** (this "Agreement") is made as of April__, 2013 (the "Effective Date") between Marc J. Wolfson ("Seller" or "Wolfson") and Pedro Valdez ("Buyer" or "Valdez"). Stephen Bracciale ("Bracciale") has executed this Agreement for the limited purposes set forth below. Buyer and Seller are at times each referred to individually as a "Party" and collectively as the "Parties".

## BACKGROUND STATEMENTS

A.       Seller is the owner of 51 shares of National Sourcing, Inc. (the "Company" or "NSI").

B.       Seller desires to sell his 51 Shares of NSI (the "Transferred Shares") to Buyer and Buyer desires to purchase the Transferred Shares upon the terms and subject to the conditions contained in this Agreement.

C.       Seller and Buyer recognize and agree that Seller acquired the Transferred Shares from John Stanton pursuant to a share purchase agreement, promissory note, security agreement, and stock pledge agreement all dated March 24, 2011 (collectively the "Wolfson Agreements") and that, in consideration for Buyer entering into and complying with this Agreement and the other agreements referenced herein, Bracciale, as assignee of John Stanton, has agreed to release Wolfson from certain obligations under the Wolfson Agreements and, accordingly, Buyer is agreeing to make the payments, and fulfill the other obligations due under this Agreement,  to Bracciale

D.       Seller and Buyer believe that it is in the best interest of Company to consummate the purchase and sale of shares of the Company as set forth in this Agreement and take such other actions as may be set forth below.

E.       Accordingly, in consideration of these Background Statements and the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties and Bracciale agree that these Background Statements are true and correct and are incorporated into this Agreement for all purposes and, further, agree as follows:

## TERMS AND CONDITIONS

1.       **Purchase**.  Subject to the terms and conditions of this Agreement, the Seller hereby sells the Transferred Shares to the Buyer, and the Buyer hereby purchases the Transferred Shares from the Seller (the "Purchase"), in exchange for Buyer's execution of and compliance with this Agreement and the Promissory Note in the amount of Five Million One Hundred Thousand Dollars (US $5,100,000.00) made payable Stephen Bracciale (the "Purchase Price"), as well as the Security Agreement and Stock Pledge Agreement, all of which documents are attached hereto as Composite Exhibit A.

2.       **Conditions Precedent to the Closing of the Purchase.**  The satisfaction of the following conditions is necessary prior to Seller and Buyer being obligated to close on the

Purchase:

(a)    Seller, Buyer, and Bracciale shall execute and deliver to each other this Agreement;

(b)    Seller, Buyer, and Company shall execute and deliver to each other that certain NSI Restated Shareholders Agreement., the form of which is attached hereto as Exhibit B;

(c)    Seller shall execute and deliver to Angelus Tam ("Tam"), who shall hold for the benefit of Buyer in accordance with the terms of the Stock Pledge Agreement, the Assignment of Transferred Shares set forth in Exhibit C attached to this Agreement; and

(d)    Buyer shall execute and deliver to Bracciale the Promissory Note, Security Agreement and Stock Pledge Agreement.

(e)    Simultaneously with the closing of this Agreement, Bracciale, Wolfson and the Company shall have executed and delivered to each other executed copies of the Satisfaction, Release and Termination Agreement a copy of which is attached hereto as Exhibit D.

3.    **Representations and Warranties of the Seller.**    The Seller represents and warrants to Buyer and Bracciale as follows:

(a)    The Seller is an individual over the age of 18 and a resident and citizen of the State of Florida.

(b)    The Seller has all the requisite power and authority to enter into this Agreement and to carry out his obligations hereunder, and this Agreement has been duly executed and delivered by the Seller and constitutes a legal, valid and binding obligation of the Seller, enforceable against him in accordance with its terms.

(c)    The execution, delivery and performance of this Agreement by the Seller and the consummation by the Seller of the transactions contemplated hereby do not, and will not, result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Seller is subject or by which any property or asset of the Seller is bound or affected.

