```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION

 3


 4

      NATIONAL SOURCING, INC.,    :
 5    et al,                      :
                                  :
 6         Plaintiff,             :
                                  : CIVIL   8:17-cv-1950-CEH
 7    vs.                         : NO.:    -JSS
                                  :
 8                                : DATE:   12/05/2017
                                  :
 9    STEPHEN R. BRACCIALE, et    : TIME:   10:03 a.m.
      al,                         :
10                                : PAGES:  1 - 79
           Defendants.            :
11    -------------------------- :

12

13
                   TRANSCRIPT OF MOTION HEARING
14            BEFORE THE HONORABLE JULIE S. SNEED
                UNITED STATES MAGISTRATE JUDGE
15

16

17

18

19

20
      Court Reporter: Lynann Nicely, RPR, RMR, CRR
21           Official Court Reporter
             801 N. Florida Avenue
22                  Suite 13B
             Tampa, Florida 33602
23
      Proceedings recorded and transcribed by computer-aided
24    stenography.

25
```

```
 1                    A P P E A R A N C E S

 2


 3      For the Plaintiff:

 4
                KEVIN L. DEES, ESQ.
 5              Older Lundy & Alvarez
                1000 W. Cass Street
 6              Tampa, Florida  33602

 7              SCOTT R. LILLY, ESQ.
                De La Pena & Holiday, LLP
 8              400 N. Tampa Street, Suite 2840
                Tampa, Florida  33602-4713
 9


10

11      For the Defendant:

12
                GREGORY W. KEHOE, ESQ.
13              DANIELLE S. KEMP, ESQ.
                Greenberg Traurig, LLP
14              Suite 100
                625 E. Twiggs Street
15              Tampa, Florida  33602

16              DENNIS P. WAGGONER, ESQ.
                Hill Ward Henderson, PA
17              101 E. Kennedy Boulevard, Suite 3700
                Tampa, Florida  33602
18

19

20

21

22

23

24

25
```

1                   P R O C E E D I N G S

2           THE COURT:  Hello and good morning to

3    everyone.  We're here in the case of National

4    Sourcing Inc. and Pedro Valdez vs. Mr. Bracciale, et

5    al, Case 8:17-cv-1950.  Can I have the lawyers

6    please state your appearances.

7           MR. DEES:  Kevin Dees on behalf of the

8    plaintiff National Sourcing, Inc.

9           MR. LILLY:  Your Honor, Scott Lilly on behalf

10   of Pedro Valdez.  I also have in the courtroom Pedro

11   Valdez.

12           THE COURT:  Good morning.

13           MR. LILLY:  I have a paralegal in the

14   courtroom, Your Honor, as well; if you would like

15   me, I can give her name.

16           THE COURT:  That's up to you.

17           MR. LILLY:  Greg Karsh is also counsel of

18   record, he's in the courtroom behind the bar.

19           THE COURT:  Very well.  Good morning to all of

20   you.

21           MR. KEHOE:  Good morning, Your Honor, Gregory

22   Kehoe and Daniel Kemp for the defendants and with me

23   at counsel table on behalf of Greenberg Traurig is

24   Mr. Dennis Waggoner, he will be representing us.

25   Also to the far left is a member of our staff --

1        attorney in the general counsel's office at

2        Greenberg Traurig, Susan Tarve.  And likewise

3        Mr. Bracciale and Ms. Tamara are before the court.

4              THE COURT:  Very well, good morning.

5              MR. WAGGONER:  Good morning, Your Honor,

6        Dennis Waggoner for Greenberg Traurig and my

7        colleague Kristina Gandre is with me here this

8        morning as well.

9              THE COURT:  Good morning to all of you.  We do

10       have a number of preliminary issues that you all may

11       want to discuss.  I want to give you an opportunity

12       not to really go in depth into these issues but I

13       did notice that they were filed.

14             There is a motion to quash a subpoena and a

15       motion to strike plaintiff's sworn declaration.

16       Again, I note that those items have been filed;

17       they're not set for hearing today.  Is there

18       anything you want to say about those?

19             MR. KEHOE:  On the motion to strike, Judge, it

20       was something that was -- it was an item that was

21       filed by the plaintiffs the night before last, well

22       after any deadline, without any permission from the

23       court, they just filed it.  And we moved to strike

24       it because it's outside the time limits set by the

25       local rules and the Federal Rules of Civil

1      Procedure.

2            THE COURT:   And on the motion to quash

3      subpoena?

4            MR. KEHOE:   Well, Your Honor, that was --

5      apparently we understood that this was not an

6      evidentiary hearing, that it was here for argument.

7      So with regard to quashing the subpoena, it was not

8      intended.   Our understanding from Your Honor's

9      chambers was that this was not going to be an

10     evidentiary hearing, so we made that motion to

11     quash.   We just didn't want to let the subpoenas sit

12     out there without bringing to Your Honor's attention

13     to say yes, we've seen it and we're just giving Your

14     Honor the benefit of how we see that particular

15     subpoena should be handled.

16           MR. DEES:   As to the motion to quash, Your

17     Honor, we had withdrawn the subpoenas in terms of

18     witness attendance.   We had asked Greenberg Traurig

19     to bring isolated documents we requested in the

20     subpoenas to the hearing today.   I think the motion

21     to quash has largely been resolved.   We were not

22     aware this was not going to be an evidentiary

23     hearing and when we confirmed that with the court's

24     offices, we said of course we won't force the

25     witnesses to attend today.

1              I don't know that they brought the invoices --

2       we pared it down to just bringing the invoices that

3       were submitted to my client, National Sourcing, from

4       Greenberg Traurig for payment and we requested they

5       bring them for in camera review.  There is some

6       assertion of privilege.  But for today's purposes we

7       can move forward without the subpoenaed witnesses

8       and documents.

9              With regard to the motion to strike, again,

10      for several months now we had requested the

11      documents that belonged we thought to our own

12      client, National Sourcing, and they were not

13      provided to us and so what we had to do was go

14      through old laptops and computers and do forensic

15      analysis to show some of the additional documents

16      that we may want to present to the court.

17             However, if the court will review them we'd be

18      very pleased.  I think there is no issue with

19      authenticating those documents.  However, we can go

20      forward on what's attached to our motion which would

21      be enough to consider the motion.

22             THE COURT:  All right.  So on the motion to

23      quash subpoena, it appears that you all at least

24      have resolved the issue related to the evidentiary

25      presentation of any witnesses.

```
 1              This isn't set for an evidentiary hearing, I

 2      didn't contemplate or provide notice to you that I

 3      will be taking any testimony, I don't intend to take

 4      any testimony here today.  So that is how that

 5      aspect will be resolved.  And I also agree that it

 6      is really a little early for discovery at this

 7      point.  Do you all have a case management and

 8      scheduling order?

 9              MR. DEES:  We do not have one in place, Your

10      Honor, we wanted this motion to disqualify resolved.

11      We had some questions about whether we could even

12      negotiate with our clients' own attorneys.

13              THE COURT:  So you haven't had a case

14      management meeting at this point?

15              MR. DEES:  We had one attempt at it and drafts

16      prepared, but we have not negotiated a final for

17      submission.

18              MR. KEHOE:  The fact is, Judge, to supplement,

19      we attempted to do it and plaintiffs were completely

20      unprepared to move forward at that case

21      management --

22              MR. DEES:  I would dispute that.

23              THE COURT:  All right.

24              MR. KEHOE:  That's what happened.  So it

25      didn't happen.
```

1          THE COURT:  Now, it may be too early for you

2     to have filed a response to that motion to quash

3     subpoena.  You have not filed a written response

4     yet?

5          MR. DEES:  No, we have not.  As I said, in

6     terms of compelling witnesses to attend, we would

7     not seek any sort of -- to compel those witnesses to

8     attend; obviously we're not taking evidence.  So.

9          THE COURT:  All right.  Well, I am going to

10     grant that motion.  Again, it's not set for hearing

11     today, so if there is -- do you think that you would

12     need to file a memo on that because --

13          MR. DEES:  We would like to.  To the extent --

14     if Your Honor -- we can reissue the subpoenas, we

15     can consider those withdrawn.  However, if we end up

16     taking evidence on this issue, which I think may be

17     appropriate, then we would have to reissue them.

18          THE COURT:  All right.  Well, so you said two

19     things, that you -- I could consider them withdrawn.

20          MR. DEES:  Yes, you may.

21          THE COURT:  All right.  So I am going to grant

22     that motion to quash the subpoena.  This is really

23     not an evidentiary hearing and it's too early for

24     discovery to take place at this point.  You can feel

25     free to reissue those at the appropriate time once

```
 1      you all have that case management meeting and you

 2      have a case management and scheduling order.

 3            On the motion to strike, it does appear that

 4      it's a sworn declaration that was filed and it

 5      wasn't really in the nature of a reply, although it

 6      was filed on the eve of the hearing.  We would

 7      prefer to have those things filed much earlier.  I

 8      don't know why -- any reason why you couldn't have

 9      filed it earlier along with your response.

10            So I'm not going to strike it, but I will not

11      have any argument on that today.  And if the defense

12      would like, you all are free to file any additional

13      response or supplemental memorandum related to that

14      declaration if you would like to do that and I'll

15      give you 20 days to do that if you would like to.

16      I'm not telling you that you need to, but you can if

17      you would like and then today we won't talk about

18      the sworn declaration.  All right?

19            Now, does that cover all the preliminary

20      issues?

21            MR. DEES:  I believe so, Your Honor.

22            MR. KEHOE:  I believe so, Your Honor.

23            THE COURT:  Now, let's go forward on the

24      motion.  Go right ahead.

25            MR. KEHOE:  Your Honor, at this point I'm
```

1        going to give the floor to Mr. Waggoner,

2        Mr. Waggoner will take over for argument.

3                THE COURT:  That's fine.

4                MR. DEES:  Your Honor, the crux of this action

5        is -- by way of background, plaintiff National

6        Sourcing Inc. is a Service-Disabled Veteran-Owned

7        Small Business, an SDVOSB.  Still gets me marble

8        mouthed to say it to the court.  And because of

9        that, National Sourcing is subject to certain

10       federal regulations and has certain preferential

11       rights in terms of being on government contracts.

12               In connection with evaluating its SDVOSB

13       status for a term of years, we contend that

14       Greenberg Traurig was its counsel.  In particular,

15       in the complaint that we filed we have contended

16       that the instruments by which Mr. Valdez took

17       ownership of the company violate those federal

18       regulations and aren't enforceable, induced by fraud

19       and a number of things.