(d)    The Seller has good and valid title to the Transferred Shares free and clear of all claims, liens, obligations and/or encumbrances (collectively, "Encumbrances") of any nature whatsoever except as disclosed in the documents set forth in Composite Exhibit A (hereinafter, collectively, "Exhibit A.") and except for the Encumbrances set forth in the Wolfson Agreements, which Encumbrances are being released by Bracciale pursuant to Exhibit D.  Upon the consummation of the transactions contemplated hereby, the Buyer will hold the Transferred Shares free and clear of all Encumbrances of any nature whatsoever other than those arising under applicable federal and state securities laws, Exhibit A and/or the NSI Shareholders Agreement.  Except as set forth in Exhibit A or in the NSI Shareholders Agreement,

there are no outstanding subscriptions, rights, options, warrants, conversion rights, agreements, commitments, understandings or other claims for the purchase or acquisition of shares in the Company, or otherwise entitling any person or entity to acquire any stock interests in the Company or obligating the Company to issue any stock interests.

4. **Representations and Warranties of the Buyer.**   The Buyer represents and warrants to the Seller and Bracciale as follows:

(a)   The Buyer is an individual over the age of 18 and a resident and citizen of the State of Florida.

(b)   The Buyer has all the requisite power and authority to enter into this Agreement and to carry out its obligations hereunder, and this Agreement has been duly executed and delivered by the Buyer and constitutes a legal, valid and binding obligation of the Seller, enforceable against him in accordance with its terms.

(c)   The execution, delivery and performance of this Agreement by the Buyer and the consummation by the Buyer of the transactions contemplated hereby do not, and will not result in a violation of any law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which the Seller is subject or by which any property or asset of the Seller is bound or affected.

(d)   The Buyer is and shall maintain his status as a duly certified Service Disabled Veteran under the laws of the United States and a holder of a Secret Security Clearance under the laws of the United States.

5. **Special Stock Provisions**

(a)   **Call Option**   In the event that Buyer shall breach the terms of this Agreement, the Promissory Note, the Security Agreement, the Stock Pledge Agreement and/or the NSI Shareholders Agreement (a "Breach"), Bracciale shall have the option of requiring Buyer to sell to Bracciale or his designee ("Designated Transferee") the Transferred Shares then owned or obtainable by Buyer for a purchase price equal to Five  Million One Hundred Thousand and No/100 Dollars ($5,100,000.00) less the amount of principal remaining to be paid under the Promissory Note, but in no event less than $100.00 (the "Option Price").  Bracciale may exercise this call option at any time after the occurrence of a Breach by notifying Buyer in writing of its intent to require such transfer and the name of the Designated Transferee (the "Call Notice"). Buyer shall sell and deliver the Stock to the Designated Transferee within ten (10) business days of Buyer's receipt of the Call Notice, or at such later date as may be agreed by Bracciale and Buyer.

(b)   **New Shares**   Notwithstanding the foregoing, Buyer agrees that if, at any time prior to the time that the Note is paid in full, Bracciale identifies a qualified individual (the "New Shareholder") whom Bracciale believes will add value to the Company and who is qualified under the laws of the United States to be designated as a service disabled veteran and, who, additionally, shall have obtained a secret

security clearance from the United States Government, then, at the request of Bracciale, Buyer agrees to take such shareholder action as may be necessary and appropriate to have the Company issue an additional 100 shares of Company stock (the "New Stock") with 51 shares of such New Stock to be issued to the New Shareholder and 49 shares of such New Stock to be issued as Bracciale may direct.

6.      **Legends on Certificates.** The Buyer and the Seller acknowledge and agree that the any certificate issued representing the Transferred Shares (a "Certificate") shall bear the following legends:

The securities represented by this certificate have not been registered under the Securities Act of 1933, as amended (the "Act"), or state securities laws, but have been issued or transferred pursuant to an exemption from the registration requirements of the Act. No distribution, sale, offer for sale, transfer, delivery, pledge, or other disposition of these securities may be effected except in compliance with the Act, any applicable state laws, and the rules and regulations of the Securities and Exchange Commission and state agencies promulgated thereunder.

The shares of stock represented by this certificate are transferable only in accordance with the terms of the Pedro Valdez Share Purchase Agreement between Marc J. Wolfson, Stephen Bracciale, and Pedro Valdez, dated as of the _____th day of April 2013, as amended or modified from time to time, now on file with the Company and the NSI Shareholders Agreement, as it may be amended, and upon proof of compliance with both such documents. Copies of the Pedro Valdez Share Purchase Agreement and the NSI Shareholders Agreement are available for inspection at the principal office of the Company. Any purported transfer in violation of the either such agreement is void. Each holder of this certificate by accepting the same pursuant to a transfer permitted by the Pedro Valdez Share Purchase Agreement and/or the NSI Shareholders Agreement agrees to be bound by the terms thereof.