20               There were some proceedings held before in

21       state court in Hillsborough County and the first

22       indication that we received regarding who the

23       counsel was in connection with preparing the

24       promissory note, a security agreement secured by all

25       the assets of the company, a stock pledge, a

1      shareholders agreement, and a couple of other

2      instruments, meeting minutes for the corporation

3      National Sourcing.  The counsel in regards to those

4      was a gentleman by the name of Mr. William Dunker --

5           THE COURT:  What time period was that, was

6      that 2011?

7           MR. DEES:  2013.

8           THE COURT:  So you're saying that those things

9      were drafted by Mr. Dunker in 2013?

10          MR. DEES:  Yes.  May I approach, Your Honor,

11     with some -- just to walk you through the actual

12     documents and testimony?  It's just a few things.

13     Now, I'm not going to show --

14          THE COURT:  Are those things attached to

15     the --

16          MR. DEES:  They are.

17          THE COURT:  -- motion?

18          MR. DEES:  The ones I would have the court

19     review, yes.

20          THE COURT:  Just tell me, what exhibit is it?

21          MR. DEES:  In terms of verified motion, it

22     would be Exhibit A would be the first bit of

23     testimony that I would walk the court through.

24          THE COURT:  All right.

25          MR. DEES:  And again we're talking about loan

1      instruments, security agreements, stock pledges, and

2      that sort of thing.

3          On Exhibit A Mr. Bracciale, who is the

4      defendant in this case, was asked in the previous

5      proceedings by counsel for Mr. Valdez who prepared

6      the loan documents.

7          Answer:  A lawyer.

8          Which lawyer?

9          Bill Dunker.

10         And who did he represent?

11         Mr. Bracciale testified, "I asked him to be a

12     neutral party."

13         And then there were questions about who paid

14     him.  And Mr. Bracciale said, "I asked him to

15     prepare the loan documents that we mutually

16     discussed with him."

17         And then he was asked about structuring the

18     operating agreement -- I believe he means

19     shareholder agreement -- for National Sourcing which

20     would allow Mr. Valdez control of the company and

21     that they would present to the U.S. government in

22     order to be compliant with the federal regulations.

23     And Mr. Bracciale answered, and it's in the

24     testimony here, that Mr. Dunker of Greenberg Traurig

25     represented National Sourcing and Mr. Valdez in

1    connection with those documents.

2           So those are the very documents that are

3    attached to the complaint in this action, those

4    documents being the shareholders agreement, the

5    stock pledge, the promissory note, the security

6    agreement and so on.

7           And that's testimony from Mr. Bracciale, the

8    defendant himself, saying that he had, one, asked

9    him to be a neutral party in connection with

10   Mr. Valdez's debt, and secondly, that Mr. Dunker

11   represented National Sourcing in connection with

12   representations to the United States federal

13   government.

14          Now, attached to that motion as well, at the

15   time of the hearing I was appearing for counsel the

16   very first time I had appeared in a hearing and I

17   asked for some documentation from my client which

18   was very limited, but Exhibit E to that motion is

19   the actual email that Mr. Dunker transmitted to

20   Mr. Bracciale at his email address at National

21   Sourcing and that's on page 8 of our motion.

22          For the convenience of the court I can

23   bring --

24          THE COURT:   Page 8 of the motion?

25          MR. DEES:   There is an image of it on page 8

1      of the motion, attached as Exhibit E to the motion.

2          THE COURT:  I've got it.

3          MR. DEES:  And you can see here Mr. Dunker

4      from GT Law, Greenberg Traurig, transmitting these

5      documents to Mr. Bracciale at NationalSourcing.com.

6      This is at a time when Mr. Bracciale is an employee

7      of the corporation but is not a shareholder at that

8      time or an officer.  So he's receiving these for the

9      corporation.

10         The documents listed in the attachments on

11     Exhibit E are the very documents that we're

12     litigating now and some of those being organic

13     documents of the company, one of those being the

14     shareholder agreement from -- that's been revised

15     for 2013, another being the corporate and board

16     meeting minutes.  And these are again coming from

17     Greenberg Traurig.

18         Also in our motion we've included National

19     Sourcing's accounting records from around that time

20     and those are not an attachment, but there is a true

21     and correct image in the motion at page 9 showing at

22     least as far back as 2012 National Sourcing was

23     paying bills and invoices from Greenberg Traurig,

24     one of those being right around the time these

25     documents were prepared in April of 2013.

1          Now, these go from 2012 to 2014 and you can

2     see them there with payments being made.  We also

3     have a check that's of record for at least one of

4     these invoices.

5          Now, we believe they go back further, but the

6     accounting system was changed, which brings to light

7     an issue that I have in this case.  Greenberg

8     Traurig I believe has more of the documentation

9     relative to these transactions and my client than I

10    do.  And so as I've asked for my client -- what I

11    believe to be my client's own documents, invoices

12    that were submitted to them for payment, documents

13    that were transmitted to them for signature, I've

14    not received them.

15         And I understand Your Honor's ruling that

16    discovery at this stage would be inappropriate.

17    However, I believe I'm asking for documents that are

18    actually my client's own corporate records, amongst

19    those being the very invoices that I've listed on

20    page 9 of the motion that my client paid.  Clearly

21    if you submit an invoice to a company and they pay

22    it, particularly from an attorney, that would become

23    part of their own business records.

24         Within the shareholder agreement that's listed

25    in this email from April of 2013 there is a recital.

1    And this was forwarded to Mr. Valdez, the current

2    president of National Sourcing, for signature.  The

3    attachment was a draft and recital that sets forth

4    in the motion says, "The undersigned" -- this is at

5    paragraph 40 of the shareholder agreement -- "the

6    undersigned acknowledge and agree that Greenberg

7    Traurig PA and William L. Dunker, Esquire,

8    collectively the attorney, have represented the

9    corporation in the preparation of this agreement."

10    That is, they have represented -- they have

11    represented the corporation.  And they go on to say

12    we don't represent the shareholders, we represent

13    the corporation.

14         Additionally, Judge, we have an issue here

15    where defendant Tek Source USA, also represented by

16    Greenberg in this particular action, has and has had

17    access to the corporate documents because Tek Source

18    USA handled the payables and receivables for

19    National Sourcing and one of the attachments to the

20    motion or one of the inclusions in the motion are

21    recent National Sourcing bank records.

22         And so counselor for Greenberg Traurig,

23    representing the company that has access to the bank

24    records and the accounting records for National

25    Sourcing, is actually still at least up until the

1    time of this check in August of 29, able to access

2    my client's bank records.  And so we have very, very

3    serious confidentiality concerns.  Greenberg Traurig

4    would seem to be sitting on a rather large pile of

5    my client's corporate records due to this

6    representation back in 2013.

7          So as I stand here today, Mr. Bracciale has

8    testified that he believed that Greenberg Traurig

9    represented National Sourcing.  We all know and I

10   don't think it's disputed that Greenberg Traurig

11   prepared the very documents that are attached to our

12   complaint and are at the center of this action.  And

13   the documents themselves would indicate that

14   Greenberg Traurig represented National Sourcing at

15   the very same time as the transactions at issue, and

16   actually transmitted those documents with the

17   documents for the transactions at issue.

18          The standard on the motion to disqualify, as

19   the court is likely aware, is we have to establish

20   the attorney-client relationship which is based on

21   the client's subjective understanding of whether

22   that relationship exists.  I would submit to the

23   court that it's not a subjective understanding here,

24   it's an objective understanding.  These documents

25   indicate very clearly that Greenberg Traurig

1     represented the corporation.  However, we have

2     attached additional documents to our sworn

3     declaration -- I understand the court is not going

4     to let us argue those today, but that would set out

5     a longitudinal record of what we understand the

6     representation to be.

7            And as is included in our motion, time and

8     again over the course of the history of the company

9     at least from 2010 to 2014, Greenberg Traurig and

10    Mr. Dunker drafted documents for the company's

11    submission to the United States federal government

12    to the VA in connection with their compliance for

13    signature by a Mr. Wolfson who was the first CEO --

14    I'm sorry, Mr. Stanton who was the first CEO,

15    Mr. Wolfson who was the second CEO, and Mr. Valdez

16    as well.

17           And so throughout this time Greenberg Traurig

18    is assisting the corporation in drafting documents

19    for the officers' signature in submission to the

20    Veterans Administration government entities as well.

21           THE COURT:  At the time that Mr. Valdez became

22    the owner of the National Sourcing company did he

23    meet with Greenberg Traurig's attorneys at all?

24           MR. DEES:  He communicated with them.  I can't

25    say at this point to offer testimony that he met

1    with Mr. -- he knows who Mr. Dunker is and after the

2    initial hearing that I mentioned, he said yes, I

3    know who Bill Dunker is --

4           THE COURT:  He's never met with him?

5           MR. LILLY:  Your Honor, that's not correct.

6    As I represent Mr. Valdez, he has met with

7    Mr. Dunker.

8           THE COURT:  Did that take place back at the

9    time of the sales or purchase transaction?

10          MR. LILLY:  Yes.

11          MR. WAGGONER:  They [inaudible] counsel for

12   Mr. Dunker.

13          MR. DEES:  Your Honor, just briefly, obviously

14   we're going to rely on the papers because that's

15   what we're here for.  When I get up and respond, I'm

16   going to respond to the fact that there is nothing

17   in their papers that would make such a suggestion.

18   So just for purposes of the record what has now been

19   represented is not within the four corners of the

20   papers that are before Your Honor.

21          THE COURT:  All right.  Let me ask, with

22   respect to those documents that you have highlighted

23   already, is there anything in those documents that

24   would talk about Mr. Valdez's relationship as the

25   owner with Greenberg Traurig?

1          MR. DEES:  Other than the shareholder

2     agreement that he was asked to sign, the ultimate

3     shareholder agreement that he did sign was a

4     different draft.  But at the time this draft was

5     presented, that was made for his signature and had

6     the representation that I mentioned to the court

7     that Greenberg Traurig represented the corporation.

8          THE COURT:  Now, say that again.  You said

9     there was a different agreement?

10         MR. DEES:  Yes.  Mr. Dunker ultimately -- my

11    understanding is -- left Greenberg Traurig and

12    prepared a second draft very similar to the one that

13    was attached to his email from Greenberg Traurig

14    that was ultimately signed that had the same recital

15    except it said Mr. Dunker representing the

16    corporation.  But at the time these documents were

17    presented, Greenberg Traurig had asserted that they

18    represented the corporation.