All Stock which is subject to this Agreement and which is issued to the Buyer after the date of this Agreement shall bear the same legends.

7.      **Additional Consideration.**   Reserved.

8**.      Indemnifications.** Seller will indemnify Buyer and Bracciale and will reimburse Buyer and Bracciale for any loss, liability, claim, damage or expense (collectively, "Damage") arising from or in connection with any claim or proceeding caused by, arising out of or related to any breach by Seller of any of its representations or  warranties under Section 3 of this Agreement; provided, however, Seller shall have no obligation to indemnify with respect to any Damage to the extent resulting from or relating to any uncured breach by Buyer of this Agreement, the NSI Shareholder Agreement, the Security Agreement, the Stock Pledge Agreement, or any intentional misconduct or gross negligence on the part of Buyer.

Buyer will indemnify Bracciale and will reimburse Bracciale for any loss, liability, claim, damage or expense including, without limitation any attorney fees  (collectively, "Damage") arising from or in connection with any claim or proceeding caused by, arising out of or related to

any breach by Buyer of its representations or  warranties under Section 4 of this Agreement; provided, however, Buyer shall have no obligation to indemnify with respect to any Damage to the extent resulting from or relating to any uncured breach by Seller of this Agreement, the NSI Shareholder Agreement, the Security Agreement, the Stock Pledge Agreement, or any intentional misconduct or gross negligence on the part of Seller.

9.      **Notices.** All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth below or to such other address as a party may designate by notice hereunder, and shall be (i) delivered by hand, (ii) telecopied or sent by electronic mail or facsimile transmission, (iii) sent by overnight courier or (iv) sent by certified or registered mail return receipt requested, postage prepaid.

If to Seller:                    Marc Julius Wolfson
                                 8402 Laurel Fair Circle, Suite 207
                                 Tampa, FL 33610


If to Buyer:                     Pedro Valdez
                                 8402 Laurel Fair Circle, Suite 207
                                 Tampa, FL 33610


If to Bracciale                  Stephen Bracciale
                                 8402 Laurel Fair Circle, Suite 207
                                 Tampa, Florida 33610


All notices, requests, consents and other communications hereunder shall be deemed to have been given (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if sent by electronic mail or made by facsimile or other electronic transmission, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next day following the day such mailing is made (or in the case that such mailing is made on Saturday, on the immediately following Monday) or (iv) if sent by certified or registered mail on the 3rd day following the time of such mailing thereof to such address (or in the case that such 3rd day is a Sunday, on the immediately following Monday).

10.     **Successors.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their authorized successors or assigns; provided that the rights of any party hereunder may not be assigned without the consent of Seller.

11.     **Additional Buyers.** Each holder of any of the capital stock of Company or any rights to acquire capital stock of Company, including any holder of any warrant, option or other security convertible into or exchangeable for capital stock of Company, shall execute a copy of the NSI Shareholder Agreement acknowledging that the restrictions contained therein shall apply to such stock or rights to acquire stock in Company.

12.     **Third Party Beneficiary.** The Parties hereto acknowledge that there are no third party beneficiaries to this Agreement except that Stephen Bracciale shall have the right in his own name to enforce any rights granted to him under this Agreement.

13.     **Governing Law.** This Agreement, the rights and obligations hereunder, any claims or disputes relating thereto, shall be governed by and construed in accordance with the laws of the State of Florida.   In the event of arbitration or litigation (including trial, bankruptcy, or appellate proceedings) or other legal action arising from a breach or threatened breach of this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' and paralegals' fees and costs incurred.

14.     **Jurisdiction; Service of Process.** Any action or proceeding seeking to enforce any provision of, or based upon any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Florida located in or for Hillsborough County, Florida or, if it has or can acquire jurisdiction, in the United States District Court for the Middle District of Florida, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

15.     **Complete Agreement.** All prior understandings and agreements between the parties hereto with respect to the transactions contemplated hereby are merged into this Agreement, and this Agreement reflects all the understandings of the parties with respect to such transactions.