19         THE COURT:  Let me just confirm again,

20    although it is not in the motion, did Mr. Valdez

21    obtain separate counsel when he was making the

22    purchase?

23         MR. DEES:  No, Your Honor.

24         THE COURT:  He did not consult with my

25    attorney?

1          MR. DEES:  The attorneys he was consulting

2     with were Greenberg Traurig.  And that was

3     consistent with the testimony --

4          THE COURT:  I understand, Mr. Waggoner.

5          MR. DEES:  That was consistent with the

6     testimony from Mr. Bracciale attached to the motion

7     saying that Mr. Dunker from Greenberg Traurig acted

8     as a neutral and also testified that he communicated

9     with the parties and Mr. Valdez in connection with

10     the transaction being the prom note, stock pledge

11     and security agreement.

12          THE COURT:  All right.  So he, Mr. Valdez,

13     doesn't have any separate retainer agreement or

14     letter -- other than the documents that you've

15     already pointed out there is no additional

16     documentation or correspondence that you are relying

17     upon today.

18          MR. DEES:  Not for separate counsel, Your

19     Honor.  The closest thing we have, barring further

20     discovery, is the payment of the invoices by

21     National Sourcing again and again and again, I think

22     there is eight of them listed.  I would imagine that

23     there are more during that time period and

24     immediately after these documents were prepared

25     through 2014.

1          THE COURT:  Let me take a look at the email

2     again that you pointed out to me.

3          MR. DEES:  And I have a courtesy copy for the

4     court.

5          THE COURT:  I do have it.

6          MR. DEES:  Very good.

7          THE COURT:  All right.  And your client was

8     not copied on that email?

9          MR. DEES:  No, he was not.  They were

10    ultimately forwarded to him by Mr. Bracciale who at

11    that time was in the employ of National Sourcing.

12         THE COURT:  All right.  Okay.  Do you want to

13    go on to talk about the nature of the action,

14    whether it's related to the prior representation?

15         MR. DEES:  I do, yes, the second prong, Your

16    Honor.  Obviously there is the instruments

17    themselves which are attached to our complaint and

18    amended complaint.  Those are listed in this email.

19    And so my understanding of the connection to the

20    matter at issue for disqualification is that it has

21    to be a relevant issue, not the central issue.  In

22    this case it is the central issue.

23         Furthermore, our theory of the case from the

24    plaintiffs is that these instruments as they are set

25    up were designed to siphon off profits and control

1      to Mr. Bracciale in violation of federal statutes.

2      So to the extent that the representation was also in

3      connection with SDVO compliance, federal regulation

4      compliance, it is the central theory of our case is

5      that these instruments cannot stand.

6           And we have more documents now that we've been

7      able to do forensic searches.  I know Your Honor is

8      not going to entertain those today.  However, at

9      least the documents we have have a lot to do that

10     we've included in the court file with SDVO

11     compliance and that was the nature of the

12     representation whether or not there was SDVO

13     compliance.

14          And so what I'm telling the court is that

15     Greenberg Traurig represented National Sourcing in

16     connection with the central theory of our case and

17     the specific instruments connected with the

18     pleadings.

19          THE COURT:  Well, your complaint has a lot of

20     allegations related to fraud and misrepresentations

21     about valuation of the company.  How does that

22     relate to your contentions about what Greenberg

23     Traurig did?

24          MR. DEES:  That's right, Your Honor.  In the

25     context of the federal regulations at issue which

1       are in the general allegations of my complaint, we

2       have a declaratory judgment action to declare that

3       these instruments are invalid as having been

4       designed to skirt those regulations.

5               THE COURT:  The documents are invalid?

6               MR. DEES:  Unenforceable --

7               THE COURT:  Which documents are you talking

8       about?

9               MR. DEES:  The ones attached to the email that

10      I've shown from Greenberg Traurig, being the

11      promissory note, the security agreement, the stock

12      pledge.  Those documents were designed to afford

13      Mr. Bracciale an unlawful level of control.  And as

14      I said in the general allegations of the pleadings

15      we talk about -- and also in the declaratory

16      judgment action -- that these documents violate

17      those laws.  And to the extent they siphoned off

18      millions of dollars to Mr. Bracciale, they are a

19      violation of those laws.

20              And so with the representation being both as

21      to these particular instruments and also as to

22      compliance, with Greenberg Traurig having designed

23      the structure by which those profits could go to

24      both Mr. Bracciale and Tek Source USA, it was an

25      attempt to intentionally design that scheme to

1      siphon off those monies to get around the federal

2      regulations that dictate that the SDVOSB must be

3      owned by a veteran, a disabled veteran, and that

4      disabled veteran must be the highest compensated

5      employee of the company.  In other words, they found

6      a work-around.

7           So in the same breath that Greenberg Traurig

8      is representing the company in connection with

9      compliance, they're communicating directly with

10     Mr. Bracciale, a National Sourcing employee, to help

11     him design this transactional scheme to siphon off

12     those monies.  And it's quite a bit of money, Your

13     Honor.

14          THE COURT:  Now, let me ask you, I know that

15     there is a motion to dismiss pending.  Do you have

16     any argument related to whether it's premature to

17     address this issue at this point, given the need to

18     determine whether this I guess the conduct or

19     actions of Greenberg are related to the allegations

20     in the amended complaint and really the allegations

21     in the amended complaint may not necessarily be

22     finally determined as a result of the pendency of

23     the motion to dismiss?

24          MR. DEES:  Well, my answer may not please the

25     court, but I think it's something that I have to

1    take up as soon as I can on behalf of National

2    Sourcing and I think that with this new information

3    that we've had to dig out in connection with the

4    disqualification, there is a lot more color to add

5    to a potential second amended complaint.  And I

6    can't speak intelligently to the very long motion to

7    dismiss.

8         However, I would say that the amended

9    complaint that we have filed is very well documented

10   in terms of exhibits and support and so there is

11   enough of record to be able to address this now and

12   I think I have to address this now.

13        THE COURT:  Let me hear from Mr. Dees and then

14   I'll give you an opportunity to respond.

15        MR. WAGGONER:  Thank you.

16        THE COURT:  Have you completed your argument?

17        MR. DEES:  I have, Your Honor.  Beyond that,

18   again, not to be repetitive, but the record is very

19   clear and based on Mr. Bracciale's own testimony we

20   understand that Greenberg Traurig represented the

21   company and the company was certainly paying them

22   for the very instruments that we're litigating

23   before the court.  And the testimony has been that

24   Greenberg Traurig definitely represented from

25   Mr. Bracciale's testimony that Greenberg Traurig

1       definitely represented the company in connection

2       with compliance issues and submissions to the

3       federal government which are a central portion of

4       the general allegations of the complaint is whether

5       or not the company was compliant.

6               THE COURT:  Let me hear from Mr. Tishman

7       quickly.  Did I get your name right?

8               MR. LILLY:  I'm sorry, Your Honor, Mr. Lilly.

9               THE COURT:  Mr. Lilly.  I'm sorry.

10              MR. WAGGONER:  Your Honor, obviously you can

11      hear from anybody, but the motion has been filed by

12      NSI who Mr. Dees represents.  Mr. Lilly's client has

13      not filed a motion to disqualify.

14              THE COURT:  Right.  I will note that.  And if

15      you will keep any additional remarks that you have,

16      Mr. Lilly, brief.

17              MR. LILLY:  I will, Your Honor.  Your Honor, I

18      want to point out a couple of basic things to make

19      certain that Your Honor is aware of them.  Some are

20      in the record.  There is another piece of litigation

21      that's also going on amongst certain of these

22      parties, not all of these parties, that is pending

23      currently.  It was filed after this lawsuit, but it

24      was filed in a state court case -- what we refer to

25      as the state court action that's in the business

1      court.

2            The business court has now scheduled an

3      evidentiary hearing on disqualification of Greenberg

4      Traurig to occur in the latter part of January.  I,

5      when I saw this motion filed, immediately

6      requested -- I've done it in writing twice,

7      beginning of November on the 6th and the 7th of

8      November, asking to coordinate depositions both in

9      this matter -- because Your Honor had scheduled this

10     initial hearing -- but also in connection with the

11     evidentiary hearing.

12           There is now an order compelling Greenberg to

13     attend depositions.  We're working on the dates of

14     those, those are going to occur in January.  But

15     when Your Honor asked whether it's premature, I

16     certainly understand NSI's position, but from

17     Mr. Valdez's position we believe some discovery

18     needs to go into these issues.  And I would point

19     out to Your Honor one of the most significant

20     reasons for that is in the written response that was

21     filed on November 1st, Attachment F, is a set of

22     letters that we believe Greenberg Traurig drafted

23     and they're using those as some indication of

24     tantamount admissions by my client, Mr. Valdez --

25           THE COURT:  Are you referring to the documents

1    that we're not going to talk about today?

2         MR. LILLY:  I am not, Your Honor.

3         THE COURT:  Okay.

4         MR. LILLY:  I'm referring to the written

5    response to the NSI motion and I'm specifically

6    referring to docket entry 28-6.

7         THE COURT:  I see.  Yes.

8         MR. LILLY:  It is somewhat surprising to me

9    that Greenberg Traurig pulled this out of its file,

10   somewhat surprising Greenberg Traurig was not in my

11   opinion candid about how they got it or the fact

12   that they drafted it.  But it's a perfect example

13   and the reason is you asked the questions about

14   Mr. Valdez, it's a perfect example of where

15   Mr. Valdez has in fact met with and relied upon

16   Greenberg Traurig to make representations and assign

17   representations that were made to the United States

18   government.

19        THE COURT:  Now, the action that is separately

20   pending, is that the receivership action?

21        MR. LILLY:  Well, Your Honor, it's not a

22   receivership action, it's actually an effort to

23   enforce the loan documents that are the subject of

24   the claims that are brought before this court.

25        So there is also a pending motion to stay that

1    underlying case.   The state court has decided now to

2    set that for hearing as well and that's scheduled to

3    occur on December 15th, but we are set -- the next

4    two hearings in that case are a motion to stay the

5    underlying state court case action as this one

6    proceeds --

7              THE COURT:   Was that action filed by

8    Mr. Bracciale?

9              MR. LILLY:   It was filed by Saint Anton

10   Capital and Stephen Bracciale, yes, Your Honor.

11             THE COURT:   All right.   Thank you for that.

12             MR. LILLY:   Thank you, Judge.

13             MR. WAGGONER:   Good morning, Your Honor.   Let

14   me start with the last document that you were shown

15   which was Exhibit 6 to Greenberg Traurig's response

16   in opposition, just to briefly address it.   You'll

17   note that it's a letter dated September 16th, 2015.