16.     **Captions.** The section titles or captions in this Agreement are for convenience of reference only. They shall not be considered to be a part of this Agreement, and they in no way define, limit**,** extend or describe the scope or intent of any provision hereof.

17.     **Modification.** This Agreement cannot be modified, extended or amended except by written agreement signed by all of the parties hereto.

18.     **Counterparts.** This Agreement may be executed in two or more counterparts and each counterpart, when so executed and delivered, shall constitute a complete and original instrument, and it shall not be necessary when making proof of this Agreement or any counterpart hereto to produce or account for any other counterparts.  Facsimile or electronic copies of this Agreement and all signatures thereon shall be deemed originals for all purposes.

19.     **No Waiver.**  No waiver of any provision of this Agreement, and no consent to any departure by a party from the terms and conditions of this Agreement, shall be effective unless such waiver or consent is given in writing by the party against whom the waiver is being sought (in which the case the waiver or consent shall be effective only in the specific instance, and only for the specific purpose, for which it was given).  No failure or delay by a party in exercising any right or remedy, or requiring the satisfaction of any condition under this Agreement, and no course of dealing between the parties, shall operate as a waiver or estoppel of any right or remedy of such party hereunder, or limit or prevent the subsequent enforcement of any provision of this Agreement by such party.  Further, the parties agree that the execution of this Agreement, the Stock Purchase Agreement and the other loan documents associated with this transaction do not constitute and shall not be interpreted to constitute a waiver, forgiveness or forbearance with

respect to any breach of any obligation of Valdez, if any should exist, under any other agreements between Valdez and Bracciale and/or any other parties.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

BUYER: Pedro Valdez

_____

Printed Name: Pedro Valdez

SELLER: Marc J. Wolfson

_____

Printed Name: Marc J. Wolfson

BRACCIALE: Stephen Bracciale

_____

Printed Name: Stephen Bracciale

Exhibits

| | |
|---|---|
| Composite Exhibit A | Pedro Valdez Promissory Note, Security Agreement, and Stock Pledge Agreement |
| Exhibit B | Revised and Restated NSI Shareholders Agreement |
| Exhibit C | Assignment of Transferred Shares Agreement |

**EXHIBIT C**

**ASSIGNMENT OF TRANSFERRED SHARES**

      **KNOW ALL MEN BY THESE PRESENTS** that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Marc Julius Wolfson (the "<u>Assignor</u>") has granted, bargained, sold, transferred, conveyed, assigned and delivered effective as of August ___, 2012, and by these presents does grant, bargain, sell, transfer, convey, assign and deliver unto Pedro Valdez (the "<u>Assignee</u>"), his/her heirs, representatives, successors and assigns, Assignor's Transferred Shares, as defined in the Pedro Valdez Share Purchase Agreement to which this Assignment is attached as Exhibit C in National Sourcing, Inc., a Florida corporation.

      **TO HAVE AND TO HOLD** the same unto the Assignee, his or her heirs, representatives, successors and assigns forever.

      **IN WITNESS WHEREOF**, the undersigned has hereunto set his hand and seal this ___th day of August, 2012.

WITNESS                                    ASSIGNOR

_____    _____

Name (Print):_____    Name (Print): Marc Julius Wolfson

_____

Name (Print):_____

To:          Board of Directors and Shareholder, National Sourcing, Inc.

From:        Marc J. Wolfson

Subject:     Resignation and Sale of Shareholdings of National Sourcing, Inc.

Date:        April __, 2013


Effective April __, 2013, and in consideration for the Board of Directors and Shareholder of National Sourcing, Inc. (the "Company") approving the sale of all of my shares of the Company to Pedro Valdez pursuant to that certain Pedro Valdez Share Purchase Agreement of even date herewith ("Purchase Agreement"), I hereby resign from my positions as a Director, Chief Executive Officer and employee of Company and all other positions and rights which I may have or have had from and/or with the Company and all subsidiaries and affiliates of Company.  Further, be advised that concurrent with the execution of this letter of resignation I have sold all of my shareholdings in the Company, which total 51% of the shares of the Company, to Pedro Valdez pursuant to the Purchase Agreement and I no longer own any interest in the Company.


_____

Marc J. Wolfson