18   Greenberg Traurig stopped any representation of

19   Mr. Bracciale in 2013.   So to the extent that this

20   -- this document has nothing to do with Greenberg

21   Traurig, they had no involvement in this whatsoever.

22             So to the extent there is any suggestion that

23   Greenberg Traurig was involved in this document is

24   just factually mistaken and I'll talk about that as

25   I go through some of the issues before Your Honor.

1          Let me start -- I want to back up a little bit

2     and talk a little bit about specifics here because

3     it's very important to focus on the specifics and

4     what NSI is doing is painting with a very broad

5     brush.  And before I get into those specifics, I'd

6     also like to take a step back and address what it is

7     we're really talking about and how this all got

8     started.

9          Well, what we're talking about is the fact

10    than Mr. Valdez defaulted on a $5.1 million

11    promissory note to a company owned by Mr. Bracciale.

12    And so once he was in default on this promissory

13    note, he began an effort to avoid paying the

14    promissory note.  So Mr. Valdez and his attorneys

15    directed NSI to file complaints against

16    Mr. Bracciale and Ms. Tam, their companies.  And in

17    the end they took it even a step further and they're

18    now seeking to disqualify Greenberg Traurig, the

19    long time counsel to Mr. Bracciale.

20         So NSI's request -- and again, it's only NSI

21    that's moved for disqualification here.  They're

22    asking this court to impose what all courts

23    recognize is one of the most drastic and one of the

24    most disfavored remedies that's out there.  Courts

25    consistently hold that disqualification motions

1          should be viewed with skepticism because they're

2          often interposed for a purpose, for a litigation

3          purpose.  And what we have here is a $5.1 million

4          note in default and now lo and behold Mr. Valdez's

5          company is seeking to disqualify Greenberg Traurig.

6                Courts consistently hold that there must be

7          compelling circumstances and specific circumstances

8          in order to justify disqualification.  They have a

9          high burden, Your Honor.  They can't paint with a

10         broad brush, they can't just say things generally

11         and ask Your Honor then to conclude that

12         disqualification is appropriate.

13               So contrary to what sort of has been intimated

14         to you this morning, NSI did not hire Greenberg

15         Traurig.  NSI never hired Greenberg Traurig, NSI

16         never had an engagement agreement with Greenberg

17         Traurig.  Mr. Bracciale and Ms. Tam hired Greenberg

18         Traurig back in 2010 and I'll talk a little bit more

19         detail about that in a moment.

20               It is true that in the work that Greenberg

21         Traurig did for Mr. Bracciale and Ms. Tam that they

22         prepared a shareholder agreement that ostensibly was

23         done for NSI.  That shareholder agreement, Your

24         Honor, isn't even mentioned in this amended

25         complaint that has been filed and it has no

1    relationship whatsoever with any of the claims that

2    are involved in this matter.

3         So the court has to focus on specifics and NSI

4    hasn't come forward with any specifics to suggest

5    that Greenberg Traurig was in fact representing NSI

6    in these matters.  So with that sort of general

7    background, I would like to kind of go through this

8    in some detail and talk about the rules and the

9    governing law.

10        Their motion references both Rule 4-1.7 of the

11   rules regulating the Bar and Rule 4-1.9.  Rule 4-1.7

12   has no application here because NSI is not a current

13   client of Greenberg Traurig.

14        So the question is was NSI a former client of

15   Greenberg Traurig under Rule 4-1.9.  And the

16   analysis that the rules require and that the courts

17   require is really two-fold.  First is whether there

18   was an attorney-client relationship between NSI and

19   Greenberg Traurig; and then second, if there was an

20   attorney-client relationship between NSI and

21   Greenberg Traurig, are the claims in this current

22   lawsuit the claims that NSI is now bringing against

23   Mr. Bracciale and everyone, are those claims

24   substantially related to whatever work Greenberg

25   Traurig may have done for NSI.  So that's the

1     analysis.

2          So the first prong is is there an

3     attorney-client relationship.  Well, as I said,

4     there is no engagement letter between Greenberg

5     Traurig and NSI.  And the law is clear that when

6     there is no formal engagement letter, a court looks

7     to whether the client believes he is consulting a

8     lawyer to seek professional advice.  It's a

9     subjective test.  It's not an objective test, which

10    NSI's counsel argued to Your Honor, it's a

11    subjective test.  And we cited the Jackson case in

12    our papers regarding that.

13         And the subjective belief has to be supported

14    by specific facts that show that NSI believed that

15    it was relying upon Greenberg Traurig as its

16    counsel.  And as I go through this, Your Honor, I'll

17    point out, there are no such facts.  None have been

18    pled, there is none in the verified motion.

19         THE COURT:  Let me ask you, because we are

20    dealing with a corporation and you're talking about

21    subjective belief, how do we determine the

22    subjective belief of a corporation?

23         MR. WAGGONER:  The subjective belief of a

24    corporation will be derived from the belief of its

25    officers or directors.  And so as you go through

1    this story, you have Mr. Stanton in 2010 and it

2    progresses forward until Mr. Valdez comes on the

3    scene where he acquires stocks in 2012 and then

4    becomes the sole owner of the company in 2013.

5         And there is nothing in any of the papers that

6    have been submitted that say that Mr. Stanton

7    believed he was hiring Greenberg Traurig as his

8    counsel; that the subsequent owner Mr. Wolfson, that

9    he believed that he was engaging Greenberg Traurig

10   as his counsel for NSI.  And there is nothing from

11   the papers that NSI has submitted that say that

12   Mr. Valdez believed that he was engaging Greenberg

13   Traurig to represent NSI or himself.

14        What the papers show is that Mr. Bracciale had

15   significant interests that he was seeking to protect

16   so he engaged Greenberg Traurig to represent his

17   interests and Ms. Tam's interests.  And he did work

18   at the direction -- I'm sorry, Greenberg Traurig did

19   work at the direction of Mr. Bracciale.  So they

20   have to come forward with specific facts that would

21   establish an attorney-client relationship with

22   Greenberg Traurig and I would submit to Your Honor

23   that they haven't done that.

24        Now, the second prong of the analysis is if

25   there is an attorney-client relationship -- and I

1    preface that with if -- then the question is was the

2    work that was done, is it substantially related to

3    the current lawsuit.

4          And as I mentioned before, there was

5    incidental work done by Greenberg Traurig that

6    benefited NSI, they prepared a shareholder agreement

7    and they prepared some corporate minutes and bylaws.

8          That work Greenberg Traurig undertook at the

9    direction of Mr. Bracciale, but it states in the

10   shareholder agreement that they were serving as

11   counsel for NSI.  That work has no relationship

12   whatsoever to any of the claims that are involved in

13   this lawsuit.

14         So for purposes of looking at the substantial

15   relationship test, there is really no hard and fast

16   rule on this, you have to look at the specific facts

17   of the case.  What the Bar sort of counsels you to

18   look at is, gee, is the lawyer switching sides and

19   somehow saying I've done this work and I did it at

20   Point A and now we're at Point B and I'm taking a

21   different position and I'm saying, you know, that

22   work that I did before, I'm criticizing that or I'm

23   saying that that work wasn't properly done.  And so

24   you see that there has been a shift in the way the

25   lawyer is representing a client.

1           There is no shift here where Greenberg Traurig

2      is in any way saying, gee, the work that we did in

3      preparing the shareholder agreement was somehow not

4      properly done.  They're not taking that position at

5      all.

6           The other thing that you sometimes see in

7      these substantial relationship cases is whether it's

8      the same -- is it the exact same transaction.  And

9      I'll talk a little bit about some of the cases in a

10      minute.  But the work that Greenberg did in terms of

11      preparing the shareholder agreement or these

12      minutes, they don't have anything to do with what's

13      being alleged by NSI in this lawsuit, they're just

14      unrelated to the claims that are being brought here.

15           So they happened contemporaneously and it's

16      part of the mix of things that were done in order to

17      complete those transactions, but those documents

18      aren't being questioned.

19           So what Your Honor has to look at is both is

20      there an attorney-client relationship with NSI; and

21      to the extent there is or to the extent Greenberg

22      Traurig did any work, is that work substantially

23      related to what is at issue in this lawsuit?

24           So I think it's also important to focus on

25      what are they claiming in the lawsuit.  And so NSI

1      has actually asserted four claims in the lawsuit.

2      Their second claim, Count Two of the lawsuit, is for

3      RICO and they bring it against Mr. Bracciale and

4      Ms. Tam and their two companies.  And they basically

5      say that Ms. Tam's company, which I just went blank

6      on the name of the company, issued fraudulent

7      invoices and inflated charges to NSI.  Tek Source.

8           Well, who prepared the administrative service

9      agreement?  Greenberg Traurig did.  For Ms. Tam and

10     Tek Source.  They didn't prepare it for NSI.

11     Greenberg Traurig was engaged in 2010 by Ms. Tam and

12     Mr. Bracciale and they prepared documents on their

13     behalf.  So the document that NSI is complaining

14     about and is suing about, Greenberg Traurig prepared

15     for its client, Ms. Tam and Tek Source.

16          So this idea that there is some type of

17     relationship with NSI there is false.  And the idea

18     that there is some type of conflict that somehow

19     Greenberg is now saying, well, it really prepared

20     this document for NSI -- that's not true.  Or

21     somehow attacking the validity of that document,

22     it's just not true.

23          The only engagement letter here was in 2010

24     with Mr. Bracciale and Ms. Tam.  And pursuant to

25     that engagement letter, this was one of the

1          documents that was prepared, the administrative

2     services agreement that NSI is now complaining about

3     and Greenberg Traurig is saying it was properly

4     prepared for its client, Tek Source and Ms. Tam.

5          The other thing that they raise in Count 2 is

6     that Mr. Bracciale set up this ownership structure

7     in order to somehow defraud Mr. Valdez or the

8     government.  Well, what are they talking about?

9     They're talking about the promissory notes that were

10    entered into starting in 2011, I believe, and I'll

11    go through those, the security agreement that bound

12    the assets in order to pay back the promissory note

13    to Mr. Bracciale.

14         Who prepared that document?  Greenberg

15    Traurig.  Who did they prepare it for?  Their

16    client.  Their client asked them to prepare that

17    document.  And eventually Mr. Valdez is the one who

18    inherited or took over the one promissory note that

19    he's now complaining about.

20         But Greenberg Traurig didn't prepare that

21    document for NSI, didn't prepare it for Mr. Stanton,

22    didn't prepare it for Mr. Wolfson, didn't prepare it

23    for Mr. Valdez.  These are documents that they

24    prepared for their client.  So they never

25    represented NSI on those documents and they're not

1       somehow switching sides or suggesting that there is

2       something wrong with those documents.

3           So that's the RICO count.  The other counts

4       essentially go through the same set of documents.

5       It's really the same thing.  We don't want to pay

6       this promissory note so we're going to come up with

7       all sorts of theories why we don't have to pay it.

8       So now we're going to claim there is a breach of

9       fiduciary duty and aiding and abetting a breach of

10      fiduciary duty.

11          And what do they complain about?  Well,

12      Mr. Bracciale had this structure where he was

13      getting these profits.  How was he getting these

14      profits?  Through these promissory notes and through

15      the security agreement that tied up the assets.

16      Those were again documents that Greenberg Traurig

17      prepared on behalf of its clients, not NSI.  And

18      we're not challenging those.

19          And the same thing with the declaratory

20      judgment count which is Count 5.  They say that the

21      security agreement which tied up NSI's assets is

22      somehow illegal or invalid.  Well, again, who did

23      Greenberg prepare that for?  Mr. Bracciale, not for

24      NSI.  They say the administrative services agreement

25      for Tek Source and Ms. Tam, they say that that's

1    invalid.  Who prepared that?  Greenberg Traurig, for

2    Ms. Tam and Tek Source.

3        THE COURT:  Let me ask you, you mentioned

4    before that I should look at the shareholder or

5    owner to figure out whether or not they subjectively

6    believe they were represented.  Is Bracciale in

7    essence NSI?

8        MR. WAGGONER:  Mr. Bracciale came to Greenberg

9    -- backing up, the company was started in 2005 and

10   it was an individual named John Stanton and

11   Mr. Bracciale who conceived of going forward with

12   this company.  Mr. Stanton was the service disabled

13   veteran.  Mr. Bracciale was not a service disabled

14   veteran, but Mr. Bracciale could provide services to

15   the company.

16       And so in 2010 Mr. Bracciale came to Greenberg

17   Traurig for legal advice about how can my

18   relationship with this company be structured --

19   because he was not going to be the service disabled

20   veteran.

21       And so what was structured in 2010 was a

22   consulting agreement and these promissory note

23   relationships.  So Mr. Bracciale was not an officer

24   at that point in time.  He eventually became a

25   shareholder at a later point in time.  But in terms

1     of who was acting for NSI and John Stanton was a

2     sophisticated individual and you'll see that in the

3     exhibits to the document where he was structuring

4     different tax aspects of how this corporation was

5     going to be set up and Mr. Bracciale was looking out

6     to protect his financial interests.

7              THE COURT:  Was Mr. Stanton represented by

8     separate counsel?

9              MR. DEES:  Mr. Stanton was, as I understand

10    it, a CPA and he handled his own issues.  And so

11    when they formed the company in 2005 it was only

12    Mr. Bracciale and Mr. Stanton, there weren't any

13    attorneys involved.

14             It wasn't until 2010 that Greenberg Traurig

15    was consulted by Mr. Bracciale and Ms. Tam in order

16    to help them deal with their sort of interests in

17    this company because Mr. Stanton was having problems

18    getting security clearance with the federal

19    government.  So that's why they went to their

20    counsel to get advice about how do we protect

21    ourselves.  And so what ultimately --

22             THE COURT:  Let me just ask you, was

23    Mr. Stanton then told -- and again, this is not in

24    the papers, so feel free to mention that back to me

25    or it may be that we need to look at the documents

```
1    themselves.  But was Mr. Stanton told that Greenberg

2    Traurig represented Mr. Bracciale and that it was

3    not going to be joint counsel for all of the parties

4    involved and that Mr. Stanton may need to obtain

5    separate counsel and NSI may need to get separate

6    counsel?

7         MR. WAGGONER:  I'm going to look at one of the

8    exhibits and see.  Okay.  What I was going to direct

9    Your Honor to -- and I can't -- it's not in the

10   record in terms of all of the communications that

11   occurred between Mr. Stanton and Mr. Bracciale, but

12   what is in the record is Greenberg Traurig's

13   engagement letter.  And the engagement letter is

14   with Mr. Bracciale and Ms. Tam and it specifically

15   says that Greenberg Traurig -- this is Exhibit C to

16   our opposition.  And it specifically says that

17   Greenberg Traurig's scope of engagement does not

18   include representation of Mr. John Stanton or

19   National Sourcing Inc., but relates only to an

20   analysis and recommendations related to your

21   relationship with National Sourcing and Mr. Stanton.

22        So that's what the engagement letter says.  I

23   have no knowledge to believe that Mr. Bracciale

24   represented anything inconsistent with this

25   engagement letter to Mr. Stanton, but clearly
```

1    Greenberg Traurig was engaged to represent the

2    interests of Ms. Tam and Mr. Bracciale.

3         So that's who Greenberg Traurig has always

4    worked for.  And NSI, who comes here and before Your

5    Honor and asks to disqualify Greenberg Traurig, has

6    to demonstrate that NSI had an attorney-client

7    relationship with Greenberg Traurig.  So they have

8    not come forward with any evidence from Mr. John

9    Stanton that said I believed that Greenberg Traurig

10   was my lawyer and that I was relying on Greenberg

11   Traurig.  They don't come forward with anything like

12   that.

13        And then Mr. Stanton left the company in

14   2010 -- I'm sorry, 2011 because he had a security

15   clearance problem.  And at Mr. Bracciale's request

16   Greenberg Traurig then prepared the documents that

17   are ultimately at issue in this case and they

18   prepared them for Mr. Bracciale.  They prepared a

19   promissory note for the service disabled veteran who

20   took the place of Mr. Stanton, it was an individual

21   by the name of Mark Wolfson.  And Mark Wolfson

22   became the 51 percent owner of the company at that

23   point in time and he signed this promissory note

24   back in 2011.  This is the same promissory note that

25   ultimately Mr. Valdez has stepped into the shoes of.

1          So here we are, we're back in March of 2011

2     and Mr. Bracciale is protecting his financial

3     interests by obtaining a promissory note from Mark

4     Wolfson.

5          There is no evidence before Your Honor that

6     would suggest that Mr. Wolfson somehow believed that

7     the lawyers who were representing Mr. Bracciale in

8     drafting a promissory note and drafting the security

9     agreement and the stock pledge agreement to protect

10    that promissory note, that they were also

11    representing him.  There is nothing to suggest that.

12         And Your Honor, I would submit that that

13    doesn't make any sense because that's not who

14    Greenberg Traurig was representing; they were

15    representing the interests of Mr. Bracciale and

16    they're protecting the interests of Mr. Bracciale.

17         So the note that's in question here was

18    prepared by Greenberg Traurig on behalf of its

19    client, Steve Bracciale and his company Saint Anton

20    Capital, in March of 2011.  And there is no evidence

21    that anyone from NSI or Mr. Wolfson personally ever

22    asked Greenberg to represent them.

23         Now, it's not until 2013 when Mr. Wolfson has

24    some security clearance problems that Mr. Valdez

25    then steps into the shoes of this $5.1 million

1      promissory note.  So the note had already been

2      prepared; it's just restated to change the maker

3      from Mr. Wolfson to Mr. Valdez.  So this is a note

4      that goes back to 2011.

5           And again, there is nothing in the record that

6      suggests that Greenberg Traurig was representing

7      anyone other than its clients, Steve Bracciale and

8      his company Saint Anton Capital.

9           Now, the other documents that were done sort

10     of what I call the clean-up documents in order to

11     finalize those transactions, they include the

12     shareholder agreement that you heard about earlier

13     that does include the paragraph where Mr. Dunker

14     says that Greenberg Traurig is representing NSI on

15     this document.  And it also includes some simple

16     minutes in order to reflect that these are the

17     transactions that are happening.

18          So that is -- to the extent Greenberg Traurig

19     represented -- and I'm putting quotes around that

20     word -- represented NSI, it was simply to do these

21     clean-up documents that were incidental.  But those

22     documents aren't what's at issue before Your Honor.

23     I mean, the shareholder agreement deals with things

24     like who can sell -- buy/sell between the company,

25     the rights in terms of nondisclosure and

1    confidential information, termination of employees,

2    nonsolicitation of employees.  There is nothing

3    about any of those issues that are involved in this

4    litigation.  No one is saying this is about the

5    shareholder agreement and Article 4 of the

6    shareholder has been violated.  There is nothing

7    like that here.

8         So the document in which Greenberg Traurig

9    stated on its face that it was being done on behalf

10   of NSI is not at issue in this case and so to the

11   extent that Greenberg Traurig incidentally did

12   anything for NSI in order to complete its work, it

13   is not substantially related to the claims that are

14   at issue here.

15        The other thing I want to point out is when

16   you're dealing with a corporation and someone has a

17   relationship with a corporation and is asking that a

18   lawsuit prepare documents for his or her benefit,

19   the corporation is a party to those agreements as

20   well oftentimes.  And so there are scenarios where

21   it's like okay, this shareholder agreement, for

22   example, is this something that the corporation

23   wanted.  I guess so.  Does it benefit the

24   corporation?  Did the corporation need minutes in

25   order to reflect these transactions?  Sure, it needs

1   those things.  They sort of incidentally benefit the

2   whole picture.

3        But the point is that even though work that

4   Greenberg Traurig did for its clients, Mr. Bracciale

5   and Ms. Tam, if it had some incidental benefit for

6   NSI as well because it needed these documents for

7   its corporate books or it needed a draft of

8   something, that doesn't transform Greenberg Traurig

9   into the attorneys for NSI.

10       And there are a number of cases that stand for

11  the proposition that even though you perform legal

12  services that may benefit a corporation, that does

13  not create an attorney-client relationship with that

14  corporation.

15       And I'll cite you a case because I'm not sure

16  it's in our papers, but it's the In Re Lentech

17  International case, it's 377 Bankruptcy Reporter 396

18  at page 402 and it was affirmed by the Eleventh

19  Circuit at 346 Fed. Appx. 430.  So that stands for

20  the proposition that even where an attorney prepares

21  documents for his or her client that may benefit a

22  corporation, that doesn't create an attorney-client

23  relationship with that corporation.

24       I have that in a case right now before Judge

25  Williamson where I represent a law firm that

1      prepared documents at the direction of its client

2      for the benefit of another related company and Judge

3      Williamson has ruled in the FLTCI case that that did

4      not create an attorney-client relationship with the

5      company for whom that work was done.  So I wanted to

6      make that point.

7           The other point I wanted to make is you heard

8      this reference about bills.  And again, paint with a

9      broad brush.  Well, the only evidence before Your

10     Honor is that the declaration or the affidavit of

11     Mr. Bracciale who said the bills were sent to me

12     because he was the client and to the extent NSI paid

13     those bills, it was because NSI owed him money.  And

14     so he asked that in order for them to satisfy

15     financial obligations to him, that they paid those

16     bills.  So the bills weren't sent to NSI, they were

17     sent to Mr. Bracciale.  And the fact that they paid

18     them, they were satisfying an obligation to

19     Mr. Bracciale.

20          And even more importantly the law is very

21     clear that even though some third party pays a legal

22     bill, that in and of itself does not create an

23     attorney-client relationship with that party.  And

24     we cited all of those decisions in our papers.

25          So to kind of sum up, what Greenberg Traurig

1    did is that it prepared a number of documents in

2    order to -- let me back up even further.  Greenberg

3    Traurig was hired by Mr. Bracciale and Ms. Tam in

4    2010.  That's the only engagement letter that was

5    ever entered into.

6         In order to protect the interests of their

7    clients, Greenberg Traurig did work at the direction

8    of Mr. Bracciale and Ms. Tam over the next three

9    years and that work essentially was the

10   administrative services agreement, the consulting

11   agreement for Mr. Bracciale, and then the promissory

12   notes, the security agreement, and the stock pledge

13   agreement, all done for Mr. Bracciale or Ms. Tam,

14   all done to protect their interests.

15        Those are the documents, those are the things

16   that NSI is creating these claims about and claiming

17   that somehow Greenberg Traurig represented them on

18   that, yet they have provided no evidence of that.

19   And it's illogical to assume that these documents

20   were prepared -- which were prepared for these

21   individuals were somehow being done for NSI, there

22   is nothing to support that.

23        The only work that Greenberg did was with

24   respect to this shareholder agreement and some

25   miscellaneous corporate documents, none of which are

1       at issue in this case and they certainly are not

2       substantially related to any of the issues in this

3       case.

4            So they haven't demonstrated an

5       attorney-client relationship between NSI and

6       Greenberg.  And to the extent that they have pointed

7       to some work done by Greenberg, it has no

8       relationship whatsoever to the issues that are

9       before Your Honor.

10           The last thing -- I guess a couple final

11      points.  This one thing they like to point about,

12      the shareholders agreement in 2013, well, that's not

13      even the operative shareholders agreement.

14           Mr. Dunker has submitted a sworn declaration

15      and he left Greenberg Traurig in October of 2013 and

16      that's when Greenberg Traurig's work ended.  So

17      Mr. Dunker has submitted a sworn declaration and

18      subsequent to leaving Greenberg Traurig there were

19      some additional things that occurred at NSI and he

20      worked on those and he prepared a new shareholders

21      agreement because the shareholder relationship

22      changed.  Mr. Valdez went from a 100 percent owner

23      to a 51 percent owner with Mr. Bracciale owning the

24      other 49 percent.

25           So when that occurred, a new shareholders

1    agreement was entered in 2014.  And so again, the

2    2013 shareholder agreement that was done with the

3    reference to Greenberg Traurig as being counsel to

4    NSI, which has nothing to do with this case, it

5    isn't even the operative shareholder agreement, it's

6    the 2014 shareholder agreement and that has nothing

7    to do with this case either.

8         The final point that I would like to make is

9    the courts that have looked at disqualification,

10   they require compelling reasons, they require

11   specificity.  They require, in order for the drastic

12   measure to be imposed, that there is specific

13   evidence of a law firm switching sides, having

14   confidential information, somehow you're on opposite

15   sides of the same transaction.  We haven't heard

16   that here.

17        And there are cases which we've cited in our

18   papers, the Fennick case, where the courts really

19   look -- look, it's not good enough for you to just

20   sort of talk about superficial relationships, you've

21   got to delineate with specificity or we're not going

22   to grant your motion.

23        And there is the Frank Weinberg case where the

24   lawyers were involved dealing with the same

25   documents, but the court said that the nature of the

1    claims in the later case do not rise to the level of

2    a substantial relationship that would require

3    disqualification because a party's choice of counsel

4    is so important.

5        So when you're dealing with a case like this

6    where you've got an individual who is trying to

7    collect on money that's owed to him and the other

8    individual then throws the kitchen sink in a broad

9    manner in response and then takes the next step to

10   disqualify that individual's counsel, I would submit

11   to Your Honor it's a very high burden and that they

12   have not met the burden.

13       And so on the record before Your Honor we

14   think it's clear that you can deny the motion for

15   disqualification.  If you have any doubts -- and I

16   hope you don't -- we would request an evidentiary

17   hearing.  But I think the record is clear and they

18   haven't met their burden.  So I appreciate it.  If

19   you have any questions, I'm obviously here.

20       THE COURT:  The only other question I have is

21   about the timing, given the pendency of the motion

22   to dismiss, the same question to you:  Is it

23   premature at this point?

24       MR. WAGGONER:  Well, I think, Your Honor, we

25   believe the motion to dismiss is well taken and that

1      there are significant problems with the claims.  And

2      as those claims go away, there is either nothing or

3      a narrower set of claims for the court to look at to

4      determine whether there is any substantial

5      relation -- was there an attorney-client

6      relationship that Greenberg had with respect to any

7      of the work done on the claims that remain?  I don't

8      think so.  I'm not sure what would remain.  And then

9      if so, was there a substantial relationship.

10             So we think the motion to dismiss is well

11     taken in that some or all of the complaint will be

12     dismissed.  And so we defer to the court in terms of

13     the order in which it wants to address these issues

14     in terms of deciding what is the scope of the claims

15     that it needs to evaluate from both the

16     attorney-client and substantial relationship

17     standpoint.

18             THE COURT:  What consideration should be

19     placed on the pendency of the case in state court,

20     somewhat related to the collection of the note.

21     Sounds like a motion to disqualify was filed there

22     as well.

23             MR. WAGGONER:  Your Honor, without a doubt

24     this is one of those cases where there has been

25     tactical decisions to make in terms of going to

1    different places and I'm not going to really comment

2    on the propriety of those decisions.

3         We're before Your Honor on a motion which we

4    do not think is well made and does not satisfy the

5    requirements and so that's why we're here and we'll

6    obviously address in state court the same

7    considerations to the extent we're required to do

8    so.

9         THE COURT:  So there is no argument that any

10   deference should be placed on the state court

11   proceeding, was that filed first or was the motion

12   first filed there?  I'll give you a chance to speak

13   after Mr. Waggoner.

14       MR. WAGGONER:  My recollection of the timing

15   is the NSI parties initially filed the suit in state

16   court and the Bracciale parties filed a

17   counterclaim.  There was some preliminary hearings.

18   In fact, you were read some testimony from that

19   hearing -- which, by the way, again painting with a

20   broad brush, that testimony was Mr. Bracciale

21   talking about the shareholder agreement, not all of

22   the documents as was represented to Your Honor.

23        After that hearing the plaintiffs dismissed

24   their case.  They then filed this case here in this

25   court and then another case got filed in state

1      court.  So in terms of first filed, I don't think

2      that there is any priority issues that Your Honor

3      needs to consider or worry about.

4           THE COURT:  All right.  Thank you very much.

5           Mr. Dees, and then I'll let Mr. Lilly, if you

6      have any additional thoughts.

7           MR. DEES:  As a point of clarification, Judge.

8      Of the two pending actions, the one here and the one

9      in state court, this one was filed first.

10     Mr. Valdez filed an action prior to this action,

11     which he subsequently dismissed in favor of refiling

12     here.  And National Sourcing, the corporation,

13     realigned with Mr. Valdez.  But again, of the two

14     pending actions, this one was filed first.  The

15     procedural background is a little more complicated

16     than that, but those statements are true.

17          MR. LILLY:  On further clarification on the

18     filings, Your Honor, Valdez filed a case in state

19     court initially against Ms. Tam, Mr. Bracciale, and

20     also NSI that they subsequently 30 days later

21     dismissed.  And they filed an initial federal claim,

22     federal jurisdiction, it was a dec action.  Judge

23     Honeywell dismissed that claim to allow them to

24     refile.  It was during that period of time that

25     Mr. Bracciale and Saint Anton Capital filed the

1      state case.   Thereafter during that time period that

2      Judge Honeywell allowed counsel to refile is when

3      they filed the complaint with this RICO action that

4      is the subject of dismiss.

5          MR. WAGGONER:   I don't think that's quite

6      right, Your Honor, but --

7          THE COURT:   I can take a look at the

8      documents.

9          MR. WAGGONER:   Please do.

10          THE COURT:   All right.   Thank you.

11          MR. DEES:   Counsel mentioned -- put an

12     emphasis on the promissory note which is at issue

13     from 2013, the debt instrument.   Again, that debt

14     instrument was transmitted with the shareholder

15     agreement that expressly says that Greenberg Traurig

16     represents National Sourcing and it was part of a

17     single transaction.

18          And the quote from the email from Mr. Dunker

19     at Greenberg Traurig, "I have prepared the attached

20     documents to effect the transfer of Wolfson's 51

21     shares of NSI to Pedro Valdez."

22          These all traveled together, they were all at

23     the same time.   And of those documents that were

24     transmitted, the only one that has an assertion of

25     who Greenberg represents says that Greenberg

1    represents the corporation at that time.

2         Now, counsel mentioned the subjective

3    understanding of who the firm represents.  And Your

4    Honor asked an astute question with regards to where

5    does that understanding come from.  And the answer

6    was the officers.  And I agree.

7         So one example of NSI's subjective

8    understanding of who represented them would be the

9    representation in the documents themselves from the

10   transaction.  Another example of who NSI could have

11   subjectively and does subjectively understand to

12   have represented them is the payment of Greenberg

13   Traurig's invoices on checks signed by Mr. Valdez

14   and there is a litany of them, including the invoice

15   that would appear to be the invoice for these very

16   documents in April of '13.  So they're paying for

17   these documents as they're receiving them.

18        Another one would be the actual checks

19   themselves signed by Mr. Valdez, an example of which

20   we've included in the document.  And another source

21   of understanding of who represented National

22   Sourcing would be Mr. Bracciale's own testimony and

23   Mr. Dunker represented National Sourcing and

24   Mr. Valdez.  And you need to ask Mr. Valdez of who

25   he subjectively understood represented the

1    corporation because Mr. Bracciale has testified that

2    Mr. Dunker did in connection with at least some

3    transactions.

4        So if the standard is I have to show a

5    subjective understanding of who represented the

6    corporation and they have talked a lot about this

7    engagement letter from 2010, their response was the

8    first I'd heard of this engagement letter, it was

9    the first the current management of the company had

10   heard of this engagement letter.  We've certainly

11   have heard of no conflict, waiver or disclosure.  It

12   would have been awful nice for the corporation to

13   know who was actually represented and whose

14   interests were actually at heart because these

15   transactional documents that are attached are not

16   with Mr. Bracciale or Ms. Tam, they're with Saint

17   Anton Capital; Mr. Wolfson, the former president's

18   resignation from NSI; the shareholder and director

19   meeting minutes for National Sourcing, NSI; the

20   promissory note to Saint Anton; the security

21   agreement in favor of Saint Anton; the stock pledge

22   agreement in favor of Saint Anton.

23       Mr. Bracciale is not made out for signature as

24   a shareholder/director of these meeting minutes.  So

25   this representation that we're suddenly learning

1      about who they represented, it would be inconsistent

2      with both the documents themselves expressly

3      written, the payments being made, the invoices being

4      tendered, Mr. Bracciale directing the company to pay

5      these invoices, the nature of the issues that

6      Greenberg Traurig is looking into.  If I have to

7      show subjective understanding, I certainly have a

8      reasonable basis for this.

9          And if one document from 2010, an engagement

10      letter, and that no one at NSI knows about, is the

11      basis for saying well their understanding was

12      unreasonable, then I have a mountain of contrary

13      evidence, some of which I would -- if the court

14      would entertain it, could present through an

15      evidentiary hearing because I think that this issue

16      is that important.  Mostly because Greenberg Traurig

17      is sitting on a mountain of paper by my estimation

18      that was tendered by my client, National Sourcing,

19      full of confidential information.

20          They can produce and put in the record as much

21      as they want, but I'm sitting here in the dark

22      because the CEOs of this company are tendering them

23      tons of information.  And that's why this motion is

24      to important, that's why we're pressing.  And it's

25      not a tactical play, it's simply because they have

1     more info than I do.  It puts me in a distinct

2     disadvantage and prejudiced in litigating the case.

3           So that's our record that we have for today.

4     We can present far more because we've been digging

5     deep down into archive documents and old hard drives

6     and dusty old boxes to try to find as much as we

7     could and there is more to tell the court which I'll

8     be pleased to do.

9           THE COURT:  Well, nothing has precluded you

10    from filing affidavits, so I don't want to leave the

11    hearing with you saying you have additional

12    information that you could present that you were

13    precluded from presenting that information.

14          MR. DEES:  And I don't think the court is

15    precluding me today if I have to renew the motion as

16    we get into the discovery process.  The reason the

17    motion is filed with as much documentation as we

18    have available which was substantial by my

19    estimation is because we don't want to waive the

20    issue, we want to preserve the issue.  I think by

21    the time we get to the end of the case, we could

22    have a separate trial just on this issue, that's how

23    much documentation we're uncovering.

24          So for today's purposes though, I think there

25    is more than enough and I would submit that to the

1      court.

2              THE COURT:   Thank you, Mr. Dees.

3              Mr. Lilly, anything to add?

4              MR. LILLY:   Yes, Your Honor, I'll be brief.

5      Your Honor, I want to point out a couple of basic

6      facts that I think are of record in the case and may

7      not necessarily jump out immediately just in looking

8      at the pleadings.

9              The promissory notes that are at issue in the

10     complaint that was filed, the amended complaint, and

11     those promissory notes are part of this action

12     that's here before Your Honor, those promissory

13     notes contemplate on their face that they're not

14     going to be paid.   They contemplate on their face

15     that they are going to be satisfied by a taking of

16     the underlying stock.   It is the stock transaction

17     that this lawsuit before Your Honor is about and

18     they have to do with that.   And we're looking at

19     objective or subjective statements by the lawyers

20     who drafted them that they represented National

21     Sourcing Inc.  in connection with the transaction.

22             I believe that Mr. Dees has made the point

23     initially of the objective standard being the

24     standard that would be a higher standard than the

25     subjective standard because under our manner of

1       representation as Florida lawyers, as members of our

2       bar, we are supposed to look out for the interests

3       of opposing parties when they are not represented by

4       counsel particularly in the context of a corporate

5       representation, to make it very clear and to give

6       disclosures to Mr. Valdez, to Mr. Wolfson, et al.,

7       in respect to exactly who it is that we are

8       representing.

9           The representation made on April of 2013 in

10      connection with the transactions, the stock

11      transactions that are squarely at the center of this

12      case, was made by Greenberg Traurig that it

13      represented National Sourcing Inc.  That is the

14      actual representation that was made and the email

15      that is before Your Honor that is part of the motion

16      to disqualify.

17          Secondarily, attached to the motion to

18      disqualify is a sworn statement in open court by

19      Mr. Bracciale who also states in the record before

20      you that he is the sole owner and director of Saint

21      Anton Capital.  He states that in connection with a

22      series of documents he was questioned about,

23      including the promissory notes that are clearly at

24      issue here, including the shareholder agreement if

25      you read through that transcript that's attached, he

1        states that it was his belief that Mr. Dunker

2        represented National Sourcing Inc. and Mr. Valdez

3        and himself.

4            Now, the really critical point that we really

5        haven't discussed yet is that's a judicial estoppel

6        issue.  He now comes before you asking you to take a

7        different position than what his sworn statement was

8        in the court.  Now, I would point that out as part

9        of what we're analyzing.

10           I believe that an evidentiary hearing is

11       appropriate.  I certainly understand that Greenberg

12       Traurig is trying to make an argument that back in

13       2010 it may have told Mr. Stanton, a prior person in

14       Mr. Valdez's shoes, that it did not intend to

15       represent NSI or Mr. Stanton, but that's not what's

16       really said in the papers.  That's something that's

17       trying to be argued today, but I don't see any

18       statement in the papers before you yet that that was

19       stated.

20           But even if it was, the representation clearly

21       morphed because 2010, if you read the engagement

22       letter that they have placed before Your Honor, they

23       say that that engagement letter only relates to the

24       matter they were dealing with in 2010.  They then

25       went on to do a series of additional representations

1    going up through 2014.  There is a statement of

2    record that Mr. Dunker left the firm at the end of

3    2013 but it is belied by the emails sent to his

4    email address in the latter part of 2014.

5           So we have some very significant evidentiary

6    issues that we would like to bring before Your

7    Honor.  This is a very significant issue that has

8    bearing on the case and I believe it does go

9    squarely to the questions at issue before Your Honor

10   in this case.

11          THE COURT:  All right.  Thank you.

12          MR. WAGGONER:  Your Honor, I'll try not to

13   beat a dead horse.  Just a couple points.  The email

14   that relates to these 2013 documents that was

15   referred to, it is Document 25-5 and it's the one

16   that involves the $5.1 million note, it is from Bill

17   Dunker to Steve Bracciale and it's not to anyone

18   else.  And it says, "Steve, per your direction," and

19   then he encloses these various documents.

20          The documents that we're talking about, the

21   promissory note that is at issue, it's not a

22   promissory note that NSI is even a party to, it's a

23   promissory note between Mr. Valdez and

24   Mr. Bracciale.  So I mean, again, NSI is moving to

25   disqualify based on a promissory note that it's not

1     even a party to.

2          And then Mr. Dunker's affidavit that was just

3     referred to in which he talks about the shareholder

4     agreement -- first of all, the shareholder agreement

5     that they talk about, which was prepared in 2013,

6     not even the operative agreement, but the one that

7     was prepared in 2013 Mr. Dunker points out that he

8     was serving in a neutral capacity in drafting that

9     document.  And again, the shareholder agreement has

10    absolutely nothing to do with any of these claims,

11    you don't hear anybody complaining about a provision

12    of the shareholder agreement.

13         So when you bring a serious motion about

14    trying to disqualify a party's counsel and then you

15    walk into court and say gosh, I want to do this, I

16    want to do this, I could have done that, I should

17    have done that -- well, they didn't do any of the

18    things they're supposed to do and they didn't come

19    forward with evidence and they haven't met their

20    burden.  And so Your Honor, respectfully we would

21    request that the motion be denied.  Thank you.

22         MR. DEES:  One sentence, Your Honor, that the

23    email is directed to NationalSourcing.com, the

24    company 's email address and server, to an employee

25    of the company.

```
 1            THE COURT:  There have been statements,

 2      Mr. Dees, and I just want to narrow and clarify this

 3      issue for the record.  Mr. Dees, you mentioned that

 4      you believe that there is sufficient information to

 5      make a decision and that in consideration of all the

 6      material that you have submitted that is sufficient,

 7      you indicated you may need to renew the motion if

 8      needed at a later time, but you are not requesting

 9      an evidentiary hearing.

10      MR. DEES:  An evidentiary hearing could be

11      beneficial, that's why we filed this sworn

12      declaration.  There is quite --

13            THE COURT:  If I have the sworn declaration,

14      then why do I need an evidentiary hearing?

15            MR. DEES:  You could consider the sworn

16      declaration in and of itself.  My understanding --

17      it's a little different in state court, but the

18      court can rule on the papers in federal court on a

19      motion to disqualify.  And if the court would

20      consider that, I think there would be quite a bit

21      more evidence to go through.

22            THE COURT:  I didn't say that I won't consider

23      it, I didn't strike it, I just am not going to have

24      the argument about that today because of just the

25      time that it was filed.
```

```
1            MR. DEES:  Understood.

2            THE COURT:  But I do plan to consider it.  So

3     do you believe an evidentiary -- are you seeking an

4     evidentiary hearing?

5            MR. DEES:  At this time if the court would

6     entertain it, yes, but there is quite a bit more

7     documentation that the court could consider there in

8     this sworn declaration and more than enough to grant

9     the motion or consider the motion.

10           THE COURT:  So you're not seeking one.

11           MR. DEES:  No, I am not on behalf of the

12    company, if the court will consider the sworn

13    declaration.  I suppose it's a conditional --

14           THE COURT:  I did say that I am going to

15    consider it.

16           MR. DEES:  Very good.

17           THE COURT:  So then you're not seeking one.

18           MR. DEES:  Not on behalf of the corporation.

19    My understanding is the individual may wish to,

20    but --

21           THE COURT:  Now, you, Mr. Lilly, did not file

22    a motion and you did not join in the motion, so I'm

23    not going to set an evidentiary hearing based on

24    what your contentions are here in court today, but

25    you certainly are free to file a separate motion,
```

1      you're free to join in that motion.  What do you

2      think is needed additionally in the way of evidence

3      that hasn't already been presented?

4           MR. LILLY:  Your Honor, should I speak from

5      here or to the podium?

6           THE COURT:  Whatever makes you comfortable is

7      fine.

8           MR. LILLY:  I just want to make sure I'm heard

9      on the record, but I think this mic will pick me up.

10          THE COURT:  Yes, it will.

11          MR. LILLY:  Your Honor, what I would like to

12     do, and I certainly intend to join in the motion or

13     file a separate motion, but what I would like to do

14     is to conduct limited discovery.

15          I've been clear on the record here today that,

16     number one, I requested the discovery to be clear, I

17     sent multiple emails to it, I received responses

18     back from Greenberg Traurig, no, we're not going to

19     do that.  We clearly have not yet opened the

20     discovery in this matter.  However, in the state

21     court matter the discovery has opened.  The judge

22     has now ordered Greenberg Traurig to sit for the

23     depositions and I believe that for Your Honor to

24     consider, candidly, the written responses, the

25     affidavits that are before Your Honor in the

1    response, my client should have an entitlement to

2    cross-examine those.

3         We are certainly going to be doing that in the

4    context of depositions that will be taken at least

5    by mid January, but I would like to open the

6    discovery in both matters, at least on the limited

7    issues involving this motion or my joinder in this

8    motion.

9         THE COURT:  All right.  Now, if you have any

10   case, Mr. Lilly, that says that you are entitled to

11   have an evidentiary hearing on this issue, please

12   let me know that by filing a document.

13        Now, also what I heard you say is that you

14   would like to conduct discovery to develop

15   additional information and I take that to mean, and

16   you correct me if I'm wrong, that you don't have any

17   additional information that you would present at

18   this time.

19        MR. LILLY:  Your Honor, at an evidentiary

20   hearing that would include Mr. Dunker being present,

21   I have quite a bit of information to present for

22   today's hearing.

23        THE COURT:  That you would need to conduct

24   discovery to obtain that additional evidence.

25        MR. LILLY:  Your Honor, I would have been

1      happy to do it in live court because I don't think

2      it's going to take more than 45 minutes to elicit

3      what I believe are false statements in the

4      affidavits.

5          I also would like to present evidence through

6      Mr. Bracciale.  I believe that I can get those

7      evidence points through those and I would like to

8      present Mr. Valdez.  Those are the parties that I

9      would like to present.  But we intended -- which of

10     course the state court has opened, we intend to do

11     more discovery than that because there may be more,

12     there may be more issues.  But I believe that those

13     at the very least should be considered at the time

14     of the decision on this particular motion.

15         THE COURT:  All right.  So discovery can't

16     proceed in this case yet until there is that case

17     management meeting, that you all have that case

18     management conference and specify certain dates and

19     then you receive a case management or case

20     scheduling order from Judge Honeywell.

21         So until that occurs, you are really precluded

22     in conducting discovery, so I urge you all to go

23     forward and have that meeting if you would like to

24     conduct that discovery.  And your response does

25     indicate to me that at this time you don't have any

1    additional evidence that you would present, but that

2    if you were able to conduct discovery, you believe

3    that you can develop additional information.

4         Is there anything -- now, you also mentioned,

5    Mr. Waggoner, about the evidentiary hearing.  Let me

6    just have you for the record state your position

7    related to that.

8         MR. WAGGONER:  Your Honor, we believe that on

9    the record before you no evidentiary hearing is

10   required because NSI has not come forward with any

11   evidence to contradict the sworn testimony through

12   Mr. Dunker and Mr. Bracciale's affidavit.  They

13   haven't come forward with the evidence that they

14   would need to show the attorney-client relationship

15   between NSI and Greenberg, nor have they come

16   forward with any evidence to demonstrate a

17   substantial relationship for those incidental work

18   that Greenberg did.

19        The law on the issue is that a court does not

20   need to have an evidentiary hearing to deny a motion

21   for disqualification where there is no conflict of

22   material issues relating to the affidavits that have

23   been submitted and that's the case out of the

24   Southern District, State Farm vs. Kugler, there is a

25   Westlaw site, 2012 Westlaw, 12868733.

1          If the court believes there is a conflict --

2     and again, we don't believe there is a conflict, but

3     if the court does believe there is a conflict in the

4     evidence, then an evidentiary hearing would be

5     required.  But again, they have not submitted any

6     evidence to support their position.

7          So we're not requesting an evidentiary hearing

8     and we believe that the motion should be denied

9     based on the record before Your Honor.

10         THE COURT:  All right.  I did not hear any

11    conflicts in the evidence at this point either.

12         Mr. Lilly, what I will do, given your intent

13    to -- do you plan to join in the motion or do you

14    plan to file a separate motion?

15         MR. LILLY:  Your Honor, I would like to join

16    in the motion and have the opportunity to file.  I

17    do want to be clear, I do believe there are things

18    that I can file now.  However, I believe that it's

19    incumbent upon me as an officer of this court to do

20    a proper investigation.  I'm trying to do that

21    through discovery.  I believe that that's

22    appropriate in this circumstance.  So I have come

23    here today, I would like an opportunity to present

24    evidence in this motion --

25         THE COURT:  You can file -- actually, here's

1        the situation.  You can file your motion whenever

2        you deem it appropriate.  I am not going to hold off

3        on making a decision on the pending motion, however.

4        So because you clearly had notice of it and I was

5        kind of for a moment contemplating whether or not I

6        would wait for you to file a separate motion and

7        then there be additional response, but my thought is

8        that if you plan to file an entirely separate

9        motion --

10            MR. LILLY:  Your Honor, I would prefer to join

11        in this motion and request an evidentiary hearing.

12        That is my preference.  And that is what I am doing

13        today, I am joining in the motion and requesting an

14        evidentiary hearing.

15            THE COURT:  If you would just file just a

16        short document that says that, that would be helpful

17        just for the record.

18            MR. LILLY:  Certainly.

19            THE COURT:  I am not going to grant -- likely,

20        I'll have to take a look at your motion, but it's

21        very unlikely, given at least what you have said

22        here, that I'm going to set the motion for

23        evidentiary hearing because I am hearing you say

24        that you can develop additional evidence but you

25        would be developing that evidence through

1      questioning and cross-examination, not necessarily

2      through documents or discovery that you already

3      have.  So what you're anticipating is that you would

4      conduct additional discovery and then you would have

5      that to use in support of your motion.

6          MR. LILLY:  Your Honor, let me try to be a

7      little more clear.  The affidavit of Mr. Dunker that

8      is before you states that Mr. Dunker left the law

9      firm of Greenberg Traurig in November of 2013.  I do

10     have evidence that that's not true.  I do have

11     evidence I would like to present to Your Honor about

12     that.

13         The problem is the witness who I would need to

14     do that through is adverse to my client.  It is

15     Mr. Dunker himself.  Mr. Dunker himself, I have

16     actual emails from 2014 with his email address at

17     Greenberg Traurig.  I have additional information --

18         THE COURT:  Why can't you file that in an

19     affidavit from your client?

20         MR. LILLY:  From my client?  I could file

21     those in an affidavit from my client, Your Honor, I

22     can do that.  But my client is not necessarily the

23     witness to those emails.  And that's the problem

24     that I face and the reason that I believed it was

25     appropriate to take discovery and the reason that

1    I've asked for that in the state court case and the

2    state court judge has agreed and compelled the

3    discovery.

4         THE COURT:  Whatever evidence that you would

5    like to submit, if you do believe that it is in

6    conflict with the evidence that has already been

7    submitted, submit that in the form of a written

8    document.

9         MR. LILLY:  Yes, Your Honor.

10         THE COURT:  All right.  And then if it does

11   turn out that it appears to conflict with any of the

12   evidence, then I'll have to revisit the view about

13   the need for an evidentiary hearing.

14         When will you file the joinder?

15         MR. LILLY:  Your Honor, we are scheduled to

16   respond to the motion to dismiss one week from

17   today.  I would request an opportunity to file that

18   within 10 days of today.  Your request as to my

19   joinder and my evidence I would file it within 10

20   days of today.  I would normally ask for a week, but

21   I do have to deal with that motion to dismiss that's

22   significant on my plate.

23         THE COURT:  All right.  Given that you are

24   only going to have -- need a short period of time to

25   file that, I will wait until you file that before

1      making any decision, especially considering whether

2      or not it may, as you represent, present some sort

3      of conflicting information.

4           Mr. Waggoner, I presume that you all will then

5      want to respond to that in due course?

6           MR. WAGGONER:  We will, Your Honor, and we

7      also will want to respond to the declaration or

8      affidavit that was submitted on Sunday night.

9      Candidly, there is really not anything new in there,

10     but I think there is probably some clarification

11     because, again, specifics rather than broad brushes

12     is important here and we'll want to respond in order

13     to make sure that that's clear before Your Honor.

14          THE COURT:  And I mentioned that you would

15     have 20 days to respond to that declaration and so

16     at that time you can also respond if Mr. Lilly has

17     filed a separate motion and separate declaration you

18     can include your response.

19          MR. WAGGONER:  That would be fine, Your Honor,

20     thank you.

21          THE COURT:  All right.  Is there anything

22     additional?

23          MR. LILLY:  Nothing at this time, Your Honor.

24          MR. WAGGONER:  Nothing here, Your Honor.

25          THE COURT:  To your recollection we are in

1       recess.

2               (The proceedings adjourned at 11:41 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3    STATE OF FLORIDA            )

4    COUNTY OF HILLSBOROUGH   )

5        I, Lynann Nicely, RMR, CRR, Official Court

6    Reporter for the United States District Court, Middle

7    District, Tampa Division,

8        DO HEREBY CERTIFY, that I was authorized to and

9    did, through use of Computer Aided Transcription,

10   report in machine shorthand the proceedings and

11   evidence in the above-styled cause, as stated in the

12   caption hereto, and that the foregoing pages,

13   numbered 1 through 79, inclusive, constitute a true

14   and correct transcription of my machine shorthand

15   report of said proceedings and evidence.

16       IN WITNESS WHEREOF, I have hereunto set my hand in

17   the City of Tampa, County of Hillsborough, State of

18   Florida, December 15, 2017.

19

20

21          /s/ Lynann Nicely
                 Lynann Nicely, RPR, RMR, CRR, CRC
22               Official Court Reporter

23

24

25
```